# UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAVID M. ROEDER, SUSANNE A. ROEDER, RODNEY SICKMANN, DON COOKE, and MARK SCHAEFER, individually and on behalf of a class of similarly situated individuals, <br><br> *Plaintiffs*, <br><br> v. <br><br> J.P. MORGAN CHASE & CO., successor by merger to CHASE MANHATTAN CORPORATION, and JPMORGAN CHASE BANK, N.A., successor by merger to CHASE MANHATTAN BANK, <br><br> *Defendants*. | Case No. <br><br> CLASS ACTION COMPLAINT <br><br> JURY TRIAL DEMANDED <br><br><br> No. 20-cv-2400 |

Plaintiffs allege as follows:

## I. INTRODUCTION

1.       In 1979 and 1980, the Chase Manhattan Corporation and Chase Manhattan Bank (collectively "Chase"), under Chairman and CEO David Rockefeller, fomented the seizure of American hostages in Iran and then sabotaged the talks to free them. Newly unsealed information reveals that Chase engineered the *casus belli* that triggered the Iran Hostage Crisis: the Shah of Iran's entry to the United States. Chase was warned that its actions on behalf of the Shah, a foreign monarch fleeing a revolution, likely would trigger an attack on the American Embassy in Tehran. But Chase had billions of dollars at stake in Iran and sought to keep the Shah on the throne to protect them.

2.      In the spring of 1979, Chase's senior executive and advisers, led by Chairman and CEO David Rockefeller, entered into an unlawful agreement with the Shah of Iran. Their aim was to defeat the Carter Administration's policy of denying the Shah entry and thereby avoid hostilities with Iranian revolutionaries. Chase called this conspiracy "Project Eagle."

3.      In furtherance of the "Project Eagle" conspiracy, Chase orchestrated the Shah's entry to the United States, induced the U.S. government to rely on its misrepresentations, and then—after the American embassy was seized in retaliation—sabotaged the Iran Hostage Talks.

4.      Acting on behalf of the Iranian monarchy, Chase's Project Eagle team flew the Shah on private jets, arranged his security forces, procured visas and housing for his entourage, and knowingly made false representations to the Carter Administration asserting that the Shah required life-saving surgery that could only be performed in New York. President Carter relied on Chase's misinformation and agreed to admit the Shah for medical treatment.

5.      Iran erupted in rage. Within weeks, Iranian revolutionaries took more than 50 Americans hostage. Plaintiffs and their loved ones were among those hostages. Over a period of 444 days, they were blindfolded, tortured, taunted, and threatened with death.

6.      They would have been freed sooner—but for the actions of Chase. Worried that billions of dollars would be repatriated to Iran as part of a release deal, Chase gathered and spread rumors of payoffs to sabotage President Carter's hostage talks. Chase purposefully delayed the hostages' release until after the Presidential election in November 1980.  As a direct and proximate result of Chase's acts, the hostages languished even longer  in their captors' hands.

7.      For decades, Chase concealed its role in the Hostage Crisis. It failed to register as a foreign agent of the Iranian monarchy under the Foreign Agent Registration Act, 22 U.S.C. §§

611-21. It denied there was ever a campaign to pressure the White House to admit the Shah. And it kept the records of Project Eagle secret.

8.      That secret was finally made public by the *New York Times* on December 29, 2019. Thanks to the *Times'* reporting, Plaintiffs discovered that records of Project Eagle had been held under seal at Yale University until the death of Chase's former Chairman David Rockefeller on March 20, 2017.[1]

9.      Plaintiffs, individually and as representatives of a class of similarly situated persons, bring this action for compensatory and punitive damages arising from the November 1979 seizure of American hostages in Iran.

10.      Plaintiffs seek judgment against the Defendants—the successors by merger of The Chase Manhattan Corporation and Chase Manhattan Bank following their merger with JP Morgan—for conspiracy to injure officers of the United States, 42 U.S.C. § 1985(1); negligence; negligence *per se* for violating the Logan Act, 18 U.S.C. § 953, Foreign Agents Registration Act, 22 U.S.C. §§ 611-21, and  18 U.S.C. § 372; gross negligence; false imprisonment; intentional infliction of emotional distress; and negligent infliction of emotional distress.

11.      Though no remedy can make the hostages and their families whole, Plaintiffs seek compensatory and punitive damages for Chase's deliberate effort to engineer one of the worst betrayals of Americans in our nation's history—all to maximize profit and to support a foreign regime.

## II. THE PARTIES

### *Plaintiffs*

---

[1] David D. Kirkpatrick, "How a Chase Bank Chairman Helped the Deposed Shah of Iran Enter the U.S.," *N.Y. Times*, Dec. 29, 2019, https://www.nytimes.com/2019/12/29/world/middleeast/shah-iran-chase-papers.html (hereinafter "December 29, 2019 NY Times Article").

12.     Plaintiff David M. Roeder, Colonel, United States Air Force, retired, is a citizen of the United States residing in North Carolina. He was the Assistant Air Force Attaché at the Embassy of the United States of America in Tehran ("American Embassy") when he was taken hostage on November 4, 1979.

13.     Plaintiff Susanne A. Roeder is the spouse of former hostage David M. Roeder. She is a citizen of the United States and a resident of North Carolina.

14.     Plaintiff Rodney V. Sickmann is a citizen of the United States, currently residing in Missouri. He was an enlisted marine serving at the American Embassy in Tehran when he was taken hostage on November 4, 1979.

15.     Plaintiff Don Cooke is a citizen of the United States residing in Maryland.  He was a Consular Officer at the American Embassy in Tehran when he was taken hostage on November 4, 1979.

16.     Plaintiff Mark Schaefer was the young son of Colonel Thomas E. Schaefer, the American Defense and Air Attaché at the American Embassy in Tehran, when his father was taken hostage on November 4, 1979. Mr. Schaefer is a citizen of the United States residing in California.

### *Defendants*

17.     The Chase Manhattan Corporation ("Chase Manhattan Corporation I") was originally formed as a holding company in 1969 through the reorganization of Chase Manhattan Bank. David Rockefeller, who was the President of Chase Manhattan Bank from 1960 to 1968, was the Chairman and CEO of Chase Manhattan Corporation I from 1969 to 1981. Joseph Verner Reed, Jr. served as Vice President of Chase Manhattan Corporation I and Assistant to David Rockefeller from 1963 to 1981. Chase Manhattan Corporation I was the holding company of its wholly owned subsidiary Chase Manhattan Bank, N.A.

18.     At all times relevant to this Complaint, Chase Manhattan Corporation I maintained a principal place of business at Two Chase Manhattan Plaza, New York, NY 10081.   Chase Manhattan Bank, N.A. maintained a principal place of business at One Chase Manhattan Plaza, New York, NY 10081. Chairman and CEO David Rockefeller and Vice President Joseph Verner Reed, Jr. maintained offices in New York City, where they carried out a substantial portion of the acts or omissions herein alleged.

19.     On or around March 31, 1996, Chase Manhattan Corporation I merged with the holding company Chemical Banking Corporation through an all-stock deal. Upon consummation of the merger, Chemical Bank Corporation changed its name to the Chase Manhattan Corporation ("Chase Manhattan Corporation II") and maintained the uninterrupted continuation of the now absorbed corporation's business.

20.     On or around December 31, 2000, Chase Manhattan Corporation II merged with the holding company J.P. Morgan & Co. through an all-stock deal and formed Defendant JPMorgan Chase & Co. The combined company retained the Chairman of Chase Manhattan Corporation II as President and CEO.

21.     Defendant JPMorgan Chase & Co. is a financial holding company incorporated in Delaware and with its main office and principal place of business located at 270 Park Avenue, New York, New York 10017. JPMorgan Chase & Co. is the successor by merger to Chase Manhattan Corporation II, successor by merger to Chase Manhattan Corporation I.

22.     Defendant JP Morgan Chase Bank, N.A., doing business as Chase Bank, is the wholly owned commercial banking subsidiary of JP Morgan Chase & Co. It is incorporated in Ohio with its main office at 1111 Polaris Parkway Columbus, OH 43240 United States. JP Morgan

Chase Bank, N.A. is the successor by conversion to JPMorgan Chase Bank, successor by merger to the Chase Manhattan Bank, successor by merger to the Chase Manhattan Bank, N.A.

23.     Throughout this Complaint, Defendants JP Morgan Chase & Co., JP Morgan Chase Bank, N.A., and their predecessor institutions are called collectively the "Chase Defendants."

### III. JURISDICTION AND VENUE

24.     The Court has original jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law.

25.      The Court additionally has original jurisdiction under 28 U.S.C. § 1332(a) because there is complete diversity between the Plaintiffs and Defendants and because the amount in controversy is greater than $75,000.

26.     The Court additionally has original jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because there are more than 100 class members, at least one class member is diverse from Defendants, class members reside throughout the United States, and the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

27.     The Court alternatively has supplemental jurisdiction under 28 U.S.C. § 1367 over all common-law claims of the Plaintiffs and Class Members because they arise from the same facts as the federal claims and form part of the same case or controversy under Article III of the U.S. Constitution.

28.     The Court has personal jurisdiction over the Chase Defendants because, *inter alia*, JPMorgan Chase & Co. and JP Morgan Chase Bank, N.A reside in and/or maintain a general and systematic presence in the State of New York.

29.     The Court alternatively has New York long-arm personal jurisdiction under CPLR § 302(a)(2) because the Chase Defendants' predecessor institutions committed tortious acts in the State of New York.

30.     Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the Southern District of New York.

## IV. FACTUAL ALLEGATIONS

### A. The Iranian Revolution and Flight of the Shah

31.     In January 1979, Islamic fundamentalists in Iran launched an uprising against the secular monarchy of Mohammad Reza Pahlavi, the Shah of Iran and head of the Pahlavi dynasty. The Shah had ruled with an iron fist since 1941, backed by a police state and a Cold War alliance with the United States.

32.     Faced with an uprising, the Shah left Iran for a "winter vacation" in January 1979, piloting his own jet. He left behind a provisional government under a Regency Council intended to preserve the monarchy.[2]  The Shah spent the next 10 months as a king in exile, traveling to Egypt, Morocco, the Bahamas, and Mexico. In the words of former U.S. Secretary of State Henry Kissinger, he was "a flying Dutchman searching for a port of call."

33.     The Shah left President Jimmy Carter in a difficult position. The United States had a strategic relationship with Iran: under the Shah, Iran was a supplier of oil for the world and a bulwark against the neighboring Soviet Union. But U.S. support for the Shah put it at odds with the Iranian revolutionaries who sought control over the country in 1979. The Carter Administration

---

[2] William Branigan, Iranians Jubiland as Shah Departs, *Washington Post*, Jan. 17, 1979, https://www.washingtonpost.com/archive/politics/1979/01/17/iranians-jubilant-as-shah-departs/ec7695d8-3327-43ee-b364-2170e9cacf4b/.

attempted a delicate balance, trying to support the Shah without sparking an anti-American conflagration in Iran.

34.     When the Shah first left Iran for Egypt, the White House invited him to the United States. State Department officials asked the Shah's undisclosed agents—David Rockefeller, then Chairman of Chase Manhattan Bank, and Henry Kissinger, then Chairman of Chase's Board of Advisers—to help coordinate travel arrangements.

35.     Events on the ground, however, led President Carter to rescind the invitation. On February 14, 1979, Iranian revolutionaries armed with machine-guns attacked the American Embassy in Tehran. Dozens of Americans were taken hostage, but were later released on the orders of the Iranian revolutionary leader Ayatollah Khomeini.

36.     The Carter Administration realized that providing safe haven to the Shah would be seen as an act of hostility in Iran. The United States therefore refused to admit the Shah when he requested entry in March 1979. Undersecretary of State for Political Affairs David Newsom reported in a now-declassified cable:

> IN MARCH AND AGAIN ON APRIL 20 WE INFORMED THE SHAH WE HAD HOPED THAT IT WOULD HAVE BEEN POSSIBLE FOR HIM TO COME TO THE U.S. HOWEVER, BECAUSE OF THE UNSETTLED SECURITY CONDITIONS IN IRAN AND OUR CONCERN FOR THE SAFETY OF AMERICANS LIVING IN IRAN, WE RELUCTANTLY CONCLUDED IT WAS IN NEITHER THE SHAH'S INTEREST NOR OURS FOR HIM TO COME HERE.[3]

37.     Carter Administration officials requested that Chase Chairman David Rockefeller convey this message to the Shah and dissuade him from seeking admission to the United States. Rockefeller refused. According to Rockefeller, President Carter's decision to bar the Shah would

---

[3] Declassified Cable from Secretary of State to American Embassy Nassau, STATE 111936, May 22, 1979.

aliene a lucrative client—and be bad for Chase's business: "The risks were too high relating to the CMB [Chase Manhattan Bank] position in Iran."[4]

38.     Chase had financial interests in preserving the Iranian monarchy. It processed billions in dollar-denominated oil revenue for the National Iranian Oil Company. It handled the Shah's family fortune in the Pahlavi Foundation. In 1975, it helped form the International Bank of Iran, in which it owned a 35% share. By 1979, Chase had syndicated more than $1.7 billion in loans for Iranian public projects (the equivalent of about $5.8 billion in 2020). Protecting those business interests meant protecting the Shah.

### B. "Project Eagle" Takes Wing

39.     In or around March 1979, Chase, through its Chairman David Rockefeller and other directors, officers, and agents, entered into an agreement with the Shah of Iran to launch "Project Eagle." This was Chase's code-name for a covert campaign to protect the Shah, secure safe haven for him in the United States, and keep the Pahlavi monarchy on the throne.

40.     Project Eagle's immediate goal was to defeat President Carter's foreign policy decisions regarding Iran. Following the February 14, 1979 attack on the American Embassy in Tehran, President Carter decided to deny admission to the Shah, and thereby avoid provoking further attacks on the U.S. diplomatic mission in Iran. President Carter still held open the possibility of maintaining strategic relations with Iran if the revolutionaries succeeded.

41.     Chase's Project Eagle team included, among others:

- David Rockefeller, Chairman of Chase Manhattan Corporation I;
- Henry Kissinger, Chairman of the Chase Advisory Board;
- Joseph V. Reed, Jr., Vice President of Chase Manhattan Corporation I and Assistant to David Rockefeller;

---

[4] December 29, 2019 N.Y. Times Article.

- John J. McCloy, lawyer to the Shah and Chase Manhattan Corporation I and a former Chairman of Chase Manhattan Bank;
- Robert F. Armao, a public relations agent for the Shah; and
- Benjamin H. Kean, M.D., Joseph Reed's personal physician.

42.     Chase's Project Eagle team provided financial and logistical support to the Shah, as well as lobbying and public relations as the Shah's propagandists. From Chase's headquarters in New York, they orchestrated the Shah's travel, flying him on private jets. They arranged visas for his entourage and searched out private schools and mansions for his family. They brought him to villas in the Bahamas and Mexico and arranged for bodyguards.

43.     Above all, they deceptively pressured the United States government to admit the Shah despite being warned that his presence in the United States likely would trigger another takeover of the American Embassy in Tehran.

44.     Chase and its directors, officers, and agents failed to register with the Department of Justice as agents of a foreign principal within ten days of the initiation of the Project Eagle campaign on behalf of the Shah, as required by the Foreign Agents Registration Act, 22 U.S.C. §§ 611-21.

### C. CHASE WAS WARNED

45.     Chase knew from early on that its actions endangered American diplomats in Iran. Rockefeller told the *New York Times*: "I got a call on March 14, 1979 from David Newsom [President Carter's Undersecretary of State for Political Affairs]. Newsom said they had intelligence reports from Iran which suggested that, if the Shah were admitted to the United States, the American embassy would be taken and it would be a threat to American lives."[5]

---

[5] Terence Smith, "Why Carter Admitted the Shah," *New York Times*, May 17, 1981, https://www.nytimes.com/1981/05/17/magazine/why-carter-admitted-the-shah.html.

46.     Chase knew that Americans in Iran—and specifically American diplomats—were already under attack, suspected by militants of plotting a counter-revolution. After the first attack on the American Embassy on February 14th, 1979, militants in Tabriz set the U.S. consulate ablaze and strung a rope around the neck of the American consul, threatening to hang him. In Isfahan, the American consul was attacked while trying to save a U.S. citizen from a mob.

47.     Chase was alert to these dangers, reducing its staff in Iran to one secretary.[6] Chase also knew that exposing its work for the Shah could risk a backlash. One recently declassified State Department cable noted that "DAVID ROCKEFELLER WOULD LIKE TO MINIMIZE KNOWLEDGE OF HIS OWN INVOLVEMENT IN VIEW OF INTERESTS IN IRAN."[7] But Chase persisted.

### D.  THE EAGLE LANDS: CHASE BRINGS THE SHAH TO AMERICA

48.     In  or around September 28, 1979, Chase Vice President Joseph Reed informed Undersecretary Newsom that the Shah was critically ill in Mexico. Vance cabled the embassy in Tehran to share the news: "ROCKEFELLER HAD SENT HIS PERSONAL PHYSICIAN TO EXAMINE SHAH. REED SAID THAT IF SHAH'S CONDITION WAS SERIOUS, THIS MIGHT BE FOLLOWED BY A REQUEST THAT HE BE ADMITTED TO THE UNITED STATES FOR MEDICAL PURPOSES."[8]

49.     Chase's Project Eagle team sent Dr. Benjamin Kean, Chase Vice President Reed's personal physician, to Mexico to take charge of the Shah's medical care. The Shah had in fact been in treatment for lymphoma since 1974. On or around October 18, 1979, Dr. Kean informed the State Department that without emergency treatment the Shah did not have long to live: "Days yes,

---

[6] Declassified Cable, Iran SITREP No. 82, STATE 005640, Jan. 9, 1979.
[7] Declassified Newsom Cable to American Embassy Rabat, STATE 072876, March 22, 1979.
[8] Declassified Vance Cable to American Embassy Tehran, STATE 256811, September 29, 1979.

weeks probably, months no." Dr. Kean intended to bring the Shah to New York for surgery instead of treating him in Mexico. Chase Vice President Reed contacted the State Department to urge they admit the Shah for life-saving treatment only available in New York. In reality, there was no medical necessity for the Shah to come to the United States.

50.     Acting upon Reed's and Dr. Kean's misrepresentations, U.S. officials recommended that President Carter admit the Shah on humanitarian grounds. On October 21, 1979, at President Carter's weekly foreign affairs breakfast, he debated what to do with his cabinet. Carter maintained that it was against American interests to admit the Shah. But his chief of staff warned that Chase advisor Henry Kissinger would act against him: "Mr. President, if the Shah dies in Mexico, can you imagine the field day Kissinger will have with that? He'll say you caused the Shah's downfall and now you've killed him." President Carter reversed his policy. Project Eagle's pressure campaign had succeeded.

51.     President Carter recalled: "I was told the Shah was desperately ill, at the point of death. I was told that New York was the only medical facility that was capable of possibly saving his life . . . . When all the circumstances were described to me, I agreed."[9] As the meeting ended, President Carter asked his cabinet, "What are you guys going to advise me to do if they overrun our embassy and take our people hostage?"[10]

52.     On the night of October 22, 1979, a Gulfstream II jet chartered by Chase's Project Eagle landed at New York's La Guardia Airport. A motorcade drove the Shah and his Empress into Manhattan, where he was whisked to New York Hospital. Doctors removed his gallstones— a procedure that could have been performed in Mexico.

---

[9] Terence Smith, "Why Carter Admitted the Shah," *New York Times*, May 17, 1981,https://www.nytimes.com/1981/05/17/magazine/why-carter-admitted-the-shah.html.
[10] Quoted in *Newsweek*, Vol. 10, Issues 10-17, p. 94.

53.     The next morning, the Project Eagle team gathered for a celebratory meeting at Chase's offices in New York. "The Eagle has landed," declared Chase Vice President Reed.

### E.  444 Days: The Hostage Crisis

54.     Iranian revolutionaries were enraged by the Shah finding safe haven in the United States—just as Chase had been warned. Furious demonstations erupted in Tehran, calling for the Shah's extradition. Iranian militants saw the Shah's admission to America as an act of hostility to Iran and the first step in a counter-revolution.

55.     On November 4, 1979, a group of armed Iranian militants scaled the walls of the American Embassy compound in Tehran. Thousands of demonstrators poured in after them. The embassy staff held out against the assult for several hours. But the militants captured the embassy and took the Americans hostage. U.S. Chargé d'affaires Bruce Laingen and two other Americans were later seized at the Iranian Foreign Ministry. Of those original 66 hostages, 14 were released over the next year. 52 were held in Iran for 444 days of captivity.

56.     The hostage takers demanded that the United States turn the Shah over to Iran as the price for the release of the hostages. Iran's fundamentalist Supreme Leader the Ayatollah Khomeini declared:

> "These days, whomever one asks about his enemy, he says: My
> enemy is first of all the United States. We demand the return of the
> great criminal Shah from the United States. America must return the
> great criminal Shah from the United States. America must return
> him to us."[11]

---

[11] Bernard Gwertzman, "U.S. Rejects Demand Of Students In Iran To Send Shah Back," *N.Y. Times*, Nov. 6, 1979, https://www.nytimes.com/1979/11/06/archives/us-rejects-demand-of-students-in-iran-to-send-shah-back-sees-little.html.

57.     Throughout their long captivity, the hostages were blindfolded, tortured, taunted, and threatened with death.

58.     On November 4, 1979, Plaintiff Colonel David M. Roeder, U.S. Air Force, retired, was taken hostage along with other Americans at the Embassy, only eight days after his arrival as the newly assigned Assistant U.S. Air Force Attaché. With the determination of a proud second son of a WWII U.S. Army Lieutenant Colonel, Colonel Roeder was determined to put up as much resistance as he could.

59.     During the subsequent 444 days of his capture, he was subjected to various forms of torture, rubber hose beatings, starvation, long solitary confinement, fake firing squads and intense interrogations. His determination was put to the test one day when an interrogator produced a photograph of the schoolbus of Colonel Roeder's severely handicapped and legally blind son. The interrogator threatened to send his son's body parts to his wife unless Colonel Roeder agreed to confess and document that he was an American spy. The interrogator was armed with absolutely correct information on his son's daily activities. Nevertheless, Colonel Roeder refused to comply and upheld his pledge under the Military Code of Conduct.

60.     In November 1980, Colonel Roeder's captors informed him that they had successfully prevented President Carter's reelection. He and the other hostages anticipated that their ordeal would then quickly end. But instead they continued to endure an unexplained incarceration until President Reagan assumed office in mid-January of 1981.

61.     This final extension of their captivity was the ultimate insult to the hostages, who were clinging to hope. It caused and exacerbated lifelong physical and psychological trauma for Colonel Roeder and his fellow hostages, many of whom would go on to suffer premature deaths,

estrangement between spouses and children, and a number of diagnosed and continuing cases of PTSD.

62.    On the day that Colonel Roeder was seized at the embassy, his wife Plaintiff Susanne A. Roeder, was back home in Fairfax County, Virginia, where she cared for their two young children. One of Mrs. Roeder's greatest fears was always to see an official military blue car arrive at the family home with the base commander and chaplain. Those fears reemerged on November 5, 1979, when she learned that the embassy had been overrun.  For weeks, she was left wondering whether her husband was still alive, since he was not seen in any of the Iranian press releases or photographs until Christmas of 1979. Mrs. Roeder and her children suffered through 444 days of fear, loss, and anguish. The toll was made worse by the inexplicable delay in the hostage's release from the fall of 1980 until Inauguration Day in January 1981.  Mrs. Roeder has borne the lifelong psychological trauma caused by her husband's hostage taking and delayed release.

63.    On November 4, 1979, Plaintiff Rodney Sickmann was one of the U.S. marines guarding the embassy. He and the other marines were eventually overpowered by the mob. Mr. Sickmann was taken hostage, blindfolded, and paraded before Iranian demonstrators. He would not be free again until January 21, 1981. Mr. Sickmann was subjected to torture and cruel and degrading treatment. He faced mock executions and death threats. In one instance, his captors forced him to watch videos of Iranian political prisoners being stripped nude by the Shah's secret police, placed against a wall, and shot in the head. They demanded that Mr. Sickmann tell the American government that the Shah must be returned to Iran to answer for the atrocities that had occurred. He refused. Later his captors reenacted the execution videos: they stripped him, stood

him up against a wall, and put a rifle to the back of his head. To this day, Mr. Sickmann bears the life-long effects of the physical and mental suffering he endured.

64.     On the day of the takeover of the embassy, Plaintiff Don Cooke was working as a Consular Officer adjudicating visas. Soon after arriving, the Embassy compound was surrounded by hundreds of thousands of protesters. A group of protestors wearing shirts bearing the likeness of Ayatollah Khomeini swarmed the embassy compound, surrounded the building and tried to break in. Mr. Cooke and the other embassy staff were ordered to evacuate and were turned back when a Revolutionary Guardsman fired shots over their heads.

65.     Mr. Cooke was taken hostage. His captivity was marked by chaos and uncertainty. The only word from the hostages' guards was that they would be let go, "When the Shah was sent back." Over the months that followed, Mr. Cooke was transported, blindfolded, around the country until he finally ended up in one of Tehran's notorious prisons. His captors subjected him to mock firing squads and solitary confinement, and forced him to hear other prisoners being beaten and tortured. For months at a time, he would hear nothing from his family, knowing that they were desperately trying to contact him.

66.     Mr. Cooke has never been the same. Every mention of Iran in the news brings him back to that terrible time. He bears the lifelong trauma of his physical and mental ordeal, and the loss of time and opportunities he can never recover.

67.     On November 4, 1979, Plaintiff Mark Schaefer's father, Colonel Thomas Schaefer, was serving as the U.S. Defense Attaché and Air Force Attaché when the embassy was overrun and he was taken hostage. The assault on the embassy came as little surprise. Colonel Schaefer and Bruce Laingen, the chargé d'affaires, had issued warnings to the government about serious risks to the security of the American Embassy and staff if the Shah were allowed to the enter the

country. Mr. Laingen communicated his concerns to the State Department and Colonel Schaefer to the Department of Defense. Their concerns were based in part on the February 14, 1979 armed takeover of the American Embassy by Iranian militants. Colonel Schaefer, present at the time of the February takeover, warned of the vulnerability of the embassy and of the likelihood of another takeover should the Shah be allowed to enter the United States.

68.     Colonel Schaefer showed defiance from the start. In November 1979, he went on a hunger strike for five days, only eating after his captors put a plate of spaghetti in front of him and a machine gun to his head. Colonel Schaefer was interrogated for 8 to 12 hours per day over the 15-day period from January 28 to February 13, 1980 in an unheated basement room. It was nearly freezing during the winter months. He wrapped himself in toilet paper from the bathroom to try to keep warm. His captors kept him in solitary confinement for more than three months.

69.     His father's ordeal had a traumatizing impact on Mr. Schaefer. Like other hostage family members, he experienced prolonged stress throughout the hostage taking, unsure of the condition and treatment of his father. This constant uncertainty fueled anxiety, depression, and a sense of helplessness. The hostage taking had a broad range of emotional impacts on family members. The militants and Iranian officials regularly provided false and misleading information about the condition of the hostages. The emotional distress of family members was exacerbated by the refusal of the militants and Iranian officials to allow the hostages to communicate with non-Iranian government officials or access to independent health care providers. News reports about the hostages being tortured and mistreated only intensified the anxiety.

### F.  Chase Conspires to Sabotage the Hostage Talks

70.     The Carter Administration worked to free the hostages throughout the 444 days that they were held captive. On November 14, 1979, President Carter signed Executive Order 12170

freezing all Iranian assets in the United States and in U.S. banks. The Order authorized banks to use Iranian deposits to satisfy debts owed by Iran to those banks.

71.     Later, on April 24, 1980, the United States launched operation Eagle Claw, a rescue mission that failed when a helicopter crash killed eight service members. In addition, the Carter Administration pursued hostage release negotiations with the newly established Islamic Republic of Iran (the "Hostage Talks").

72.     Chase had a direct financial interest in the outcome of the Hostage Talks. The country of Iran owed Chase more than $300 million. Chase sought to collect on those debts from Iranian assets deposited outside of Iran. As part of that effort, it transferred the dollar balances of the Iranian Central Bank's deposits in London to New York, sparking litigation with Iran's central bank.[12]

73.     The Hostage Talks threatened to undermine Chase's efforts to use Iranian foreign assets to pay off Iran's debts. The Islamic Republic of Iran was demanding the repatration of billion of dollars of funds deposited in foreign banks—notably Chase—under the Shah's regime.

74.     Against the backdrop of the Hostage Talks, Chase continued to pursue Project Eagle's goal of keeping the Shah's Pahlavi dynasty as the rulers of Iran. The Shah himself died of cancer on July 27, 1980. Yet even after his death, Chase continued to push for a counter-revolution to maintain the monarchy.

75.     Meanwhile, the Hostage Talks continued throughout 1980. As the November 1980 presidential elections approached, Chase grew concerned that President Carter would achieve what it labeled an "October Surprise" and secure the hostages' release before the elections.

---

[12] When Bank Markazi, the Central Bank of Iran, sued in the United Kingdom to recover the transferred deposits, Chase moved unsuccessfully to enjoin their transfer in the United States. *Chase Manhattan Bank v. State of Iran*, 484 F. Supp. 832 (S.D.N.Y. 1980) (motion for injunction denied on February 15, 1980).

76.     In 1980, Chase's Project Eagle team entered into an unlawful agreement to sabotage the Hostage Talks and delay the release of the American hostages. The Chase team and its collaborators gathered and spread rumors about possible payoffs to win the release, a propaganda effort that Carter administration officials acknowledged impeded talks to free the captives.

77.     After Ronald Reagan won the 1980 presidential election, Chase lobbied the incoming administration to ensure that its Iran policies protected the bank's financial interests. Chase Chairman David Rockefeller advocated for a restoration of the Pahlavi monarchy. As late as December 1980, Rockefeller urged the Reagan transition team to encourage a counter-revolution by stopping "rug merchant type bargaining" for the hostages and taking military action. That same month, the Speaker of the Iranian Parliament demanded $24 billion for the release of the hostages.

78.     The hostage release was delayed until Inauguration Day, January 20, 1981. Days later, President Carter's departing White House counsel called David Rockefeller to ask how the release deal affected Chase. "Worked out very well," Rockefeller replied according to his records. "Far better than we feared."

79.     Writing at the time, Chase Vice President Joseph Reed described Chase's effort to discourage and delay a hostage release deal. "I had given my all," he wrote, to thwarting any effort by the Carter officials "to pull off the long-suspected 'October surprise.'"

80.     As a direct and proximate result of Chase's sabotage of the Hostage Talks, the hostages were subjected to further prolonged captivity and torture. Chase purposefully and maliciously forced the hostages to languish even longer in their captors' hands.

### G.  December 29, 2019: Project Eagle is Finally Revealed

81.    Chase and the Project Eagle conspirators deliberately concealed their role in causing, contributing to, and prolonging the hostages' captivity. They failed to register as foreign agents of the Shah under the Foreign Agent Registration Act. They also denied trying to defeat President Carter's policy of caution. For example, Rockefeller claimed that aside from a side comment at an April 1979 meeting involving President Carter, he "did nothing more publicly or privately to influence the administration's thinking."[13] Moreover, they misrepresented their financial interest in the Shah's dynasty. For example, Rockefeller told the *New York Times* in 1981: "There may have been small accounts of convenience, but they had no real significance."[14]

82.    Chase and the Project Eagle conspirators concealed their unlawful actions because they feared the repercussions. Minutes from an August 1980 dinner meeting in New York make this clear: Rockefeller and members of the Project Eagle team discussed concerns that Chase's link to the Embassy seizure would become known. The minutes noted that the Shah had been admitted because of "Medical treatment/DR recommended," using Rockefeller's initials. "This association cannot be ignored." Chase adviser Henry Kissinger reassured Rockefeller that Congress would never conduct an investigation during an election year. "I don't think we're in trouble anymore, David," Kissinger said.

83.    Chase's concealment of its role continued for decades. Vice President Joseph Reed donated secret records of Project Eagle to Yale University. To protect his patron, Reed stipulated that the records remain sealed until Rockefeller's death. Yale University held the records under seal until Rockefeller died on March 20, 2017.

---

[13] December 29, 2019 NY Times Article.
[14] Terence Smith, "Why Carter Admitted the Shah," *New York Times*, May 17, 1981, https://www.nytimes.com/1981/05/17/magazine/why-carter-admitted-the-shah.html.

84.     Plaintiffs and Class Members first discovered the details of Chase's decisive role in causing their injuries on the December 29, 2019, when the *New York Times* published an investigative report on the now unsealed archives of Project Eagle.[15]

## V. CHOICE OF LAW

85.     The law of New York governs Plaintiffs' and Class Members' common law claims.

86.     At all relevant times, the principal place of business of the Chase Defendants was in Manhattan. This was the "nerve center" of their business activities—the place where Chairman and CEO David Rockefeller and other high-level officers directed, controlled, and coordinated Chase Bank's activities, including the Project Eagle conspiracy.

87.     New York has significant sovereign interests in regulating the conduct of banks and holding companies operating within its borders, including the Chase Defendants. New York has a greater interest in the nationwide claims of Plaintiffs and Class Members than any other state or commonwealth because the Defendants' corporate decisions were made from and in New York. In addition, Defendant's breaches of duty owed to Plaintiffs and class members emanated from New York. And the initial object of the conspiracy—the admission of the Shah—was consummated in New York.

88.     Application of New York law with respect to Plaintiffs' and Class Members' claims would be neither arbitrary nor fundamentally unfair because New York has significant contacts and a significant aggregation of contacts that create a state interest in the claims of Plaintiffs and Class Members.

89.     Under choice of law principles applicable to this action, the common law of New York should apply to the nationwide common-law claims of all Class Members given New York's

---

[15] December 29, 2019 NY Times Article.

significant interest in regulating the conduct of businesses operating within its borders.  Plaintiffs are therefore pleading nationwide claims based upon New York law.

90.     Alternatively, additional factual analysis is necessary in order to determine which state's law should apply to the claims of the Class Members. Accordingly, it would be inappropriate to determine choice of law at the pleadings stage of this case.

## VI. CLASS ALLEGATIONS

91.     All Plaintiffs bring this suit as a class action pursuant to Rules 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and a Class composed of all Americans taken hostage from the American Embassy in Tehran or from the Iranian Foreign Ministry in 1979 (the "Hostages"), including the Hostages' estates and successors, and the Hostages' immediate family members at the time, including those family members' estates and successors.

92.     Class membership is readily ascertainable as it only requires identifying the hostages taken at the American Embassy in Tehran and the Iranian Foreign Ministry in 1979 and their immediate family members.

93.     Plaintiffs reserve the right to modify or amend the definition of the proposed Class or to create subclasses before the Court determines whether certification is appropriate.

**General Class Allegations**

94.     *Numerosity*: On information and belief, there are more than 140 members of the proposed Class composed of the Hostages and their immediate family members at the time, including their estates or successors. Therefore, the Class is sufficiently numerous such that joinder of all members of the Class in a single action is impracticable.

95.     *Commonality:* There are numerous common questions of law and fact including, but not limited to:

a) Whether Chase and other participants in Project Eagle acted as the foreign agents of the Shah of Iran and/or the Pahlavi monarchy in 1979 and 1980;

b) Whether, as a foreign agent of the Shah of Iran and/or the Pahlavi monarchy, Chase owed a legal duty to the Class under Article 29 of the Vienna Convention on Diplomatic Relations to respect the inviolability of the Hostages, who were American diplomatic agents;

c) Whether Chase breached a legal duty to the Class when it orchestrated the Shah's entry to the United States, provided false information to the United States government on his behalf, and sabotaged the Hostage Talks;

d) Whether Chase's affirmative acts or omissions were substantial factors that caused, contributed to, exacerbated, and/or prolonged the Hostages' captivity and the resulting injuries to the Class;

e) Whether the injuries to the Class were foreseeable by Chase;

f) Whether Chase conspired with persons known or unknown to sabotage the Hostage Talks and thereby injure the hostages while they were engaged in the lawful discharge of their duties as diplomatic agents of the United States in violation of 18 U.S.C. § 372 and 42 U.S.C. § 1985;

g) Whether the Class members are part of the class protected by 18 U.S.C. § 372;

h) Whether Chase carried out any correspondence or intercourse with the Shah of Iran or any other foreign government or officer or agent thereof, with intent to defeat the measures of the United States, in violation of the Logan Act, 18 U.S.C. § 953;

i) Whether the Class members are part of the class protected by 18 U.S.C. § 953;

j) Whether Chase acted as an unregistered agent of a foreign principal in violation of the Foreign Agents Registration Act, 22 U.S.C. §§ 611-621;

k) Whether the Class members are part of the class protected by 22 U.S.C. §§ 611-621;

l) Whether Chase's sabotage of the Hostage Talks was intended to prolong the confinement of the hostages against their will and that such confinement was not otherwise privileged;

m) Whether Chase's conduct was so shocking and outrageous that it is liable to the Class for their resulting emotional distress;

n) Whether Chase acted with reckless or depraved indifference to the lives and safety of the diplomatic agents of the United States in Iran, including the Class; and

o) Whether Chase's conduct was willful, wanton, malicious, or outrageous and warrants punitive damages.

96. *Typicality*: The legal claims of named Plaintiffs are typical of the legal claims of other Class Members. Named Plaintiffs have the same legal interests and need for legal remedies as other Class, since all injuries to the Class arise from the same transaction or occurrence: the hostage taking in Iran in November 1979.

97. *Adequacy of Representation*: Named Plaintiffs are adequate representatives of the Class in which they participate, and together with their legal counsel, each will fairly and adequately protect the interests of Class Members. Named Plaintiffs have no known conflict with the Class and are committed to the vigorous prosecution of this action. Moreover, all Class

members share a common cause of damages and theory of harm: Chase's causing, contributing to, and prolonging the hostages' captivity.

98.     The undersigned counsel are competent counsel experienced in class action litigation, mass torts, human rights, and terrorism litigation.  Counsel will fairly and adequately protect the interests of the Class.

99.     **_Predominance:_** The questions of law and fact common to the members of the Class predominate over any questions that might require individualized determination.

100.     **_Superiority:_** A class action is superior in this case to other methods of dispute resolution.  The Class Members have an interest in class adjudication rather than individual adjudication because of their overlapping rights.  It is highly desirable to concentrate the resolution of these claims in this single forum because it would be difficult and highly unlikely that the affected Class Members would protect their rights on their own without this class action case. Management of the class will be efficient and far superior to the management of more than 100 individual lawsuits, which would be expensive, time consuming, and taxing of judicial resources. Accordingly, Plaintiffs' legal claims are properly certified pursuant to Rule 23(b)(3).

101.     The issues particularly common to the Class Members' claims, some of which are identified above, are alternatively certifiable pursuant to Federal Rule of Civil Procedure 23(c)(4), as resolution of these issues would materially advance the litigation, and class resolution of these issues is superior to repeated litigation of these issues in separate trials.

## VII. GENERAL ALLEGATIONS

102.     Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

103.     At all relevant times, the predecessors of Defendants committed the acts, caused or directed others to commit the acts, or conspired with or permitted others to commit the acts alleged

in this Complaint. Any allegation about acts of the corporate defendants means that those acts were committed through their officers, directors, employees, agents, and/or representatives while those individuals were acting within the actual or implied scope of their authority.

104.    At all times relevant to this Complaint, Chase Manhattan Bank acted as the agent of its parent, Chase Manhattan Corporation I.

105.    Defendants JP Morgan Chase & Co. and its subsidiary JP Morgan Chase Bank, N.A. are the successors by merger of Chase Manhattan Corporation II and its subsidiary Chase Manhattan Bank, respectively. They assumed all liabilities of Chase Manhattan Corporation I and Chase Manhattan Bank and are directly and/or vicariously liable for all acts or omissions alleged in this Complaint.

106.    Plaintiffs' and Class Members' claims accrued on December 29, 2019 when the *New York Times* first revealed that the records of Project Eagle had been kept under seal at Yale University in March 2017, and revealed publicly the contents of those records. By virtue of the *New York Times* article, Plaintiffs came into possession of the critical facts revealing that Chase inflicted injuries upon them and the details of how and why it did so.

## COUNT I

## CONSPIRACY TO IMPEDE OR INJURE AN OFFICER OF THE UNITED STATES

## 42 U.S.C. § 1985(1)

107.    Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

108.    In 1979 and 1980, Chase conspired with persons known and unknown, in the United States, to prolong the captivity of the Iran hostages and thereby injure Plaintiffs and Class Members while they were engaged in the lawful discharge of their duties as U.S. diplomatic agents in Iran. Chase and other participants in Project Eagle committed overt acts in furtherance of this conspiracy.

These acts included disseminating false rumors about the Carter Administration's negotiations that were intended to, and did actually, sabotage and impede the Hostage Talks and delay the release of the Hostages. This conspiracy was in violation of 42 U.S.C. § 1985(1).

109.    As a direct and proximate result of Chase's acts or omissions in furtherance of this conspiracy, Plaintiffs and Class Members were harmed and have suffered damages, including loss of consortium and solatium, as described herein.

110.    The Chase Defendants are liable to Plaintiffs and Class Members under the statutory right of action provided by 42 U.S.C. § 1985(3).

111.    Chase's actions were deliberate, malicious, wanton, reckless, and show conscious indifference and utter disregard of their effect upon the lives, safety, and rights of others. The Chase Defendants are therefore liable to Plaintiffs and the Class for compensatory and punitive damages.

## COUNT II

### NEGLIGENCE

112.    Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

113.    From January 16, 1979 until at least January 20, 1981 Chase and its directors, officers, consultants, agents, and co-conspirators, including Chairman and CEO David Rockefeller and Vice President Joseph Verner Reed, acted as the foreign agents of the Shah of Iran and/or the Iranian monarchy.

114.    The Shah of Iran was the head of state of Iran under the Iranian Constition of 1906.

115.    Iran ratified the Vienna Convention on Diplomatic Relations on February 3, 1965.

116.    As a foreign agent acting doing the business of the Shah and/or Iranian monarchy, Chase owed Plaintiffs and Class Members a duty of care under Article 29 of the Vienna

Convention on Diplomatic Relations to respect the inviolability of American diplomatic agents, to refrain from subjecting such agents to "any form of arrest or detention," and to "take all appropriate steps to prevent any attack on . . . [the] person, freedom, or dignity" of such agents. Accordingly, Chase owed a duty to Plaintiffs and Class Members, as internationally protected persons, to carry out the business of the Shah of Iran in conformity with Article 29 and other applicable provisions of the Vienna Convention on Diplomatic Relations.

117.   In addition, Chase owed Plaintiffs and Class Members a duty of care when it affirmatively undertook the rescue of the Shah of Iran and knew or reasonably should have known that this rescue would create and exacerbate a dangerous situation likely to injure Plaintiffs and Class Members.

118.   Chase knew or should have known that its wrongful acts and omissions would result in harm and damages in the manner set forth herein. Indeed, it was specifically warned that this would be the natural and foreseeable consequence of its actions.

119.   Chase breached its duties when it orchestrated the Shah's entry to the United States, induced the U.S. government to rely on its misrepresentations, and then sabotaged the Iran Hostage Talks.

120.   As a direct and proximate result of Chase's acts or omissions, Plaintiffs and Class Members were harmed and have suffered damages, including loss of consortium and solatium, as described herein.

121.   Chase's actions were deliberate, malicious, wanton, reckless, and show conscious indifference and utter disregard of their effect upon the lives, safety, and rights of others. The Chase Defendants are therefore liable to Plaintiffs and the Class for compensatory and punitive damages.

## COUNT III

### NEGLIGENCE PER SE

### VIOLATIONS OF THE LOGAN ACT, 18 U.S.C. § 953

122.     Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

123.     Under the Logan Act, 18 U.S.C. § 953, Chase owed statutory duties to Plaintiffs and Class Members to refrain from carrying on any correspondence or intercourse with any foreign government or any officer or agent thereof, with intent to defeat the measures of the United States.

124.     As diplomatic agents of the United States, and their immediate relatives, Plaintiffs and Class Members were within the class of persons protected by the Logan Act's prohibition on private intercourse with foreign powers intended to defeat the measures of the United States.

125.     The Shah of Iran was the head of state of Iran under the Iranian Constitution of 1906. At no time prior to his death on July 27, 1980 did the Shah abdicate his role as head of state. The Iranian monarchy continued to assert sovereignty.

126.     Chase repeatedly carried on correspondence and intercourse with the Shah from sometime in or around February 1979 until July 27, 1980, with the intent to defeat the measures taken by the United States to deny safe haven to the Shah and thereby avoid provoking attacks on the U.S. diplomatic mission in Iran.

127.     Chase's correspondence and intercourse with the Shah violated the Logan Act and breached Chase's statutory duties owed to Plaintiffs and Class Members.

128.     The Logan Act defines the standard of conduct and due care that reasonable persons must observe in their correspondence or intercourse with foreign powers. By violating the Logan Act, Chase was negligent *per se* under the common law of the State of New York.

129.    Chase knew or reasonably should have known that its conduct in violation of the Logan Act could, and would, cause foreseeable harm, damage, and/or personal injuries to Plaintiffs and Class Members by provoking hostilities with Iranian revolutionaries.

130.    As a direct and proximate result of Chase's acts or omissions, Plaintiffs and Class Members were harmed and have suffered damages, including loss of consortium and solatium, as described herein.

131.    Chase's actions were deliberate, malicious, wanton, reckless, and show conscious indifference and utter disregard of their effect upon the lives, safety, and rights of others. The Chase Defendants are therefore liable to Plaintiffs and the Class for compensatory and punitive damages.

**COUNT IV**

**NEGLIGENCE PER SE**

**VIOLATIONS OF 18 U.S.C. § 372**

132.    Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

133.    Under 18 U.S.C. § 372, Chase owed a statutory duty to Plaintiffs and Class Members not to conspire to impede or injure an officer of the United States while engaged in the lawful discharge of the duties of his office.

134.    As diplomatic agents of the United States, and their immediate relatives, Plaintiffs and Class Members were within the class of persons protected from conspiracies to impede or injure officers under 18 U.S.C. § 372.

135.    In 1979 and 1980, Chase conspired with persons known and unknown, in the United States, to prolong the captivity of the Iran hostages and thereby injure Plaintiffs and Class Members while they were engaged in the lawful discharge of their duties as the United States diplomatic mission

in Iran. Chase and other participants in Project Eagle committed overt acts in furtherance of this conspiracy. These acts included disseminating false rumors about the Carter Administration's negotiations that were intended to, and did actually, sabotage and impede the Hostage Talks and delay the release of the Hostages.

136.    18 U.S.C. § 372 defines the standard of conduct and due care that reasonable persons must observe in their treatment of officers of the United States who are lawfully discharging their duties . By violating 18 U.S.C. § 372, Chase was negligent *per se* under the common law of the State of New York.

137.    Chase knew or reasonably should have known that its conspiracy to impede or injure officers of the United States could, and would, cause foreseeable harm, damage, and/or personal injuries to Plaintiffs and Class Members by prolonging the Hostages' captivity.

138.    As a direct and proximate result of Chase's acts or omissions, Plaintiffs and Class Members were harmed and have suffered damages as described herein.

139.    Chase's actions were deliberate, malicious, wanton, reckless, and show conscious indifference and utter disregard of their effect upon the lives, safety, and rights of others. The Chase Defendants are therefore liable to Plaintiffs and the Class for compensatory and punitive damages.

## COUNT V

## NEGLIGENCE PER SE

## VIOLATIONS OF THE FOREIGN AGENTS REGISTRATION ACT, 22 U.S.C. §§ 611-621

140.    Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

141.    Under the Foreign Agents Registration Act ("FARA"), 22 U.S.C. §§ 611-621, Chase owed a statutory duty to Plaintiffs and Class Members not to act as agents of the Shah and/or Iranian

monarchy without registering as foreign agents with the U.S. Department of Justice and revealing their work on behalf of the Shah to the public.

142.    FARA was designed to protect the officers and institutions of the United States government from covert foreign influence by requiring foreign propagandists to disclose their political or public relations activities in the United States. As diplomatic officers of the United States, and their immediate relatives, Plaintiffs and Class Members were within the class of persons protected from unregistered foreign propagandists under 22 U.S.C. §§ 611-621.

143.    At all relevant times relevant to this Complaint, the Shah of Iran and other members of the Iranian monarchy were foreign principals as defined in 22 U.S.C. § 611(b).

144.    Beginning in or around March 1979 and continuing until the Shah of Iran's death on July 27, 1980, Chase acted at the order or request of the Shah of Iran, a foreign principal, to engage in political activities in the United States and carry out public relations designed to influence the American public.  These activities included pressuring U.S officials to admit the Shah to the United States and making false representations to U.S. officials about the Shah's health condition and purported need for care only available at U.S. facilities.

145.    FARA defines the standard of conduct and due care that reasonable persons must observe when acting on behalf of foreign principals. Under FARA, no person is permitted to act as an agent of a foreign principal unless he files a registratioin with the U.S. Department of Justice within ten days of becoming such an agent. Chase and the Project Eagle conspirators failed to file a FARA registration within the 10 days of becoming an agent of the Shah, a foreign principal. By violating 22 U.S.C. § 612, Chase was negligent *per se* under the common law of the State of New York.

146.     Chase knew or should have known that by engaging in covert foreign propaganda it would conceal material information from the United States government that was likely to affect the foreign policy decisions of the President and cause foreseeable harm to officers and institutions of the United States in Iran, including Plaintiffs and Class Members.

147.     As a direct and proximate result of Chase's acts or omissions as a foreign propagandist, Plaintiffs and Class Members were harmed and have suffered damages, including loss of consortium and solatium, as described herein.

148.     Chase's actions were deliberate, malicious, wanton, reckless, and show conscious indifference and utter disregard of their effect upon the lives, safety, and rights of others. The Chase Defendants are therefore liable to Plaintiffs and the Class for compensatory and punitive damages.

## COUNT VI

### GROSS NEGLIGENCE

149.     Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

150.     As pled in the preceding paragraphs, Chase owed common law and statutory duties to Plaintiffs and Class Members to exercise reasonable care.

151.     Chase breached its duties when it orchestrated the Shah's entry to the United States, induced the U.S. government to rely on its misrepresentations, and then sabotaged the Iran Hostage Talks.

152.     Chase was specifically warned by U.S. government officials that its affirmative actions could, and would, provoke hostilities with Iranian revolutionaries and cause foreseeable harm, damage, and/or personal injuries to Plaintiffs and Class Members.

153.    In defiance of these specific and repeated warnings, Chase persisted in Project Eagle's goal of securing safe haven for the Shah in the United States, supporting the Pahlavi monarchy, and ultimately sabotaging the Iran Hostage Talks during the Carter Presidency. Chase's unlawful actions evinced a reckless disregard for the rights of Plaintiffs and Class Members and depraved indifference to the lives and safety of American diplomats in Iran.

154.    As a direct and proximate result of Chase's acts or omissions, Plaintiffs and Class Members were harmed and have suffered damages, including loss of consortium and solatium, as described herein.

155.    Chase's actions were deliberate, malicious, wanton, reckless, and show conscious indifference and utter disregard of their effect upon the lives, safety, and rights of others. The Chase Defendants are therefore liable to Plaintiffs and the Class for compensatory and punitive damages.

## COUNT VII

### FALSE IMPRISONMENT

156.    Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

157.    As pled herein, Chase carried out acts that were intended to sabotage the Iran Hostage Talks and prolong the confinement of  Hostage Plaintiffs and Class Members. Chase's actions were substantial factors in causing the confinement of Hostage Plaintiffs and Class Members. The Hostage Plaintiffs and Class Members were held against their will and were painfully conscious of their confinement.

158.    Chase had no privilege to cause, contribute to, or prolong the confinement Hostage Plaintiffs and Class Members. To the contrary, their confinement was a violation of U.S. law and a violation of *jus cogens* norms protecting diplomats under international law.

159.    As a direct and proximate result of Chase's intentional prolonging of the Hostages' confinement, Plaintiffs and Class Members were harmed and have suffered damages, including loss of consortium and solatium, as described herein.

160.    Chase's actions were deliberate, malicious, wanton, reckless, and show conscious indifference and utter disregard of their effect upon the lives, safety, and rights of others. The Chase Defendants are therefore liable to Plaintiffs and the Class for compensatory and punitive damages.

**COUNT VIII**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

161.    Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

162.    As pled herein, Chase carried out acts that were intended to sabotage the Iran Hostage Talks and prolong the confinement of  Hostage Plaintiffs and Class Members.

163.    Chase knew with substantial certainty that by prolonging the hostages's captivity it would inflict severe emotional distress on the Hostage Plaintiffs and Class Members and on the Hostage Family-Member Plaintiffs and Class Members.

164.    Chase's actions towards the hostages was so outrageous and shocking that it exceeded all reasonable bounds of decency.

165.    Chase's actions were substantial factors in causing, exacerbating, and/or prolonging the confinement of Hostage Plaintiffs and Class Members and all resulting harm. As a direct and proximate result of Chase's actions, Plaintiffs and Class Members suffered severe and prolonged emotional distress, including exteme anxiety, depression, and trauma with life-long consequences.

166.     Chase's actions were deliberate, malicious, wanton, reckless, and show conscious indifference and utter disregard of their effect upon the lives, safety, and rights of others. The Chase Defendants are therefore liable to Plaintiffs and the Class for compensatory and punitive damages.

**COUNT IX**

**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

167.     Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

168.     As pled herein, Chase owed a duty of care to Plaintiffs and Class Members.

169.     Chase knew or should have known that its wrongful acts and omissions would subject Plaintiffs and Class Members to emotional distress in the manner set forth herein. Indeed, it was specifically warned that this would be the natural and foreseeable consequence of its actions.

170.     Chase breached its duty of care when it orchestrated the Shah's entry to the United States, induced the U.S. government to rely on its misrepresentations, and then sabotaged the Iran Hostage Talks.

171.     All Plaintiffs and Class Members were direct victims of Chase's wrongful acts and omissions.

172.     Chase's actions were substantial factors in causing, exacerbating, and/or prolonging the confinement of Hostage Plaintiffs and Class Members and all resulting harm. As a direct and proximate result of Chase's actions, Plaintiffs and Class Members suffered severe and prolonged emotional distress, including exteme anxiety, depression, and trauma with life-long consequences.

173.     Chase's actions were deliberate, malicious, wanton, reckless, and show conscious indifference and utter disregard of their effect upon the lives, safety, and rights of others. The

Chase Defendants are therefore liable to Plaintiffs and the Class for compensatory and punitive damages.

*     *     *

## DEMAND FOR JURY TRIAL

Plaintiffs, individually and on behalf of the Class Members, hereby demand a trial by jury as to all issues so triable as a matter of right.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs, on behalf of themselves and all others similarly situated demand upon Defendants jointly and severally for:

      a.     an order certifying the case as a class action;

      b.     an order certifying the Class;

      c.     an order appointing Plaintiffs as the Class Representatives of the Class;

      d.     an order appointing undersigned counsel and their firms as counsel for the Class;

      f.     compensatory damages, in an amount to be determined at trial;

      g.     punitive damages, in an amount to be determined at trial;

      h.     pre- and post-judgment interest as allowed by law;

      j.     an award of attorneys' fees as allowed by law;

      k.     an award of taxable costs; and

      l.     any and all such further relief as this Court deems just and proper.

Dated: March 18, 2020                          Respectfully submitted,


By:  /s/ *Brent W. Landau*

Brent W. Landau (BL0123)
**HAUSFELD LLP**
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Tel: (215) 985-3270
Fax: (215) 985-3271
blandau@hausfeld.com

Walter D. Kelley, Jr.*
Scott A. Gilmore*
**HAUSFELD LLP**
1700 K Street, NW, Suite 650
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201
wkelley@hausfeld.com
sgilmore@hausfeld.com


V. Thomas Lankford, Jr.*
Terrance G. Reed*
Robert K. Moir*
**LANKFORD & REED, P.L.L.C.**
120 N St. Asaph St.
Alexandria, VA 22314
Tel: (703) 299-5000
Fax: (703) 299-8876
tlankford@lrfirm.net
tgreed@lrfirm.net
rkmoir@lrfirm.net
*Pro Hac Vice to be filed*


*Attorneys for David M. Roeder,
Susanne A. Roeder, Rodney Sickmann,
Don Cooke and Mark Schafer,
individually and on behalf of a class of
similarly situated individuals.*