**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| DAVID M. ROEDER, SUSANNE A. ROEDER, RODNEY SICKMANN, DON COOKE, and MARK SCHAEFER, individually and on behalf of a class of similarly situated individuals,<br><br>                    Plaintiffs,<br><br>  - against -<br><br>J.P. MORGAN CHASE & CO., successor by merger to CHASE MANHATTAN CORPORATION, and JPMORGAN CHASE BANK, N.A., successor by merger to CHASE MANHATTAN BANK,<br><br>                    Defendants. | Case No. 20-cv-2400 (LJL) (SDA)<br><br>**ORAL ARGUMENT REQUESTED** |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF**
**MOTION TO DISMISS THE COMPLAINT**

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

BACKGROUND ....................................................................................................2

LEGAL STANDARD.............................................................................................3

ARGUMENT ........................................................................................................4

I.      PLAINTIFFS' CLAIMS ARE UNTIMELY ...................................................4

      A.    The State Claims Accrued Upon Injury In 1981, Not Discovery In 2019..............4
      B.    The Federal Claim Accrued Upon Injury In 1981, Not Discovery In 2019 ...........5
      C.    The Narrow Exception For Equitable Estoppel Does Not Apply...........................7

II.    PLAINTIFFS' CLAIMS ARE BARRED BY THE *NOERR-PENNINGTON* DOCTRINE ...............................................................................................11

      A.    *Noerr-Pennington* Provides Expansive Protection To The First Amendment Right To Petition.................................................................11
      B.    Plaintiffs' Claims Are Based On Protected Petitioning Activity Under *Noerr-Pennington* ......................................................................15

III.   THE COMPLAINT FAILS TO ALLEGE THAT DEFENDANTS PROXIMATELY CAUSED PLAINTIFFS' INJURIES ...................................20

      A.    Plaintiffs' Claims All Require Plausibly Alleging Proximate Causation ...........21
      B.    Defendants' Alleged Acts Did Not Proximately Cause Plaintiffs' Injuries .........22
      C.    Previous Attacks Do Not Render the Crisis Foreseeable.....................................27

IV.   EACH OF THE INDIVIDUAL CLAIMS SUFFERS FROM PLEADING DEFICIENCIES...................................................................................30

      A.    Defendants Did Not Conspire To Injure Plaintiffs ...............................................30
      B.    Plaintiffs Fail To State A Negligence-Based Claim .............................................31
            1.    None Of Plaintiffs' Cited Sources Of Law Create Tort Duties ................31
            2.    "Rescuing" The Shah Did Not Give Rise To A Duty To Plaintiffs..........33
            3.    Plaintiffs Allege No Additional Source Of Duties Owed By Defendants ....................................................................34
      C.    Defendants Did Not Imprison The Hostages ........................................................34
      D.    Defendants' Lobbying Was Not Extreme And Outrageous .................................35

CONCLUSION......................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abbas v. Dixon*,
480 F.3d 636 (2d Cir. 2007)...................................................................................7, 8

*Ackers v. Kerry*,
No. 18-cv-1296, 2018 U.S. Dist. LEXIS 124013 (D.D.C. July 25, 2018) ............................33

*Alfred Weissman Real Estate, Inc. v. Big V Supermarkets, Inc.*,
268 A.D.2d 101 (N.Y. Sup. Ct. 2000) ...............................................................14

*Allaway v. McGinnis*,
362 F. Supp. 2d 390 (W.D.N.Y. 2005) ..............................................................8

*Allen v. Antal*,
665 F. App'x 9 (2d Cir. 2016) .........................................................................6

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
486 U.S. 492 (1988)...............................................................................16, 20

*Arnold v. Int'l Bus. Machines Corp.*,
637 F.2d 1350 (9th Cir. 1981) ........................................................................21

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................................................................................3

*Baraliu v. Vinya Capital, L.P.*,
No. 07-cv-4626, 2009 WL 959578 (S.D.N.Y. Mar. 31, 2009).................................35

*Barnes v. Anderson*,
202 F.3d 150 (2d Cir. 1999)...........................................................................22

*Bath Petroleum Storage, Inc. v. Mkt. Hub Partners, L.P.*,
229 F.3d 1135 (2d Cir. 2000) ........................................................................13

*BE & K Const. Co. v. N.L.R.B.*,
536 U.S. 516 (2002)...................................................................................11

*Bill Johnson's Restaurants, Inc. v. N.L.R.B.*,
461 U.S. 731 (1983)...................................................................................13

*Blanco v. Am. Tel. & Telegraph Co.*,
689 N.E.2d 506 (N.Y. 1997)...........................................................................5

*Boos v. Barry*,
   485 U.S. 312 (1988).................................................................................................25

*Borough of Duryea, Pa. v. Guarnieri*,
   564 U.S. 379 (2011).......................................................................................... *passim*

*Bradley v. Computer Scis. Corp.*,
   643 F.2d 1029 (4th Cir. 1981) ...............................................................................14

*Brown v. New York City Health and Hospitals Corp.*,
   648 N.Y.S.2d 880 (N.Y. App. Div. 1996) ..............................................................21

*Cal. Motor Transp. Co. v. Trucking Unlimited*,
   404 U.S. 508 (1972).................................................................................................12

*Cardtoons, L.C. v. Major League Baseball Players Ass'n*,
   208 F.3d 885 (10th Cir. 2000) ...............................................................................14

*Chanko v. American Broadcasting Cos., Inc.*,
   49 N.E.3d 1171 (N.Y. 2016)...................................................................................35

*Citizens United v. FEC*,
   558 U.S. 310 (2010).................................................................................................19

*City of Columbia v. Omni Outdoor Advert., Inc.*,
   499 U.S. 365 (1991).........................................................................................15, 19

*Coleman v. Worster*,
   35 N.Y.S.3d 354 (N.Y. App. Div. 2016) ..................................................................5

*Concourse Nursing Home v. Engelstein*,
   278 A.D.2d 35 (N.Y. Sup. Ct. 2000) .....................................................................14

*Conklin v. Doe*,
   No. 01-cv- 987, 2002 WL 227067 (S.D.N.Y. Feb. 13, 2002) .................................34

*Cornwell v. Robinson*,
   23 F.3d 694 (2d Cir. 1994)........................................................................................5

*Corsello v. Verizon N.Y., Inc.*,
   967 N.E.2d 1177 (N.Y. 2012)....................................................................................8

*Curley v. AMR Corp.*,
   153 F.3d 5 (2d Cir. 1998) ..................................................................................21, 34

*In re DDAVP Direct Purchaser Antitrust Litig.*,
   585 F.3d 677 (2d Cir. 2009)....................................................................................13

*Derdiarian v. Felix Contracting Corp.*,
    414 N.E.2d 666 (N.Y. 1980)....................................................................21, 22, 26

*Doron Precision Systems, Inc. v. FAAC, Inc.*,
    423 F. Supp. 2d 173 (S.D.N.Y. 2006)....................................................................18

*Dougherty v. Town of North Hempstead Bd. Of Zoning Appeals*,
    282 F.3d 83 (2d Cir. 2002)....................................................................12

*Dubai Islamic Bank v. Citibank. N.A.*,
    126 F. Supp. 2d 659 (S.D.N.Y. 2000)....................................................................33

*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*,
    365 U.S. 127 (1961)................................................................... *passim*

*Eaton v. Newport Bd. of Educ.*,
    975 F.2d 292 (6th Cir. 1992) ....................................................................14

*EDF Renewable Development, Inc. v. Tritec Real Estate Co., Inc.*,
    147 F. Supp. 3d 63 (E.D.N.Y. 2015) ....................................................................14, 19

*Effie Film, LLC v. Pomerance*,
    909 F. Supp. 2d 273 (S.D.N.Y. 2012)....................................................................10

*Eiseman v. State*,
    511 N.E.2d 1128 (N.Y. 1987)....................................................................31

*Fisher v. JPMorgan Chase Bank, N.A.*,
    740 F. App'x 745 (2d Cir. 2018) ....................................................................4

*Free Namibia v. S. W. Africa People's Org*,
    554 F. Supp. 722 (D.D.C. 1982)....................................................................33

*Gabelli v. SEC*,
    568 U.S. 442 (2013)....................................................................6

*Gain v. Eastern Reinforcing Serv., Inc.*,
    603 N.Y.S.2d 189 (N.Y. App. Div. 1993) ....................................................................32

*Gaines-Tabb v. ICI Explosives, USA, Inc.*,
    160 F.3d 613 (10th Cir. 1998) ....................................................................29

*German v. Fed. Home Loan Mortg. Corp.*,
    896 F. Supp. 1385 (S.D.N.Y. 1995)....................................................................31

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974)....................................................................17

*Gorman Towers, Inc. v. Bogoslavsky*,
    626 F.2d 607 (8th Cir. 1980) ............................................ 14

*Hamilton v. Beretta U.S.A. Corp.*,
    750 N.E.2d 1055 (N.Y. 2001) .......................................... 34

*Hardin v. Straub*,
    490 U.S. 536 (1989) ...................................................... 8

*Hernandez v. United States*,
    939 F.3d 191 (2d Cir. 2019) ............................................ 3

*Herr v. Pequea Twp.*,
    274 F.3d 109 (3d Cir. 2001) ............................................ 14

*Higazy v. Templeton*,
    505 F.3d 161 (2d Cir. 2007) ............................................ 22

*Howell v. N.Y. Post Co.*,
    612 N.E.2d 699 (N.Y. 1993) ........................................... 35

*Ingrassia v. Lividikos*,
    864 N.Y.S.2d 449 (N.Y. App. Div. 2008) ........................... 21

*Kemper v. Deutsche Bank AG*,
    911 F.3d 383 (7th Cir. 2018) ..................................24, 25, 26, 27

*King v. Crossland Sav. Bank*,
    111 F.3d 251 (2d Cir. 1997) ............................................ 21

*Klein v. Metropolitan Child Servs., Inc.*,
    954 N.Y.S.2d 559 (N.Y. App. Div. 2012) ........................... 21

*In re Korean Air Lines Disaster of Sept. 1, 1983*,
    1985 WL 9447 (D.D.C.) ............................................25, 28

*Kottke v. Northwest Kidney Ctrs.*,
    146 F.3d 1056 (9th Cir. 1998) ......................................... 20

*Koziol v. Wright*,
    809 N.Y.S.2d 350 (N.Y. App. Div. 2006) ........................... 21

*Kronos, Inc. v. AVX Corp.*,
    612 N.E.2d 289 (N.Y. 1993) .........................................4, 5

*Kush v. City of Buffalo*,
    449 N.E.2d 725 (N.Y. 1983) ........................................... 22

*LaDuke v. Lyons*,
    673 N.Y.S.2d 240 (N.Y. App. Div. 1998) .............................................................35

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) ...............................................................................................21

*Long v. Sowande*,
    810 N.Y.S.2d 195 (N.Y. App. Div. 2006) .............................................................5

*The Lusitania*,
    251 F. 715 (S.D.N.Y. 1918) ............................................................................25, 30

*Mack v. Altmans Stage Lighting Co., Inc.*,
    98 A.D.2d 468 (N.Y. App. Div. 1984) ...........................................................22, 23

*Manistee Town Ctr. v. City of Glendale*,
    227 F.3d 1090 (9th Cir. 2000) ................................................................................14

*Manuel v. City of Joliet*,
    137 S. Ct. 911 (2017) ................................................................................................7

*McDonough v. Smith*,
    139 S. Ct. 2149 (2019) ..............................................................................................7

*Medellin v. Texas*,
    552 U.S. 491 (2008) .................................................................................................32

*Miracle Mile Assocs. v. City of Rochester*,
    617 F.2d 18 (2d Cir. 1980) .....................................................................................13

*Mora v. New York*,
    524 F.3d 183 (2d Cir. 2008) ...................................................................................32

*Mosdos Chofetz Claim, Inc. v. Village of Wesley Hills*,
    701 F. Supp. 2d 568 (S.D.N.Y. 2010) ...................................................................14

*Nat'l Fireproofing Co. v. Mason Builders Ass'n*,
    169 F. 259 (2d Cir. 1909) .......................................................................................31

*Nationwide Mut. Ins. Co. v. Mortensen*,
    606 F.3d 22 (2d Cir. 2010) .....................................................................................13

*New W., L.P. v. City of Joliet*,
    491 F.3d 717 (7th Cir. 2007) ..................................................................................14

*Owens v. BNP Paribas, S.A.*,
    897 F.3d 266 (D.C. Cir. 2018) .....................................................................24, 26, 27

*Pearl v. City of Long Beach*,
    296 F.3d 76 (2d Cir. 2002).................................................................7, 8

*Port Auth. of New York & New Jersey v. Arcadian Corp.*,
    189 F.3d 305 (3d Cir. 1999)..................................................................25

*Primetime 24 Joint Venture v. Nat'l Broadcasting Co., Inc.*,
    219 F.3d 92 (2d Cir. 2000)...................................................................12

*Pulver v. Dougherty*,
    871 N.Y.S.2d 495 (N.Y. App. Div. 2009) ...............................................8

*Redd v. Leftenant*,
    737 F. App'x 603 (2d Cir. 2018) ...........................................................6

*Rich v. Fox News Network, LLC*,
    939 F.3d 112 (2d Cir. 2019)..................................................................35

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013).................................................22, 23, 24, 26

*Rotkiske v. Klemm*,
    140 S. Ct. 355 (2019)............................................................................6

*Schmidt v. Merchs. Despatch Trans. Co.*,
    200 N.E. 824 (N.Y. 1936).....................................................................32

*Sewell v. Bernadin*,
    795 F.3d 337 (2d Cir. 2015)...................................................................4

*Sheehy v. Big Flats Cmty. Day, Inc.*,
    541 N.E.2d 18 (N.Y. 1989)...................................................................33

*Shoultz v. Monfort of Colorado, Inc.*,
    754 F.2d 318 (10th Cir. 1985) ..............................................................14

*Singh v. NYCTL 2009-A Tr.*,
    683 F. App'x 76 (2d Cir. 2017) .....................................................13, 14

*Smith v. Campbell*,
    782 F.3d 93 (2d Cir. 2015).....................................................................6

*Sosa v. DIRECTV, Inc.*,
    437 F.3d 923 (9th Cir. 2006) ................................................................17

*Spak v. Phillips*,
    857 F.3d 458 (2d Cir. 2017)...................................................................5

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
   547 F.3d 406 (2d Cir. 2008)................................................................10

*Stern v. U.S. Gypsum, Inc.*,
   547 F.2d 1329 (7th Cir. 1977) ..............................................13, 14, 18, 19

*Strunk v. N.Y. Province of Soc. of Jesus*,
   No. 09-cv-1249, 2010 WL 816121 (D.D.C. Mar. 8, 2010) ....................33

*Suburban Restoration Co., Inc. v. ACMAT Corp.*,
   700 F.2d 98 (2d Cir. 1983).............................................................12, 13

*In re Terrorist Attacks on September 11, 2001*,
   714 F.3d 118 (2d Cir. 2013)..............................................................27

*Townes v. City of N.Y.*,
   176 F.3d 138 (2d Cir. 1999).........................................................21, 31

*TRW Inc. v. Andrews*,
   534 U.S. 19 (2001) ...........................................................................6

*Tuosto v. Philip Morris USA, Inc.*,
   No. 05-cv-9384, 2007 WL 2398507 (S.D.N.Y.) ....................................14

*Turturro v. City of N.Y.*,
   68 N.E.3d 693 (N.Y. 2016)......................................22, 24, 25, 28

*Twersky v. Yeshiva Univ.*,
   993 F. Supp. 2d 429 (S.D.N.Y. 2014)...............................................8, 9

*United Mine Workers of America v. Pennington*,
   381 U.S. 657 (1965).................................................................*passim*

*United Mine Workers v. Ill. State Bar Ass'n*,
   389 U.S. 217 (1967).........................................................................12

*United States v. DeMott*,
   No. 05-cr-0073, 2005 WL 2314134 (N.D.N.Y. Sept. 22, 2005) ...........30

*Vernes v. Phillips*,
   194 N.E. 762 (N.Y. 1935)................................................................21

*Video Int'l Prod., Inc. v. Warner-Amex Cable Commc'ns, Inc.*,
   858 F.2d 1075 (5th Cir. 1988) ..........................................................14

*Wallace v. Kato*,
   549 U.S. 384 (2007).................................................................5, 6, 7

*Warren v. Fischl,*
  33 F. Supp. 2d 171 (E.D.N.Y. 1999) ....................................................................30

*Weber v. Suffolk Cty. Div. of Real Estate,*
  768 N.Y.S.2d 225 (N.Y App. Div. 2003) ................................................................8

*Weican Meng v. Xinhuanet Co., Ltd.,*
  No. 16-CV-6127, 2017 WL 3175609 (S.D.N.Y. July 25, 2017) ...........................33

*Weiss v. Willow Tree Civic Ass'n,*
  467 F. Supp. 803 (S.D.N.Y. 1979).........................................................................14

*White v. Lee,*
  227 F.3d 1214 (9th Cir. 2000) ...............................................................................13

*Zumpano v. Quinn,*
  849 N.E.2d 926 (N.Y. 2006)...............................................................................8, 9

## STATUTES

18 U.S.C. § 372.............................................................................................................30, 33

42 U.S.C.
  § 1985.............................................................................................................. *passim*
  § 1985(1) ......................................................................................................... *passim*

N.Y. C.P.L.R.
  § 214.........................................................................................................................5
  § 214(5) ...................................................................................................................4
  § 215(3) ...................................................................................................................4

## RULES

Fed. R. Civ. P. 9(f)..........................................................................................................4

## TREATISES

1 C. Corman, Limitation of Actions § 7.4.1 (1991).........................................................6

54 C.J.S. Limitations of Actions § 221 ...........................................................................6

Restatement (Second) of Torts § 45A...............................................................................7

Restatement (Second) of Torts § 288................................................................................32

## CONSTITUTIONAL PROVISIONS

U.S. Const., amd. 1 ..........................................................................................................11

## OTHER AUTHORITIES

U.N. Treaty Collection.................................................................................................25

VCDR, Apr. 18, 1961, 23 U.S.T. 3227......................................................................25

VCDR preamble, Apr. 18, 1961, 23 U.S.T. 3227.......................................................32

## INTRODUCTION

This case arises out of the Iran Hostage Crisis—one of the major U.S. foreign policy crises of the twentieth century.  Iranian militants stormed the American embassy in Iran, and the Iranian government refused to release the 52 diplomats taken hostage for 444 days.  The crisis sparked an international standoff that transformed the politics of the region and poisoned the U.S.-Iran relationship to this day.  Plaintiffs are former hostages and their family members.  They suffered immensely during their period of captivity and deserve respect and gratitude for their service as American diplomats during one of the darkest episodes in recent American history.

In this case, however, Plaintiffs are not trying to hold accountable the Iranian revolutionaries that attacked the embassy and took them hostage or the Iranian government that sanctioned their captivity.  Instead, Plaintiffs accuse Defendants—American banking and financial services companies—of somehow fomenting and prolonging the crisis and seek to hold them liable for the injuries incurred.  But Plaintiffs' outlandish allegations of a plot between some of America's most respected businessmen and statesmen to harm American interests and risk the lives of American diplomats is wholly implausible.  Their federal and state claims all suffer from the same three defects, each of which compels dismissal of the complaint in its entirety.

*First*, Plaintiffs' claims are untimely.  The events at issue occurred nearly forty years ago.  Plaintiffs say they only recently learned of Chase Bank's purported involvement, but the timing of that alleged discovery does not affect the claims' accrual under settled law.  Plaintiffs allege no basis for tolling the long-expired statute of limitations.  Nor could they, given that the alleged facts they rely upon have been the subject of numerous books and articles for nearly 40 years.

*Second*, all of Plaintiffs' claims are predicated on Defendants' alleged efforts to influence U.S. government policy and lobby the Carter Administration to protect their financial interests.  Those efforts represent Defendants' exercise of their constitutional right to petition the government

1

for redress and are squarely protected under the First Amendment.  The *Noerr-Pennington* doctrine thus immunizes Defendants from liability on the basis of their alleged conduct.

*Third*, Plaintiffs fail to plausibly allege that Defendants proximately caused their injuries. Defendants' alleged actions are far removed from the crisis, so Plaintiffs must rely on a long and attenuated chain of causation to connect those actions to the harm.  But Iran's acts of terrorism— in flagrant violation of international law—definitively sever Plaintiffs' asserted causal nexus.

In addition, each of Plaintiffs' federal and state claims also suffers from individual pleading defects and fails on the merits.  Settled legal principles—including core First Amendment protections—thus bar Plaintiffs' effort to hold Defendants responsible for injuries inflicted decades ago, halfway around the world, by foreign militants with the support of a sovereign state.

## BACKGROUND

On November 4, 1979, Iranian militants launched the Iran Hostage Crisis by attacking the U.S. Embassy in Tehran and placing American diplomatic personnel under forced confinement. Compl. ¶ 55.  The United States refused to accede to Iran's demands for their release, and as a result 52 hostages were held captive for 444 days, until January 1981.  *Id.* ¶ 55-56.  During their period of captivity, the hostages were abused and mistreated.  *Id.* ¶¶ 59-68.  Plaintiffs are three former hostages and two of their immediate family members and seek to represent a class composed of all American hostages and immediate family members.  *Id.* ¶ 91.

Plaintiffs allege that Chase Manhattan Corporation and Chase Manhattan Bank (referred to collectively as "Chase") contributed in two ways to the Hostage Crisis.  First, Plaintiffs allege that a group of Chase officers led by David Rockefeller, Chase's then-Chairman and CEO, and former Secretary of State Henry Kissinger, then-Chairman of Chase's Board of Advisors, entered into an agreement with the Shah of Iran (known as "Project Eagle") to secure safe haven for the Shah in the United States in order to protect Chase's financial interests.  *Id.* ¶¶ 34, 38-41.

2

According to Plaintiffs, Chase pressured the U.S. government to admit the Shah, including by telling the State Department that he would die without emergency, life-saving medical treatment in New York, even though Chase knew the Shah's presence in the United States could endanger the lives of Americans in Iran. *Id.* ¶¶ 42-43, 45-49.  Plaintiffs allege that this lobbying persuaded President Carter to permit the Shah to enter the United States, thereby prompting Iranian revolutionaries to launch an assault on the American embassy. *Id.* ¶¶ 50-55.  Second, Plaintiffs allege that the Project Eagle participants, concerned that the Carter Administration's negotiations to obtain the hostages' release might result in the repatriation of Iranian funds held by Chase, acted to prevent such a deal. *Id.* ¶¶ 72-76.  Specifically, Plaintiffs allege that Chase "gathered and spread rumors about possible payoffs to win the release." *Id.* ¶ 76.  According to Plaintiffs, these rumors "impeded" negotiations and prolonged the hostages' captivity. *Id.* ¶¶ 76-80.

Plaintiffs assert nine claims against Defendants, the successors to Chase Manhattan Corporation and Chase Manhattan Bank. *Id.* ¶¶ 17-22.  Their statutory claim is brought under the Civil Rights Act of 1871, 42 U.S.C. § 1985(1), on the theory that Defendants conspired to injure them while they were serving as United States diplomatic agents. *Id.* ¶¶ 107-111.  The common-law claims allege negligence, different forms of negligence per se, gross negligence, false imprisonment, intentional infliction of emotional distress, and negligent infliction of emotional distress. *Id.* ¶¶ 112-173.  Plaintiffs seek compensatory and punitive damages. *Id.* at 37.

## LEGAL STANDARD

On a motion pursuant to Rule 12(b)(6), a complaint must be dismissed unless it pleads "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  The Court is "not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Hernandez v. United States*, 939 F.3d 191, 198 (2d Cir. 2019) (internal quotation marks and citation omitted).  In

3

addition, issues of timeliness are "material when testing the sufficiency of a pleading." Fed. R. Civ. P. 9(f). "Dismissal under [Rule] 12(b)(6) is appropriate when a defendant raises a statutory bar, such as lack of timeliness, as an affirmative defense and it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law." *Sewell v. Bernadin*, 795 F.3d 337, 339 (2d Cir. 2015) (internal quotation marks and citation omitted).

## ARGUMENT

## I.   PLAINTIFFS' CLAIMS ARE UNTIMELY

All of Plaintiffs' claims are untimely on the face of the complaint. While Plaintiffs assert that they first learned of Defendants' purported involvement in the chain of events that led to their injury on December 29, 2019, and therefore their claims accrued on that date, Compl. ¶ 106, that position has no basis in governing law. The date of injury, not discovery of a defendant's purported involvement in the events that led to the injury, sets the benchmark for accrual of claims. Because the complaint fails to plausibly allege any set of facts that could render Plaintiffs' action timely, the Court should dismiss this action in its entirety.

### A.   The State Claims Accrued Upon Injury In 1981, Not Discovery In 2019

New York law governs the limitations period and accrual rules applicable to Plaintiffs' state common law claims. The negligence claims (Counts II-VI and IX) are subject to a three-year limitations period, while the intentional torts (Counts VII and VIII) carry a one-year limitations period. N.Y. C.P.L.R. §§ 214(5), 215(3). For both sets of claims, accrual is based on the time that "injury is sustained," not on the alleged "wrongful act of defendant or discovery of the injury by plaintiff." *Kronos, Inc. v. AVX Corp.*, 612 N.E.2d 289, 292 (N.Y. 1993); *see also Fisher v. JPMorgan Chase Bank, N.A.*, 740 F. App'x 745, 746 (2d Cir. 2018) (summary order) ("[U]nder New York law, negligence claims accrue when an injury is sustained. It is irrelevant when a person

discovers either her injury or the tortfeasor's wrongful conduct." (quotation marks and citation omitted)).

The application of these rules here is clear:  Plaintiffs' injuries were inflicted no later than their release in 1981, but they waited nearly 40 years—until 2019—to bring their common law claims.  By then, all of the relevant limitations periods had long expired.

Plaintiffs assert that their claims accrued only upon discovery of Defendants' purported "inflict[ion of] injuries upon them and the details of how and why it did so."  Compl. ¶ 106.  That contention is inconsistent with New York law, which makes clear that the time of injury, not discovery, governs accrual.  *Kronos*, 612 N.E.2d at 292.  The only injuries alleged in the complaint are those sustained during and as a result of the hostages' captivity, *e.g.* Compl. ¶¶ 95(d), 96, and so the state law claims accrued, at the latest, at the time of their release, *see Blanco v. Am. Tel. & Telegraph Co.*, 689 N.E.2d 506, 510 (N.Y. 1997) (actions controlled by C.P.L.R. § 214 accrue "when all . . . facts necessary to the cause of action have occurred"); *Coleman v. Worster*, 35 N.Y.S.3d 354, 356 (N.Y. App. Div. 2016) (false imprisonment claim accrues on release); *Long v. Sowande*, 810 N.Y.S.2d 195, 198 (N.Y. App. Div. 2006) (intentional infliction of emotional distress claim accrues on date that plaintiff first suffers emotional distress).

### B.    The Federal Claim Accrued Upon Injury In 1981, Not Discovery In 2019

The same result holds under the federal accrual standard:  Plaintiffs' claims accrued at the time the injury occurred, irrespective of the time of discovery.  Plaintiffs' lone federal claim, for violation of 42 U.S.C. § 1985(1) (Count I), draws its three-year limitations period from New York law.  *See, e.g., Cornwell v. Robinson*, 23 F.3d 694, 703 (2d Cir. 1994).  The date on which that period begins to run, however, is determined by federal law, and courts must "apply 'general . . . common-law tort principles' to determine the accrual date of a [federal] claim."  *Spak v. Phillips*, 857 F.3d 458, 462 (2d Cir. 2017) (quoting *Wallace v. Kato*, 549 U.S. 384, 388 (2007)).

As the Supreme Court has made clear, it is "the standard rule that [accrual occurs] when the plaintiff has 'a complete and present cause of action,'" *Wallace*, 549 U.S. at 388 (citation omitted), which is "when the wrongful act or omission results in damages," *id.* at 391 (quoting 1 C. Corman, Limitation of Actions § 7.4.1, pp. 526-27 (1991)). "That [injury-accrual] rule has governed since the 1830s," *Gabelli v. SEC*, 568 U.S. 442, 448 (2013), decades before § 1985(1) was enacted in 1871. That rule is fundamentally different from a discovery-accrual rule, under which a claim accrues only when the plaintiff knows or has reason to know of their injury. *See id.* at 447-54 (applying *Wallace*'s injury-accrual rule and explaining that the discovery rule is an "exception" limited to fraud cases); *see also Rotkiske v. Klemm*, 140 S. Ct. 355, 360-61 (2019) (distinguishing between the "standard rule" and accrual based on "the date of discovery"); *TRW Inc. v. Andrews*, 534 U.S. 19, 37 (2001) (Scalia, J., concurring) (noting that under the injury-accrual rule, the fact "that a person entitled to an action has no knowledge of his right to sue, or of the facts out of which his right arises, does not postpone the period of limitation"); 54 C.J.S. Limitations of Actions § 221 (noting that claims accrue under the standard rule "even though the plaintiff was . . . unaware of the identity of the wrongdoer" absent fraudulent concealment). The Second Circuit has applied *Wallace*'s injury-accrual rule to dismiss civil rights claims—at the pleading stage—when the plaintiff had a complete cause of action yet failed to sue within the limitations period. *See Smith v. Campbell*, 782 F.3d 93, 100-02 (2d Cir. 2015).[1]

In determining when the alleged "wrongful act . . . results in damages" for purposes of the injury-accrual rule, courts may "adopt wholesale the rules that would apply in a suit involving the

---

[1] The Second Circuit has sometimes cited pre-*Wallace* accrual standards indicating that a § 1985 claim accrues when the plaintiff discovers his injury. *See, e.g.*, *Redd v. Leftenant*, 737 F. App'x 603, 604 (2d Cir. 2018) (summary order); *Allen v. Antal*, 665 F. App'x 9, 12 (2d Cir. 2016) (summary order). *But see Smith*, 782 F.3d at 100. But *Gabelli* makes clear that such a discovery rule is fundamentally incompatible with *Wallace*'s injury-accrual rule, which turns on when the injury occurs and *not* on when it is discovered. *See Gabelli*, 568 U.S. at 447-54.

most analogous tort." *Manuel v. City of Joliet*, 137 S. Ct. 911, 920 (2017); *see also McDonough v. Smith*, 139 S. Ct. 2149, 2156 (2019). While, on its face, section 1985(1) does not have a direct equivalent in common-law tort, the specific allegations here—that Defendants conspired to "prolong" the hostages' unlawful captivity by others, Compl. ¶ 108—are most analogous to a claim of false imprisonment. *See* Restatement (Second) of Torts § 45A (describing tort of false imprisonment). And *Wallace* makes clear that in false imprisonment cases, the statute of limitations begins to run when the "false imprisonment . . . end[s]," irrespective of later discovery of additional facts. *Wallace*, 549 U.S. at 389, 391. *Wallace* thus controls and dictates the result: Plaintiffs' claims accrued upon their release on January 21, 1981; the limitations period expired on January 21, 1984; and this case was untimely filed in March 2020.

Despite this case law, Plaintiffs assert that their claims accrued when they read a December 2019 *New York Times* article discussing Defendants' purported involvement in their imprisonment. Compl. ¶ 106. That is mistaken. As noted, their § 1985 claim accrued once the alleged unlawful act resulted in damages—no later than January 1981, when the hostages were released—*not* when that cause of action was purportedly first discovered. *See supra* at 5-6. Under the injury-accrual approach, Plaintiffs' cause of action accrued almost forty years ago.

## C.    The Narrow Exception For Equitable Estoppel Does Not Apply

The complaint at several points suggests that Defendants concealed information about their role in causing or contributing to Plaintiffs' injuries. *See, e.g.*, Compl. ¶¶ 81-83. To the extent that Plaintiffs seek equitable relief from the statute of limitations based on claimed misrepresentations, those arguments also fail as a matter of law.

State law governs the tolling of claims arising under state common law, and generally governs claims under § 1985 unless those tolling rules would "defeat the goals" of that statute. *Abbas v. Dixon*, 480 F.3d 636, 642 (2d Cir. 2007) (quoting *Pearl v. City of Long Beach*, 296 F.3d

76, 80 (2d Cir. 2002)) (as to § 1983).[2]   Under New York's doctrine of equitable estoppel (sometimes called fraudulent concealment), a defendant may be estopped from asserting a timeliness defense where the plaintiff shows that he was "prevented from filing an action within the applicable statute of limitations due to his . . . reasonable reliance on [the defendant's] deception, fraud or misrepresentations." *Pulver v. Dougherty*, 871 N.Y.S.2d 495, 496 (N.Y. App. Div. 2009).   The plaintiff bears the burden of showing his entitlement to such relief and must "articulate . . . acts by defendants that prevented him from timely commencing suit." *Abbas*, 480 F.3d at 642 (internal quotation marks, alterations, and citation omitted).   The plaintiff must demonstrate "active fraudulent concealment" by the defendant, *Pearl*, 296 F.3d at 88 (quotation marks omitted), and cannot satisfy his burden by pointing solely to the "defendants' failure to disclose the wrongs they had committed," *Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012), or "broad misstatements to the community at large," *Twersky v. Yeshiva Univ.*, 993 F. Supp. 2d 429, 442 (S.D.N.Y. 2014).   Moreover, New York law is clear that a plaintiff cannot rely on equitable estoppel to prevent dismissal of an untimely brought claim when the exercise of reasonable diligence would have revealed the facts it claims were concealed. *Weber v. Suffolk Cty. Div. of Real Estate*, 768 N.Y.S.2d 225, 225 (N.Y App. Div. 2003).

The limits of equitable estoppel are most clearly demonstrated by the Court of Appeals' decision in *Zumpano v. Quinn*, 849 N.E.2d 926 (N.Y. 2006).   The plaintiffs, victims of clergy abuse, argued that equitable estoppel applied due to the defendant diocese's forty-year "pattern of concealment [through] failing to investigate and report the conduct to law enforcement authorities, transferring abusive priests to different parishes and making secret payments to victims and their

---

[2] "[T]he central goal of the Reconstruction-Era civil rights statutes . . . is to ensure that individuals whose federal constitutional or statutory rights are abridged may recover damages or secure injunctive relief," *Hardin v. Straub*, 490 U.S. 536, 539 (1989) (quotation marks omitted). Defendants are unaware of any decision in this circuit holding that New York's tolling rules defeat that purpose. *See Allaway v. McGinnis*, 362 F. Supp. 2d 390, 395 (W.D.N.Y. 2005).

families in return for their silence." *Id.* at 928.   The Court of Appeals held those allegations insufficient to trigger equitable estoppel, stating that defendants are "not legally obliged to make a public confession, or to alert people who may have claims against it, to get the benefit of a statute of limitations.   Plaintiffs do not allege any specific misrepresentation to them by defendants, or any deceptive conduct sufficient to constitute a basis for equitable estoppel." *Id.* at 930.

Measured against these standards, Plaintiffs' threadbare allegations of concealment do not come close to satisfying their burden for estopping Defendants' limitations defense.   Read most generously, the complaint alleges two forms of concealment:   first, David Rockefeller's denial (or failure to publicly disclose, through registration as a foreign agent) that Chase had a significant financial stake in the Shah's dynasty or involvement in bringing the Shah into the U.S., *see* Compl. ¶ 81; and second, Joseph Reed's donation of his records of Project Eagle to Yale University with instructions that they remain under seal until Rockefeller's death, *see id.* ¶ 83.   The cursory public denials that Plaintiffs cite are clearly insufficient as a matter of law to constitute concealment.   *See Twersky*, 993 F. Supp. 3d at 442.   Holding otherwise would turn every general denial of wrongdoing into an act of fraudulent concealment, a result that is clearly inconsistent with *Zumpano* and other cases.   Any suggestion that an individual donating private business documents to a private university with instructions that they remain under seal for a period of time constitutes fraudulent concealment is equally insufficient, as doing so at most constitutes nondisclosure of alleged wrongdoing.   New York law is clear that, absent a fiduciary relationship that is not present here, nondisclosure is insufficient as a matter of law to merit equitable estoppel:   Defendants are not "obliged to make a public confession, or to alert people who may have claims against [them], to get the benefit of a statute of limitations." *Zumpano*, 849 N.E.2d at 930.

Finally, even if the allegedly deceptive acts were theoretically sufficient to merit estoppel,

Plaintiffs cannot show they acted with the requisite diligence once those facts were revealed.  The core allegations on which Plaintiffs base their action were publicly reported as early as the time of the Hostage Crisis.  *See, e.g.*, Ex. 2, Terence Smith, *Why Carter Admitted the Shah*, N.Y. Times Magazine (May 17, 1981) (claiming the Shah was admitted after "months" of efforts by Rockefeller and Kissinger and that Carter Administration was swayed by "misinformation" regarding medical necessity); Ex. 3, Richard Cohen, *Rockefeller Keys Open Doors for Sick Shah*, Wash. Post (Nov. 20, 1979) (stating that Rockefeller's doctor "pronounced the [S]hah too sick to be treated anywhere but Manhattan"); Ex. 4, Dan Morgan, *Chase Manhattan's Ties to the Shah: Rockefeller and His Bank Have Been Active in Iran for Years*, Wash. Post (Nov. 16, 1979) (noting that "Chase's commercial ties to the [S]hah and his country long have been a matter of record").[3]

Those allegations continued to garner significant public interest long after the hostages' release—and long before the December 2019 *New York Times* article.  For example, retired University of California Berkeley professor Peter Dale Scott devoted a full chapter of his 2007 book to Rockefeller and Chase's alleged links to the hostage crisis.  Ex. 5, Peter Dale Scott*, The Road to 9/11: Wealth, Empire, and the Future of America*, 80-92 (Univ. of Calif. Press 2007). That chapter—titled "Carter's Surrender to the Rockefellers on Iran"—is replete with citations to public sources and describes in detail every major allegation in the complaint, including that (1) Rockefeller and Kissinger "organized a 'special project' . . . to admit the Shah," who they purportedly code-named "the Eagle"; (2) this project succeeded when Rockefeller's personal assistant and physician represented to the Carter Administration that the Shah required medical

---

[3] On a motion to dismiss, the Court "may take judicial notice of facts that various newspapers, magazines, and books were published solely as an indication of information in the public realm at the time."  *Effie Film, LLC v. Pomerance*, 909 F. Supp. 2d 273, 299 (S.D.N.Y. 2012) (internal quotation marks and citation omitted); *see also Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425-26 (2d Cir. 2008) (stating that courts can "take judicial notice of the fact that press coverage . . . contained certain information, without regard to the truth of their contents," where it is introduced "for the purpose of establishing that the information in the [] documents was publicly available").

treatment in New York; and (3) the same group actively undermined the "October Surprise" hostage negotiations. *See id.* at 82, 83-84, 91. Nor is that book an outlier, as other public sources offer similarly detailed accounts of the allegations at issue here. *See generally, e.g.*, Ex. 6, Kai Bird, *The Chairman: John J. McCloy & The Making of the American Establishment*, 641-54 (Simon & Schuster 1992). Combined with Plaintiffs' awareness of their injuries, *see* Compl. ¶ 157, this widespread public reporting shows that Plaintiffs did not diligently pursue their claims.

Plaintiffs' allegations of deception, fraud or misrepresentation are thus insufficient as a matter of law to excuse their untimeliness, and the complaint should be dismissed accordingly.

## II.   PLAINTIFFS' CLAIMS ARE BARRED BY THE *NOERR-PENNINGTON* DOCTRINE

Even if Plaintiffs' claims are timely, they run headlong into the First Amendment. The *Noerr-Pennington* doctrine grants immunity from liability to parties engaged in conduct protected by the First Amendment right to petition. Because all of Plaintiffs' claims are predicated on Defendants' alleged efforts to lobby or otherwise influence the federal government—conduct squarely protected by the right to petition—the complaint must be dismissed.

### A.   *Noerr-Pennington* Provides Expansive Protection To The First Amendment Right To Petition

The First Amendment guarantees "the right of the people . . . to petition the Government for a redress of grievances." U.S. Const., amd. 1. The right to petition is "integral to the democratic process," as it "allows citizens to express their ideas, hopes, and concerns to their government and their elected representatives." *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 388 (2011); *see BE & K Const. Co. v. N.L.R.B.*, 536 U.S. 516, 524-25 (2002) (explaining that "the right is implied by the very idea of a government, republican in form" (internal quotation marks omitted)). Indeed, the "right to petition is in some sense the source of other fundamental rights, for petitions have provided a vital means for citizens to request recognition of new rights

and to assert existing rights against the sovereign." *Borough of Duryea*, 564 U.S. at 397; *see Dougherty v. Town of North Hempstead Bd. Of Zoning Appeals*, 282 F.3d 83, 91 (2d Cir. 2002) (recognizing the right to petition as "among the most precious of the liberties safeguarded by the Bill of Rights" (quoting *United Mine Workers v. Ill. State Bar Ass'n*, 389 U.S. 217, 222 (1967)).

The *Noerr-Pennington* doctrine protects that right by immunizing petitioning activity from liability. The doctrine arose in the antitrust context, after the Supreme Court held that "activities attempting to influence legislative, executive, administrative or judicial action to eliminate competition are wholly immune from federal antitrust liability." *Suburban Restoration Co., Inc. v. ACMAT Corp.*, 700 F.2d 98, 99 (2d Cir. 1983); *see Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc*., 365 U.S. 127, 138 (1961) (holding that the Sherman Act does not apply to "activities compris[ing] mere solicitation of governmental action with respect to the passage and enforcement of laws"); *United Mine Workers of America v. Pennington*, 381 U.S. 657 (1965) (extending immunity to efforts to lobby Secretary of Labor); *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508 (1972) (institution of administrative or adjudicative proceedings).

Despite *Noerr-Pennington*'s roots in competition law, the Supreme Court has "made explicit its reliance on First Amendment principles" in crafting and implementing the doctrine. *Primetime 24 Joint Venture v. Nat'l Broadcasting Co., Inc.*, 219 F.3d 92, 99 (2d Cir. 2000); *see, e.g.*, *Cal. Motor Transp.*, 404 U.S. at 612 (holding that "the right to petition extends to all departments of the Government" and the "right of access to the courts is indeed but one aspect of the right to petition"). The doctrine provides broad immunity to ensure that the right conferred by the Petition Clause is not eroded through laws that indirectly penalize its exercise. *See United Mine Workers*, 389 U.S. at 222 ("The First Amendment would . . . be a hollow promise if it left government free to destroy or erode its guarantees by indirect restraints so long as no law is passed

that prohibits free speech, press, petition, or assembly as such."). Accordingly, "*Noerr-Pennington* is a label for a form of First Amendment protection; to say that one does not have *Noerr-Pennington* immunity is to conclude that one's petitioning activity is unprotected by the First Amendment." *White v. Lee*, 227 F.3d 1214, 1231 (9th Cir. 2000); *see, e.g.*, *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 685-86 (2d Cir. 2009) (citizens petitions are immune "in light of the First Amendment"); *Miracle Mile Assocs. v. City of Rochester*, 617 F.2d 18, 20 (2d Cir. 1980) (legislative lobbying under *Noerr* is "fully protected by the First Amendment").

Because *Noerr-Pennington* immunity reflects "an application of the First Amendment," it applies outside the antitrust context. *Suburban Restoration Co.*, 700 F.2d at 101. For example, the Supreme Court relied on *Noerr-Pennington* principles to hold that a retaliatory lawsuit may not be enjoined as an unfair labor practice under the National Labor Relations Act. *See Bill Johnson's Restaurants, Inc. v. N.L.R.B.*, 461 U.S. 731, 741-743 (1983) (citing *California Motor Transport* and the Petition Clause "right of access to the courts"). Other courts—including the Second Circuit—have similarly applied *Noerr-Pennington* to immunize petitioning activity against a wide range of claims. *See, e.g.*, *Singh v. NYCTL 2009-A Tr.*, 683 F. App'x 76, 77-78 (2d Cir. 2017) (summary order) (RICO, the New York General Business Law, and New York common law); *Nationwide Mut. Ins. Co. v. Mortensen*, 606 F.3d 22, 33 (2d Cir. 2010) (Connecticut Unfair Trade Practices Act); *Bath Petroleum Storage, Inc. v. Mkt. Hub Partners, L.P.*, 229 F.3d 1135 (2d Cir. 2000) (unpublished) (RICO and state-law tortious interference and fraud).

Courts routinely apply *Noerr-Pennington* to bar liability under federal civil rights statutes, including § 1985. In *Stern v. U.S. Gypsum, Inc.*, for example, the Seventh Circuit dismissed a § 1985(1) claim based on "the presentation of complaints about an auditing IRS agent's professional conduct to his superiors" because the allegations represented a "classic example of

the right to petition."  547 F.2d 1329, 1343 (7th Cir. 1977) (noting "chill[ing]" effect suit would

have on "the exercise of the right to petition"); *see also Shoultz v. Monfort of Colorado, Inc.*, 754

F.2d 318, 321 (10th Cir. 1985) (dismissing § 1985(1) claim based on "First Amendment right to

petition for a redress of grievances" where alleged injury resulted from complaints about plaintiff's

official performance to his superiors); *Bradley v. Computer Scis. Corp.*, 643 F.2d 1029, 1033 (4th

Cir. 1981) (same); *Mosdos Chofetz Claim, Inc. v. Village of Wesley Hills*, 701 F. Supp. 2d 568,

598 (S.D.N.Y. 2010) (holding that "*Noerr-Pennington* immunity can restrict civil rights claims

[under §§ 1982, 1983, and 1985] based on a defendant's petitioning activity"); *Weiss v. Willow

Tree Civic Ass'n*, 467 F. Supp. 803, 818-19 (S.D.N.Y. 1979) (same).[4]

 *Noerr-Pennington* likewise confers immunity against state tort claims.  As the Fifth Circuit

has explained, "[t]here is simply no reason that a common-law tort doctrine can any more

permissibly abridge or chill the constitutional right of petition than can a statutory claim such as

antitrust." *Video Int'l Prod.*, 858 F.2d at 1084.  Both state and federal courts have therefore applied

the doctrine "to bar liability in state common law tort claims, including negligence and products

liability claims, for statements made in the course of petitioning the government." *Tuosto v. Philip

Morris USA, Inc.*, No. 05-cv-9384, 2007 WL 2398507, at *5 (S.D.N.Y.); *see, e.g.*, *Singh*, 683 F.

App'x at 77-78 (common law fraud); *EDF Renewable Development, Inc. v. Tritec Real Estate Co.,

Inc.*, 147 F. Supp. 3d 63, 71 (E.D.N.Y. 2015) (tortious interference with contract); *Alfred

Weissman Real Estate, Inc. v. Big V Supermarkets, Inc*., 268 A.D.2d 101, 106-07 (N.Y. Sup. Ct.

2000) (prima facie tort and General Business Law); *Concourse Nursing Home v. Engelstein*, 278

---

[4] Every court of appeals to have considered the issue appears to have held that the *Noerr-Pennington* doctrine
bars liability on the basis of protected petitioning activity in the closely related context of § 1983 claims.  *See, e.g.*,
*New W., L.P. v. City of Joliet*, 491 F.3d 717, 722 (7th Cir. 2007); *Herr v. Pequea Twp*., 274 F.3d 109, 119 (3d Cir.
2001); *Manistee Town Ctr. v. City of Glendale*, 227 F.3d 1090, 1093 (9th Cir. 2000); *Eaton v. Newport Bd. of Educ*.,
975 F.2d 292, 298 (6th Cir. 1992); *Video Int'l Prod., Inc. v. Warner-Amex Cable Commc'ns, Inc*., 858 F.2d 1075,
1084 (5th Cir. 1988); *Gorman Towers, Inc. v. Bogoslavsky*, 626 F.2d 607, 615 (8th Cir. 1980); *cf. Cardtoons, L.C. v.
Major League Baseball Players Ass'n*, 208 F.3d 885, 890 (10th Cir. 2000).

A.D.2d 35, 35 (N.Y. Sup. Ct. 2000) (prima facie tort and tortious interference with contract).

**B.     Plaintiffs' Claims Are Based On Protected Petitioning Activity Under _Noerr-Pennington_**

All of Plaintiffs' claims are based on Defendants' alleged efforts (i) to secure the Shah's entry to the United States and (ii) to undermine negotiations with the Iranian government.  _See_ Compl. ¶ 2.  But the conduct underlying those claims is petitioning activity protected by the First Amendment.  Accordingly, Defendants are immune from liability under _Noerr-Pennington_.

The crux of Plaintiffs' first theory of liability is that Defendants disagreed with "President Carter's foreign policy decisions regarding Iran" and "pressured the United States government" to change its policy and "admit the Shah."  _Id._ ¶¶ 40, 43; _see id._ ¶ 42 ("Chase's Project Eagle team provided financial and logistical support to the Shah, as well as lobbying and public relations as the Shah's propagandists.").  Plaintiffs allege that as part of that "pressure campaign," Defendants "urge[d] the State Department to] admit the Shah for life-saving treatment only available in New York."  _Id._ ¶¶ 49-50.

Lobbying executive branch officials to change federal policy with which one disagrees is quintessentially protected activity under the First Amendment right to petition.  _See City of Columbia v. Omni Outdoor Advert., Inc._, 499 U.S. 365, 380-82 (1991) (_Noerr-Pennington_ protects "lobbying" that genuinely aims "to influence governmental action"); _Pennington_, 381 U.S. 657 at 670 (_Noerr-Pennington_ immunizes any "concerted effort to influence public officials").  Defendants' alleged "pressure campaign" and overtures to the State Department to persuade the Carter Administration to grant entry to the Shah thus fall within the scope of the _Noerr-Pennington_ doctrine, Compl. ¶¶ 49-50—indeed, such communications are "petitions" to the government in the most classic sense.  _See Borough of Duryea_, 564 U.S. at 388 ("A petition conveys the special concerns of its author to the government and . . . requests action by the government to address

15

those concerns.").

And Defendants' alleged financial and logistical support to the Shah is similarly protected conduct. *Noerr-Pennington* immunity extends to "private action . . . 'incidental' to a valid effort to influence government action." *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499 (1988) (quoting *Noerr*, 365 U.S. at 143). By Plaintiffs' own admission, the assistance Defendants allegedly offered to the Shah was incidental to their broader effort to "pressure[]" the U.S. government to grant him entry. Compl. ¶¶ 42-43. The Petition Clause therefore protects all of the alleged conduct underlying Defendants' first theory of liability.

Plaintiffs' second theory fares no better. Plaintiffs principally contend that, in order to prevent the Carter Administration from agreeing to repatriate billions of dollars of Iranian funds, Defendants carried out a "propaganda effort that . . . impeded talks to free the captives" and prolonged the crisis. *Id.* ¶¶ 73, 76; *see id.* (alleging that Defendants "gathered and spread rumors about possible payoffs to win the release"). "After Ronald Reagan won the 1980 presidential election," Plaintiffs further allege, "Chase lobbied the incoming administration" and "advocated for a restoration of the Pahlavi monarchy." *Id.* ¶ 77.

A "publicity campaign to influence governmental action falls clearly into the category of political activity" protected under the First Amendment. *Noerr*, 365 U.S. at 140-41. In fact, the core of the conduct Plaintiffs allege—a "propaganda effort" to prevent the executive branch from acceding to Iran's demands in negotiations—is closely akin to the conduct the Supreme Court found immune in *Noerr* itself. *See* Compl. ¶¶ 73, 76. There, the railroads and the emerging trucking industry were involved in an economic battle for control of the long distance freight hauling market. 365 U.S. at 128-29. The Court held that the railroads could not be held liable for mounting a deceptive "publicity campaign" and circulating "propaganda" in order to sour public

perception of truckers and to facilitate the passage of laws disadvantageous to the trucking industry. *Id.* at 129, 136. Defendants' alleged propaganda campaign to influence the executive branch in its foreign policy dealings thus falls squarely within *Noerr*'s protection.

Chase's alleged lobbying of the incoming Reagan administration is similarly protected under the Petition Clause. As described, *Noerr-Pennington* immunizes any "concerted effort to influence public officials." *Pennington*, 381 U.S. 657 at 670. And where, as here, lobbying efforts involve issues of public importance—such as U.S. government policy with respect to the Iranian revolutionary regime, *see* Compl. ¶ 77—First Amendment concerns are at their apex. *See Borough of Duryea*, 564 U.S. at 395 ("Petitions to the government assume an added dimension when they seek to advance political, social, or other ideas of interest to the community as a whole.").

All of Plaintiffs' allegations thereby involve classic petitioning activity. In order to circumvent the clear First Amendment bar on liability based on such conduct, Plaintiffs suggest that Defendants' conduct was unprotected for various reasons. For example, they allege that Defendants' actions were "deceptive" and motivated by financial self-interest, notwithstanding the known risk of injury to others. Compl. ¶ 43, *see id.* ¶¶ 38, 45. None of these allegations, however, takes Defendants' protected activity outside the scope of *Noerr-Pennington* immunity.

***First***, *Noerr-Pennington* immunity extends to petitioning activity involving deceptive conduct. Plaintiffs allege that "there was no medical necessity for the Shah to come to the United States" and that Defendants spread "rumors" and "propaganda" to defeat the hostage talks. *Id.* ¶¶ 49, 76. But the "First Amendment requires that we protect some falsehood in order to protect speech that matters." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341 (1974); *see Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 933 (9th Cir. 2006). Accordingly, in *Noerr* itself, the Court made clear that the railroads' publicity campaign was protected petitioning activity, even though it involved

17

"deception of the public, manufacture of bogus sources of reference, and distortion of public sources of information"—in short, conduct falling "far short of the ethical standards general[ly] approved in this country."  365 U.S. at 140; *see Stern*, 547 F.2d at 1345 (affirming that falsehoods must be protected under the First Amendment to avoid "chill[ing the] right to petition"). Defendants' petitioning is therefore immune under *Noerr-Pennington* even accepting Plaintiffs' allegation that it was "deceptive."  Compl. ¶ 43; *see Doron Precision Systems, Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 189 (S.D.N.Y. 2006) ("Defendants are entitled to *Noerr-Pennington* protection even if they pressured government officials [or] lied to the government.").

*Second*, *Noerr-Pennington* shields from liability "a concerted effort to influence public officials *regardless of intent or purpose*."  *Pennington*, 381 U.S. 657 at 670 (emphasis added). Throughout the complaint, Plaintiffs allege that Defendants' actions were driven by their "financial interests."  Compl. ¶ 38; *see id.* ¶ 73.  But even if so, that in no way deprives Defendants' actions of First Amendment protection.  The "Petition Clause undoubtedly does have force and application in the context of a personal grievance addressed to the government."  *Borough of Duryea*, 564 U.S. at 394.  For that reason, *Noerr* emphatically rejected the idea that defendants could be held liable for seeking to influence governmental action because they were "taking a public position on matters in which they [we]re financially interested."  365 U.S. at 139.  To hold as such, the Court instructed, would both "deprive the government of a valuable source of information and, at the same time, deprive the people of their right to petition in the very instances in which that right may be of the most importance to them."  *Id.*; *Stern*, 547 F.2d at 1343.  Even assuming Defendants sought to sway the federal government's Iran policy to protect their finances, their actions serve to illustrate precisely why the right to petition is essential.

Plaintiffs also suggest that Defendants sought to influence the hostage negotiations to further Ronald Reagan's presidential prospects. *See* Compl. ¶ 75. But *Noerr-Pennington* immunity applies to Defendants' petitioning activity "regardless of [their] intent or purpose." *Pennington*, 381 U.S. at 670. And insofar as the purpose of Defendants' alleged propaganda campaign was election-related, that effort would merit even greater protection under the First Amendment. *See Citizens United v. FEC*, 558 U.S. 310, 339 (2010) ("The First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office.").

***Third***, the *Noerr-Pennington* doctrine immunizes petitioning activity regardless of its consequences. Plaintiffs allege that Defendants lobbied the federal government even though they knew the decision to grant entry to the Shah could "endanger[] American diplomats in Iran." Compl. ¶ 45; *see also id.* ¶ 76. But it is "irrelevant to the applicability of the right to petition that its exercise might have the effect of causing . . . injury to others." *Stern*, 547 F.2d at 1343. As the Supreme Court has explained, "[i]t is inevitable" that an effort to influence governmental action might have the "incidental effect" of "inflict[ing] some direct injury" upon another party. *Noerr*, 365 U.S. at 143. And it is "equally inevitable" that those responsible for petitioning "would be aware of, and possibly even pleased by, the prospect of such injury." *Id*. Holding that "the knowing infliction of such injury" renders conduct unprotected "would thus be tantamount to outlawing all such campaigns." *Id*. Defendants' petitioning activity is thus protected under *Noerr-Pennington* even if Defendants were aware of the possibility of injury. *See EDF Renewable*, 147 F. Supp. 3d at 68 (*Noerr-Pennington* immunity applies regardless of "injurious . . . effect." (internal quotation marks omitted)).

Plaintiffs' claims are thus squarely foreclosed under the *Noerr-Pennington* doctrine. The Supreme Court has recognized only a single exception to *Noerr-Pennington* immunity, which

applies to "sham" activities.  *Noerr*, 365 U.S. at 144; *see Omni Outdoor Advert.*, 499 U.S. at 382 (rejecting a "conspiracy" exception to *Noerr-Pennington*).  Outside the litigation context, the sham exception is "extraordinarily narrow," *Kottke v. Northwest Kidney Ctrs.*, 146 F.3d 1056, 1061-62 (9th Cir. 1998), and applies only to "private action that is not genuinely aimed at procuring favorable government action," *Allied Tube*, 486 U.S. at 500 n.2.  That exception has no application here.  Plaintiffs do not allege that Defendants' efforts to lobby the government and influence federal policy were not genuine.  Nor could they.  Plaintiffs assert Defendants' alleged petitioning was *successful*, as Defendants were able to secure the Shah's entry to the United States and complicate the Carter Administration's negotiations.  Where a party's lobbying efforts are successful, "[t]he effort to influence governmental action . . . certainly cannot be characterized as a sham."  *Allied Tube*, 486 U.S. 492, 502 (1988).

Accordingly, all of Defendants' alleged conduct is protected by the Petition Clause and immunized under the *Noerr-Pennington* doctrine.  The complaint must be dismissed in its entirety.

## III.  THE COMPLAINT FAILS TO ALLEGE THAT DEFENDANTS PROXIMATELY CAUSED PLAINTIFFS' INJURIES

Plaintiffs' claims also fail for another, separate reason:  They do not plausibly allege that their injuries were proximately caused by Defendants' conduct.  Plaintiffs seek to hold Defendants liable for their alleged role in (i) causing and (ii) prolonging the Iranian hostage crisis.  But—as Plaintiffs themselves acknowledge—Defendants at no point in time inflicted any direct injury or harm on the hostages.  Rather, their theory is that Defendants' efforts to influence U.S. government policy render them responsible for injuries inflicted by the Iranian revolutionaries and government. *See* Compl. ¶¶ 4-6.  Plaintiffs do not and cannot allege proximate causation for two independent reasons: (i) the many steps and intervening actors in the purported causal chain linking Defendants' actions and Plaintiffs' injuries demonstrate that Defendants' actions were not a substantial cause

of injury, and (ii) even if Plaintiffs could meet the substantial cause burden, Iran's egregious and illegal actions constitute a superseding cause that defeats proximate causation.  The complaint therefore fails to state a viable federal or state claim.

## A.  Plaintiffs' Claims All Require Plausibly Alleging Proximate Causation

The purpose of proximate causation is to "bar[] suits for alleged harm that is 'too remote' from the defendant's [allegedly] unlawful conduct." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014).  In that way, proximate causation "serve[s] to place manageable limits upon the liability that flows from . . . [certain] conduct." *Derdiarian v. Felix Contracting Corp.*, 414 N.E.2d 666, 670 (N.Y. 1980).

All of Plaintiffs' claims incorporate a requirement that the alleged wrongful conduct proximately cause the stated injuries.  Federal causes of action, including under 42 U.S.C. § 1985, are "presume[d] . . . limited to plaintiffs whose injuries are proximately caused by violations of the statute." *Lexmark*, 572 U.S. at 132; *see Arnold v. Int'l Bus. Machs. Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981) ("The causation requirement of [§§] 1983 and 1985" requires "establish[ing] proximate or legal causation."); *Townes v. City of N.Y.*, 176 F.3d 138, 146 (2d Cir. 1999) (same for § 1983 action).  And a similar limitation applies in the context of the alleged common law torts. *See Ingrassia v. Lividikos*, 864 N.Y.S.2d 449, 452 (N.Y. App. Div. 2008) (negligence); *Koziol v. Wright*, 809 N.Y.S.2d 350, 352 (N.Y. App. Div. 2006) (negligence per se); *Vernes v. Phillips*, 194 N.E. 762, 763 (N.Y. 1935) (false imprisonment);[5] *Klein v. Metropolitan Child Servs., Inc.*, 954 N.Y.S.2d 559, 562 (N.Y. App. Div. 2012) (intentional infliction of emotional distress); *Brown v.*

---

[5] A defendant who did not personally confine plaintiffs can be held responsible for an imprisonment only if the defendant "affirmatively induced the [captor] to act, such as taking an active part in the [detention] and procuring it to be made or showing active, officious and undue zeal to the point where the [captor] is not acting of his own volition." *Curley v. AMR Corp.*, 153 F.3d 5, 13-14 (2d Cir. 1998); *see King v. Crossland Sav. Bank*, 111 F.3d 251, 256-57 (2d Cir. 1997) (requiring that the defendant "affirmatively procure[] or instigate[] the confinement").  In that way, the cause of action incorporates a causation requirement when the defendant is not the entity that did the confining.

*New York City Health and Hospitals Corp.*, 648 N.Y.S.2d 880, 885 (N.Y. App. Div. 1996) (negligent infliction of emotional distress).

Although proximate causation for a § 1985 claim is a question of federal law, rather than state law, the key principles remain the same. *See Barnes v. Anderson*, 202 F.3d 150, 158 (2d Cir. 1999) (applying "state tort analogs" to determine proximate causation for § 1983 suit); *see supra* at 7, n.5. A plaintiff bears the burden of showing that the defendant's conduct was "a substantial cause of the events which produced the injury." *Derdiarian*, 414 N.E.2d at 670; *see Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013) (similar). In determining whether a plaintiff has met his burden, courts must consider "the aggregate number of factors involved which contribute towards the harm and the effect which each has in producing it." *Mack v. Altmans Stage Lighting Co., Inc.*, 98 A.D.2d 468, 470 (N.Y. App. Div. 1984)).

Even with a substantial cause showing, "[w]here the acts of a third person intervene between the defendant's conduct and the plaintiff's injury," the intervening act "breaks the causal nexus" if it is "extraordinary under the circumstances, not foreseeable in the normal course of events, or independent of or far removed from the defendant's conduct." *Derdiarian*, 414 N.E.2d at 670; *see Higazy v. Templeton*, 505 F.3d 161, 175 (2d Cir. 2007) (adhering to the "common law definition of superseding cause" in § 1983 action). "[A]n intervening intentional or criminal act will generally sever the liability of the original tortfeasor." *Turturro v. City of N.Y.*, 68 N.E.3d 693, 705 (N.Y. 2016) (quoting *Kush v. City of Buffalo*, 449 N.E.2d 725, 835 (N.Y. 1983)).

### B.   Defendants' Alleged Acts Did Not Proximately Cause Plaintiffs' Injuries

Plaintiffs fail to allege that Defendants' alleged conduct was the proximate cause of their injuries. As described, the complaint sets forth two theories of liability. The gist of the first theory is that Defendants "orchestrated the Shah's entry to the United States," which then prompted Iranian militants, acting with the support of the Iranian government, to hold more than 50

Americans hostage, including Plaintiffs, for 444 days.  Compl. ¶ 3, *see id.* ¶¶ 48-58.  The second

is that Defendants "sabotage[d the] hostage talks," which extended Plaintiffs' period of captivity

by several months.  *Id.* ¶ 6; *see id.* ¶ 70-80.  Neither plausibly alleges proximate causation.

Plaintiffs' theories rest on long, attenuated causal chains establishing that Defendants'

actions were not a substantial cause of the harm.  In support of their first theory, Plaintiffs allege

that: (1) Chase told the State Department the Shah needed "life-saving treatment only available in

New York," *id.* ¶ 49; (2) "U.S. officials recommended that President Carter admit the Shah on

humanitarian grounds," *id.* ¶ 50; (3) President Carter "agreed," and the Shah was "whisked to a

New York hospital," *id.* ¶¶ 51-52; (4) angry Iranian militants "captured the embassy and took the

Americans hostage," *id.* ¶ 55; (5) "Iran's fundamentalist Supreme Leader" demanded that "the

United States turn the Shah over to Iran" in exchange for releasing the hostages, *id.* ¶ 56; (6) the

United States did not accede to Iran's demands, *id.*; and (7) Iran kept the hostages for 444 days,

during which period it "blindfolded, tortured, taunted, and threatened [them] with death," *id.* ¶ 57.

Plaintiffs' second causal chain is equally attenuated: (1) Chase "spread rumors about

possible payoffs to win the release," *id.* ¶ 76; (2) the rumors "impeded" the Carter Administration's

negotiations with Iran, *id.* ¶ 76; (3) the two governments were unable to reach an agreement until

January 20, 1981, *id.* ¶ 78; (4) Iran refused to free the hostages until that agreement was reached,

*id.* ¶¶ 77, 116; and (5) the captivity period was thereby prolonged, *id.* ¶¶ 60-61.  A "number of

factors"—at least five—each involving different intervening actors are thus required to link

Defendants' conduct to Plaintiffs' injuries.  *Mack*, 98 A.D.2d at 470.  These speculative causal

chains fail to plausibly allege that Defendants' actions were "a substantial factor in the sequence

of responsible causation."  *Rothstein*, 708 F.3d at 91, 97.

Even more, the causal chains make clear that the Iranian government's intervening

actions—specifically, its backing of an attack against the American embassy and detention of diplomatic personnel, in violation of international law—are superseding causes of Plaintiffs' injuries.[6]  "When one of the links on a causal chain is a sovereign state, the need for facts specifically connecting a defendant's actions to the ultimate . . . attack is especially acute." *Kemper v. Deutsche Bank AG*, 911 F.3d 383, 393 (7th Cir. 2018).  In *Kemper*, the plaintiff brought an Anti-Terrorism Act claim against Deutsche Bank, alleging that "Iran [wa]s responsible for the terrorist attack that killed her son, and that Deutsche Bank facilitated that attack by providing services to Iran and state-owned Iranian businesses." *Id.*  The Seventh Circuit found that plaintiff failed to establish proximate cause, explaining that "a sovereign's affirmative choice to engage in a wrongful act will usually supersede a third party's [interactions] . . . with that sovereign." *Id.*; *see Rothstein*, 708 F.3d at 97 (no proximate cause in a similar suit because the "fact remains that Iran is a government"); *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 276 (D.C. Cir. 2018) (no proximate cause in a suit against BNP Paribas for its alleged financial assistance to Sudan, which funded al Qaeda's attack on U.S. embassies in Kenya and Tanzania).  This rule "makes sense," the court went on, because "[f]inding that a sovereign state's actions supersede other more tangential causes prevents the scope of liability from extending to the many individual persons, businesses, and other sovereigns that interact with that state." *Kemper*, 911 F.3d at 393.

Here, as in *Kemper*, the Iranian government's "affirmative choice to engage in a wrongful act" supersedes "other more tangential causes" of the hostage crisis. 911 F.3d at 393.  The Vienna Convention on Diplomatic Relations ("VCDR") declares diplomatic missions and persons

---

[6] The actions of both the Iranian militants and the Iranian government contributed to Plaintiffs' injuries.  Our analysis focuses on the actions of the Iranian government, because the government lent support to the militants' attack on the embassy and refused to release the hostages for over a year, thus adopting the militants' actions as its own. Although the government's actions reflect the clearest break in the chain and superseding cause of harm, the militants' "intentional [and] criminal" conduct is likewise sufficient to sever the chain of causation. *Turturro*, 68 N.E.3d at 705.

"inviolable" and imposes on sovereign states the responsibility to protect missions in their territory.  VCDR, Apr. 18, 1961, 23 U.S.T. 3227, arts. 22, 29 (providing that "a diplomatic agent" shall not be "liable to any form of arrest or detention").  Both the United States and Iran ratified the Convention years before the crisis, *see* U.N. Treaty Collection, VCDR, making those obligations mandatory under international law, *see Boos v. Barry*, 485 U.S. 312, 322 (1988).  Iran's failure to protect the American embassy and its decision to keep holding American diplomats hostage until an agreement was reached on January 20, 1981, *see* Compl. ¶¶ 56, 78, therefore reflects a flagrant breach of international law.  Indeed, in the immediate aftermath of the crisis, President Carter denounced Iran's actions as "an act of terrorism totally outside the bounds of international law."  Ex. 7, Terence Smith, *Carter, Denouncing Terror, Warns Iran on Hostages' Safety*, N.Y. Times (Nov. 16, 1979).

Courts, including this one, have long recognized that this kind of "intentional[]," "illegal" action by a sovereign state definitively breaks any causal chain.  *Kemper*, 911 F.3d at 393; *The Lusitania*, 251 F. 715, 736 (S.D.N.Y. 1918); *see also In re Korean Air Lines Disaster of Sept. 1, 1983 ("KAL")*, 1985 WL 9447, at *7 (D.D.C.).  In *The Lusitania*, for example, the court dismissed negligence claims against a steamship company whose merchant ship was torpedoed without warning by German submarines, resulting in the deaths of almost 1,200 people.  Because international law had long prohibited states from attacking enemy merchant ships without warning, the court held that the "foul" and "illegal act of the Imperial German government" caused the harm.  251 F. at 736.  Iran's decision to detain and abuse American diplomats constitutes a similarly "shocking [] breach of international law" that supersedes other causes of harm.  *Id.*[7]

---

[7] This reflects a direct application of common law principles—if private persons had detained and sanctioned the abuse of American diplomats, their actions would be criminal and would "sever the liability of the original tortfeasor." *Turturro*, 68 N.E.3d at 705; *see Port Auth. of New York & New Jersey v. Arcadian Corp.*, 189 F.3d 305, 318-19 (3d Cir. 1999) ("terrorists' intentional acts to create an explosive device and to cause harm to the World Trade Center and

Two features of this case make the alleged causal nexus even weaker here than in *Kemper* and the related cases cited above finding no proximate cause. First, Plaintiffs' asserted causal chains involve intervening actions by not just one sovereign state, but *two*. The actions and decisions of the U.S. government lie at the core of Plaintiffs' allegations. President Carter himself made the final decision to grant entry to the Shah, *see* Compl. ¶ 51, and his administration rejected Iran's demands for release and was unable to reach an agreement with the Iranian government until January 1981, *see id*. ¶¶ 77-78. The involvement of an "independent intermediary . . . create[s] a more attenuated chain of causation" between defendant's actions and the ultimate harm, especially when that "intermediary is a sovereign state." *Owens*, 897 F.3d at 275. Where, as here, two of the links on the causal chain are sovereign states—each with their own interests, priorities, and strategic plans—the purported causal connection between Defendants' conduct and Plaintiffs' injuries breaks down completely.

Second, in *Kemper*, plaintiffs at least alleged that defendants interacted directly with the sovereign state responsible for the attack. *See* 911 F.3d at 393 (alleging that Deutsche Bank "facilitated . . . $210 million of transactions" for Iran); *Rothstein*, 708 F.3d at 85, 97 (alleging that UBS provided "U.S. currency to Iran"). Here, however, Defendants' alleged conduct is entirely removed from the harm. The complaint does not allege that Defendants participated in any way in the attack on the Embassy. It does not allege that Defendants provided assistance to the Iranian government or the revolutionaries. It does not allege that Defendants lobbied or sought to influence the Iranian government's actions. And it does not allege that if Defendants had not petitioned the U.S. government to prevent the repatriation of Iranian funds, Iran would have let the hostages free any earlier. The absence of any "facts specifically connecting [the] defendant's

---

its occupants" were a superseding cause of the WTC bombing). Iran's status as a sovereign state renders its resort to international terrorism all the more "extraordinary under the circumstances." *Derdiarian*, 414 N.E.2d at 670.

actions to the ultimate . . . attack" dooms Plaintiffs' claims. *Kemper*, 911 F.3d at 393; *see In re Terrorist Attacks on September 11, 2001*, 714 F.3d 118, 124, 126 (2d Cir. 2013) (dismissing plaintiffs' ATA and common law intentional tort claims because similar types of allegations were "insufficient . . . for establishing proximate causation"); *Owens*, 897 F.3d at 276 (finding no alleged facts "demonstrating a substantial connection between the defendant and terrorism").

Finding proximate causation on these alleged facts would improperly expand "the scope of liability" for entities that interact with the government. *Kemper*, 911 F.3d at 393.  For example, under Plaintiffs' theory, a veterans group that advocated in favor of the "surge" in Iraq in 2007 could be found liable for the deaths of American citizens in that war.  Or a civil liberties nonprofit that lobbied the State Department to release a report documenting crimes against Uighurs could be held responsible for China's retaliatory detention of American journalists.  These seemingly far-fetched hypotheticals are on all fours with this case and illustrate the extent to which Plaintiffs' claims stretch the concept of legal causation beyond its breaking point.  Defendants' alleged conduct is many steps and intervening actors removed from Plaintiffs' injuries, and the illegal actions of the Iranian government definitively sever any causal link.  Under settled common law principles, the complaint contains no plausible allegation of proximate cause.

### C.     Previous Attacks Do Not Render The Crisis Foreseeable

Unable to draw any direct connection between Defendants' actions and Plaintiffs' injuries, Plaintiffs allege that their injuries were foreseeable because of prior incidents of violence against Americans in Iran.  In particular, they note that in February 1979 "Iranian revolutionaries armed with machine-guns attacked the American Embassy in Tehran" and took "dozens of Americans hostage."  Compl. ¶ 35; *see id.* ¶ 46 (describing two subsequent attacks on the American consul in Tabriz and Isfahan).  Plaintiffs also allege that the State Department warned Chase about potential fallout from admitting the Shah.  *See id.* ¶ 45.  To be sure, an intervening event may not sever the

chain of causation if it is "a normal or foreseeable consequence of the situation created by the defendant's negligence." *Turturro*, 68 N.E.3d at 705.  But nothing about the alleged warning signs renders Iran's egregious violation of international law remotely normal or foreseeable.

The decision in *In re Korean Air Lines Disaster of Sept. 1, 1983 ("KAL")*, 1985 WL 9447 (D.D.C.), is instructive.  The *KAL* plaintiffs filed a tort suit against Boeing and Litton after a manufacturing defect caused a civilian flight to deviate from its assigned course into Soviet territory, prompting Soviet military aircraft to fire missiles that destroyed the plane and killed everyone aboard.  The district court found as a matter of law that the Soviet attack was a superseding cause of harm.  In reaching that conclusion, the court relied on the Convention on International Civil Aviation (ICAO), to which the Soviet Union was a party.  Because the Convention set out detailed procedures for interception and made clear that states should "refrain from deliberate violence against unarmed civilian aircraft," the court found that "Defendant manufacturers had reason to expect that force would be avoided."  *Id*. at *4.  The plaintiffs argued that the Soviet Union's disregard of the ICAO procedures was nonetheless foreseeable based on prior aircraft incidents involving Soviet use of force—and in particular, a similar incident in 1978 in which another KAL jetliner was intercepted by Soviet fighter planes.

The court rejected that argument.  In the 1978 incident, the court explained, "the Soviet intercepting fighter planes did follow the ICAO procedures and signalled the Korean plane to land"; "[o]nly after those attempts failed . . . did the Soviet Union force the plane down."  *Id*. at *5.  Even then, the court observed, the plane was only "forced to land; it was not" shot down, like the 1983 flight.  *Id*.  "*There lies the difference*," the court declared:  "In 1978, the Soviet Union opted to force landing.  Unfortunately, in 1983, the decision was otherwise."  *Id*. (emphasis added).  Defendants, the court concluded, could not "anticipate such deliberate destruction."  *Id*.

28

The same holds true here.  As in *KAL*, Plaintiffs seek to hold Defendants liable for an act of aggression by a sovereign state, in clear violation of international law.  And as in *KAL*, Plaintiffs claim that the stunning attack was foreseeable based on an earlier, similar incident.  But just as in *KAL*, Plaintiffs fail to recognize the critical difference between the two:  In February 1979, the embassy attack did not succeed, as the hostages were "released on the orders of the Iranian revolutionary leader Ayatollah Khomeini."  Compl. ¶ 35.  In November 1979, the decision was otherwise—Khomeini backed the embassy takeover and refused to release the hostages until the United States acceded to Iran's demands.  *See id.* ¶ 55-56.  Given that key distinction, Defendants could not anticipate the 444-day hostage crisis that unfolded.  Indeed, if anything, the February 1979 incident made the November 1979 crisis *less* foreseeable.  The earlier incident suggested a commitment by Khomeini to uphold Iran's obligations under international law—making it all the less predictable that, just a few months later, the Iranian government would turn its back on those very same obligations and sanction a "direct and deliberate . . . attack."  *KAL*, 1985 WL, at *6.

Plaintiffs' other alleged warning signs are no more illuminating.  The sporadic episodes of mob violence in Tabriz and Isfahan, *see* Compl. ¶ 46, bear no resemblance, in scope, duration, or consequence, to Iran's decision to hold 52 Americans hostage in the Embassy—actions amounting to state-sanctioned terrorism.  *See Gaines-Tabb v. ICI Explosives, USA, Inc*., 160 F.3d 613, 621 (10th Cir. 1998) (holding that it was unforeseeable as a matter of law that ammonium nitrate would be used to create the Oklahoma City bomb despite a few previous "occasions of successful terrorist actions using ammonium nitrate").  The State Department's intelligence reports, *see* Compl. ¶ 45, likewise fail to establish foreseeability.  In *The Lusitania*, the court found that Germany's brazen attack constituted a superseding cause of harm even though "there had been explicit notice from the German government that enemy merchant ships passing through certain waters would be

destroyed." *KAL*, 1985 WL, at *7; *see* 251 F. at 736 (holding that the steamship company was "justified in believing that" Germany "would not be violated" "universally accepted principle[s]" of international law notwithstanding its 1915 war zone proclamation).  Similarly, no paper warning of potential retaliation could render Iran's intentional and illegal actions foreseeable.

At bottom, "[i]t is . . . easy now, in the light of many later events, . . . to look back and say the [Defendants] should have known that [Iranian] government would authorize or permit so shocking a breach of international law and so foul an offense." *The Lusitania*, 251 F. at 736.  But Iran's actions constituted a grave departure from settled norms and risked a war.  Defendants "cannot be held accountable for [its] unexpected act of aggression." *KAL*, 1985 WL, at *8.

## IV.    EACH OF THE INDIVIDUAL CLAIMS SUFFERS FROM PLEADING DEFICIENCIES

### A.    Defendants Did Not Conspire To Injure Plaintiffs

Plaintiffs' claim under § 1985(1) is also deficient because the agreement described—to "sabotage the Hostage Talks" because of their potential to harm Chase's alleged "efforts to use Iranian foreign assets to pay off Iran's debts," Compl. ¶¶ 73, 76—was not aimed at injuring Plaintiffs.  In relevant part, that statute prohibits conspiracies "to injure [an officer of the United States] . . . while engaged in the lawful discharge" of his duties.  42 U.S.C. § 1985(1); *see* Compl. ¶ 108.  In order to prevail, Plaintiffs "must plead facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end," *Warren v. Fischl*, 33 F. Supp. 2d 171, 177 (E.D.N.Y. 1999), that is, "to injure" Plaintiffs, *United States v. DeMott*, No. 05-cr-0073, 2005 WL 2314134, at *1 (N.D.N.Y. Sept. 22, 2005) (as to 18 U.S.C. § 372).

Even accepted as true, Plaintiffs' own allegations make clear that the goal of the agreement was not to inflict injury on the hostages but rather to prevent repatriation of Iranian funds as a term in hostage negotiations.  *See* Compl. ¶¶ 72-73, 76-77.  Despite Plaintiffs' characterization of this

course of action as an "unlawful agreement," neither that goal nor the means used to pursue it were unlawful. *Cf. Nat'l Congress for Puerto Rican Rights vs. City of N.Y.*, 75 F. Supp. 2d 154, 168 (S.D.N.Y. 1999) (civil conspiracy under § 1983 requires agreement to "commit an unlawful act, or to commit a lawful act by unlawful means"). That injury resulted from an otherwise lawful agreement and course of action does not transform that arrangement into a conspiracy to cause the injury in the first instance. *See, e.g.*, *Nat'l Fireproofing Co. v. Mason Builders Ass'n*, 169 F. 259, 265 (2d Cir. 1909) ("An agreement entered into for the primary purpose of promoting the interests of the parties is not rendered illegal by the fact that it may incidentally injure third persons.").

### B.   Plaintiffs Fail To State A Negligence-Based Claim

Plaintiffs' negligence-based claims (Counts II-VI & IX) are all insufficiently pled, as they fail to assert a cognizable legal duty owed by Defendants. While the complaint asserts that Defendants owed "common law and statutory duties to Plaintiffs" as the basis for those claims, Compl. ¶ 150, none of the cited sources of duty in fact create legal obligations owed by Defendants to Plaintiffs. Because "a duty of reasonable care owed by the tort-feasor to the plaintiff is elemental to any recovery in negligence," *Eiseman v. State*, 511 N.E.2d 1128, 1134 (N.Y. 1987), the failure to establish such a duty is fatal to those claims.

### 1.   None Of Plaintiffs' Cited Sources Of Law Create Tort Duties

Counts II-V all rely on a negligence per se theory, *i.e.,* that the cited laws establish duties owed to Plaintiffs, which Defendants breached in purportedly violating the statutes. Compl. ¶¶ 116, 122-48. Under that doctrine, plaintiffs in negligence actions can rely on certain statutory dictates to establish the existence of a duty of care. *See, e.g.*, *German v. Fed. Home Loan Mortg. Corp.*, 896 F. Supp. 1385, 1396 (S.D.N.Y. 1995). But not all statutory duties are properly raised in negligence actions; instead, the question is one of "legislative intent," and those duties are only privately enforceable where "the underlying policy of the legislation is the protection of a certain

class of individuals and [] judicial recognition of a statutory standard [as grounds for liability] will

further that policy of protection."  *Gain v. Eastern Reinforcing Serv., Inc.*, 603 N.Y.S.2d 189, 192

(N.Y. App. Div. 1993); *see also Schmidt v. Merchs. Despatch Trans. Co.*, 200 N.E. 824, 829 (N.Y.

1936).  No duty exists where the statutory standard exclusively "protect[s] the interests of the state

or any subdivision of it as such."  Restatement (Second) of Torts § 288.

Plaintiffs raise this theory as to three different sources of law—the VCDR, the Logan Act,

and the Foreign Agents Registration Act ("FARA").  Compl. ¶¶ 116, 123, 141.  But none of the

cited sources of law give rise to privately enforceable duties.

Turning first to the VCDR, it is entirely clear that the treaty does not give rise to private

rights or duties.  Treaties "generally do not create private rights or provide for a private cause of

action in domestic courts."  *Medellin v. Texas*, 552 U.S. 491, 506 n.3 (2008) (quotation marks and

citation omitted).  The VCDR makes this point directly, stating that the "purpose of [VCDR-

created] privileges and immunities is not to benefit individuals[.]"  VCDR preamble, Apr. 18,

1961, 23 U.S.T. 3227.  In *Mora v. New York*, 524 F.3d 183 (2d Cir. 2008), the Second Circuit drew

on this presumption and a substantially similar disclaimer of intent to benefit individuals, among

other things, in concluding that the Vienna Convention on Consular Rights does not give rise to

privately enforceable rights.  *See id.* at 197 (explaining that "the rights created by the Convention

[] belong to, and should generally be enforced by, the States parties to the Convention and their

official representatives").  The same result must apply here.

Nor do FARA or the Logan Act reflect any legislative intent to protect Plaintiffs or any

other particular class of individuals. "The purpose of [FARA] is 'to provide [a] centralized

reporting system to track activities of agents acting on behalf of foreign countries . . . and no

language in [the] statute or its legislative history suggests that Congress intended to establish [a]

cause of action in any entity other than the Federal Government.'" *Weican Meng v. Xinhuanet Co., Ltd.*, No. 16-CV-6127, 2017 WL 3175609, at *3 (S.D.N.Y. July 25, 2017)  (quoting *Free Namibia v. S. W. Africa People's Org*, 554 F. Supp. 722 (D.D.C. 1982)).  The same is true of the Logan Act, which prohibits private citizens from interfering with U.S. foreign policy:  "Only the [] Department of State is aggrieved by a violation of the Logan Act," *Strunk v. N.Y. Province of Soc. of Jesus*, No. 09-cv-1249, 2010 WL 816121, at *2 (D.D.C. Mar. 8, 2010) (citation omitted), and there are no grounds for permitting private actions based on that law, *see Ackers v. Kerry*, No. 18-cv-1296, 2018 U.S. Dist. LEXIS 124013 (D.D.C. July 25, 2018).[8]

Count IV fails for an even more fundamental reason: 18 U.S.C. § 372 is substantially identical to 42 U.S.C. § 1985(1), and the latter act provides a direct source of civil liability.  Under those circumstances, implying a judicial remedy would circumvent the legislature's intent.  *See Sheehy v. Big Flats Cmty. Day, Inc.*, 541 N.E.2d 18, 22 (N.Y. 1989) ("Where the Legislature has not been completely silent but has instead made express provision for [a] civil remedy . . . the courts should ordinarily not attempt to fashion a different remedy . . . on the basis of a different statute, at least where, as here, the two statutes address the same wrong.").

### 2. "Rescuing" The Shah Did Not Give Rise To A Duty To Plaintiffs

Count II also asserts that "Chase owed Plaintiffs . . . a duty of care when it affirmatively undertook the rescue of the Shah of Iran and knew or reasonably should have known that this rescue would create and exacerbate a dangerous situation."  Compl. ¶ 117.  But there is no legal authority for the proposition that affirmatively agreeing to assist a client creates a duty of care to other individuals who may be harmed by those who dislike one's client.  Moreover, there is no

---

[8] While the cited cases address private causes of action under the statutes, "[t]he issue of whether a plaintiff can assert a cause of action based on negligence per se is closely related to the question of whether a private cause of action exists under a statute."  *Dubai Islamic Bank v. Citibank. N.A.*, 126 F. Supp. 2d 659, 668 (S.D.N.Y. 2000) (internal quotation marks and citation omitted).

general duty to "control the conduct of third-persons so as to prevent them from harming others," absent a special relationship between the defendant and either the plaintiff or the direct tortfeasors. *Hamilton v. Beretta U.S.A. Corp.*, 750 N.E.2d 1055, 1161 (N.Y. 2001) (citation omitted).

### 3.    Plaintiffs Allege No Additional Source Of Duties Owed By Defendants

The final two negligence-based counts—for gross negligence (Count VI) and negligent infliction of emotional distress (Count IX)—do not separately allege any source of a duty owed by Defendants, but instead rely on "common law and statutory duties" as "pled in prior paragraphs." Compl. ¶ 150; *see also id.* ¶ 168.  As discussed, however, each purported source of a duty fails. The failure to establish such duty is fatal to those claims, and they must be dismissed.

### C.    Defendants Did Not Imprison The Hostages

Plaintiffs' false imprisonment claim (Count VII) rests on the theory that, by purportedly undertaking "acts that were intended to sabotage the Iran Hostage Talks" and that were "substantial factors" in the hostages' continued imprisonment, Defendants are liable for their captivity.  Compl. ¶ 157.   But to hold a party who does not physically cause confinement liable for false imprisonment, the plaintiff must show that the defendant "personally participate[d] in or proximately cause[d the] false imprisonment."  *Conklin v. Doe*, No. 01-cv- 987, 2002 WL 227067, at *3 (S.D.N.Y. Feb. 13, 2002) (quotation marks and citation omitted).  This standard is high: "[T]he defendant must have affirmatively induced the [captor] to act, such as taking an active part in the [detention] and procuring it to be made or showing active, officious and undue zeal to the point where the [captor] is not acting of his own volition."  *Curley*, 153 F.3d at 13-14 (internal quotation marks and citation omitted).  None of the allegations come close to meeting this standard. Plaintiffs' entire contention is that Defendants' public lobbying undercut efforts to free the hostages.  *See* Compl. ¶¶ 76-79.  Even taken as true, there is a wide gap between impeding hostage negotiations and "affirmatively induc[ing]" the captors to act.  *Curley*, 154 F.3d at 14.

### D.      Defendants' Lobbying Was Not Extreme And Outrageous

Plaintiffs' claim for intentional infliction of emotional distress ("IIED") (Count VIII) does not allege conduct nearly approaching the requisite level of outrageousness.  New York's standard for assessing whether conduct supports an IIED claim is both "difficult to satisfy" and "susceptible to determination as a matter of law."  *Rich v. Fox News Network, LLC*, 939 F.3d 112, 122 (2d Cir. 2019) (quotation marks and citations omitted).  The underlying behavior must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Howell v. N.Y. Post Co.*, 612 N.E.2d 699, 702 (N.Y. 1993) (quotation marks and citation omitted).  Noting this stringent standard, the Court of Appeals has emphasized that, of the IIED claims it has reviewed, "*every one has failed because the alleged conduct was not sufficiently outrageous.*"  *Chanko v. American Broadcasting Cos., Inc.*, 49 N.E.3d 1171, 1179 (N.Y. 2016) (quotation marks and citation omitted).

Measured against this high threshold, the public lobbying efforts cited here are clearly insufficient to sustain Plaintiffs' IIED claim.  Defendants' alleged actions—urging the government to allow the Shah to enter the country for medical treatment and seeking to prevent negotiation terms contrary to their financial interests—were simply efforts to affect government policy.  Those activities are plainly not "utterly intolerable in a civilized community."  *Howell*, 612 N.E.2d at 702.  The further claim that Defendants made untrue assertions does not make their lobbying "extreme and outrageous."  *See, e.g.*, *Baraliu v. Vinya Capital, L.P.*, No. 07-cv-4626, 2009 WL 959578, at *12 (S.D.N.Y. Mar. 31, 2009) ("[F]alse statements or misrepresentations—even if intentionally made—do not rise to the level of the extreme and outrageous conduct." (citing, *inter alia*, *LaDuke v. Lyons*, 673 N.Y.S.2d 240, 244 (N.Y. App. Div. 1998)).

### CONCLUSION

For these reasons, the Court should grant Defendants' motion to dismiss.

Dated: June 5, 2020
      Boston, Massachusetts

Respectfully submitted,

**LATHAM & WATKINS LLP**


/s/  William J. Trach
William J. Trach (admitted *pro hac vice*)
Michael F. Houlihan
200 Clarendon Street
Boston, MA 02116
Telephone: (617) 948-6000
Facsimile: (617) 948-6001
Email: william.trach@lw.com
Email: michael.houihan@lw.com

Roman Martinez (admitted *pro hac vice*)
Reema B. Shah (admitted *pro hac vice*)
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004-1304
Telephone: (202) 637-2200
Email: roman.martinez@lw.com
Email: reema.shah@lw.com

James E. Brandt
885 Third Ave.
New York, NY 10022-4834
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email: james.brandt@lw.com

*Attorneys for Defendants JPMorgan Chase & Co.*
*and JPMorgan Chase Bank, N.A.*