**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DAVID M. ROEDER, SUSANNE A. ROEDER,
RODNEY SICKMANN, DON COOKE, and MARK
SCHAEFER, individually and on behalf of a class of
similarly situated individuals,

                                        Plaintiffs,

        - against -

J.P. MORGAN CHASE & CO., successor by merger to
CHASE MANHATTAN CORPORATION, and
JPMORGAN CHASE BANK, N.A., successor by
merger to CHASE MANHATTAN BANK,

                                        Defendants.

Case No. 20-cv-2400 (LJL) (SDA)

**ORAL ARGUMENT
REQUESTED**

**DEFENDANTS' MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

BACKGROUND ...................................................................................................2

ARGUMENT .......................................................................................................3

I.      PLAINTIFFS' CLAIMS ARE UNTIMELY .................................................3

      A.      The State Claims Accrued Upon Injury In 1981, Not Discovery In 2019 ...............4
      B.      The Federal Claim Accrued Upon Injury In 1981, Not Discovery In 2019 ...........4
      C.      The Narrow Exception For Equitable Estoppel Does Not Apply ...........................6

II.     PLAINTIFFS' CLAIMS ARE BARRED BY THE *NOERR-PENNINGTON* DOCTRINE .......................................................................................................12

      A.      *Noerr-Pennington* Protects The First Amendment Right To Petition ...............12
      B.      Plaintiffs' Claims Are Based On Protected Petitioning Activity.........................15

III.    THE COMPLAINT FAILS TO ALLEGE PROXIMATE CAUSATION .......................21

      A.      Plaintiffs' Claims All Require Plausibly Alleging Proximate Causation .............22
      B.      Defendants' Alleged Acts Did Not Proximately Cause Plaintiffs' Injuries .........23
      C.      Previous Attacks Do Not Render The Crisis Foreseeable ....................................27

IV.     EACH OF THE INDIVIDUAL CLAIMS IS DEFECTIVE...............................................30

      A.      Defendants Did Not Conspire To Injure Plaintiffs ...............................................30
      B.      Plaintiffs Fail To State A Negligence-Based Claim ...............................................31
          1.      None Of Plaintiffs' Cited Sources Of Law Create Tort Duties ................31
          2.      "Rescuing" The Shah Did Not Give Rise To A Duty To Plaintiffs..........33
          3.      Plaintiffs Allege No Additional Source Of Duties Owed By Defendants ................................................................................................34
      C.      Defendants Did Not Imprison The Hostages .........................................................34
      D.      Defendants' Lobbying Was Not Extreme And Outrageous .................................35

CONCLUSION ....................................................................................................35

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## CASES

*Abbas v. Dixon*,
  480 F.3d 636 (2d Cir. 2007)....................................................................................6, 7, 8

*Abercrombie v. Andrew Coll.*,
  438 F. Supp. 2d 243 (S.D.N.Y. 2006)...........................................................................11

*Ackers v. Kerry*,
  No. 18-cv-1296, 2018 U.S. Dist. LEXIS 124013 (D.D.C. July 25, 2018) ............................33

*Alfred Weissman Real Estate, Inc. v. Big V Supermarkets, Inc.*,
  268 A.D.2d 101 (N.Y. Sup. Ct. 2000) ...........................................................................15

*Allaway v. McGinnis*,
  362 F. Supp. 2d 390 (W.D.N.Y. 2005) ............................................................................7

*Allen v. Antal*,
  665 F. App'x 9 (2d Cir. 2016) ......................................................................................5

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
  486 U.S. 492 (1988)......................................................................................16, 17, 21

*Arnold v. International Business Machines Corp.*,
  637 F.2d 1350 (9th Cir. 1981) ....................................................................................22

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).....................................................................................................3

*Astoria Entertainment v. Edwards*,
  159 F. Supp. 2d 303 (E.D. La. 2001) ............................................................................19

*Baraliu v. Vinya Capital, L.P.*,
  No. 07-cv-4626, 2009 WL 959578 (S.D.N.Y. Mar. 31, 2009)...............................................35

*Barnes v. Anderson*,
  202 F.3d 150 (2d Cir. 1999).........................................................................................22

*Bath Petroleum Storage, Inc. v. Market Hub Partners, L.P.*,
  229 F.3d 1135 (2d Cir. 2000)........................................................................................14

*BE & K Const. Co. v. N.L.R.B.*,
  536 U.S. 516 (2002).....................................................................................................12

*Bill Johnson's Restaurants, Inc. v. N.L.R.B.*,
    461 U.S. 731 (1983)............................................................................................14

*Blanco v. American Telephone & Telegraph Co.*,
    689 N.E.2d 506 (N.Y. 1997)................................................................................4

*Boos v. Barry*,
    485 U.S. 312 (1988)............................................................................................25

*Borough of Duryea, Pennsylvania v. Guarnieri*,
    564 U.S. 379 (2011).................................................................................. *passim*

*Bradley v. Computer Sciences Corp.*,
    643 F.2d 1029 (4th Cir. 1981) ...........................................................................15

*Brown v. New York City Health and Hospitals Corp.*,
    648 N.Y.S.2d 880 (N.Y. App. Div. 1996) .........................................................22

*California Motor Transport Co. v. Trucking Unlimited*,
    404 U.S. 508 (1972)....................................................................................13, 18

*Cardtoons, L.C. v. Major League Baseball Players Ass'n*,
    208 F.3d 885 (10th Cir. 2000) ...........................................................................15

*Chanko v. American Broadcasting Cos., Inc.*,
    49 N.E.3d 1171 (N.Y. 2016)..............................................................................35

*Citizens United v. FEC*,
    558 U.S. 310 (2010)............................................................................................20

*City of Columbia v. Omni Outdoor Advertising, Inc.*,
    499 U.S. 365 (1991).................................................................................16, 19, 21

*Coleman v. Worster*,
    35 N.Y.S.3d 354 (N.Y. App. Div. 2016) ............................................................4

*Coll v. First American Title Insurance Co.*,
    642 F.3d 876 (10th Cir. 2011) ...........................................................................19

*Concourse Nursing Home v. Engelstein*,
    278 A.D.2d 35 (N.Y. Sup. Ct. 2000) .................................................................15

*Conklin v. Doe*,
    No. 01-cv-987, 2002 WL 227067 (S.D.N.Y. Feb. 13, 2002) .............................34

*Cornwell v. Robinson*,
    23 F.3d 694 (2d Cir. 1994)...................................................................................5

*Corsello v. Verizon New York, Inc.*,
  967 N.E.2d 1177 (N.Y. 2012) .................................................................8, 9

*In re DDAVP Direct Purchaser Antitrust Litigation*,
  585 F.3d 677 (2d Cir. 2009).......................................................................14

*Derdiarian v. Felix Contracting Corp.*,
  414 N.E.2d 666 (N.Y. 1980) .........................................................22, 23, 26

*Doe v. Kolko*,
  No. 06-CV-2215, 2008 WL 4146199 (E.D.N.Y. Sept. 5, 2008) ...............8

*Doron Precision Systems, Inc. v. FAAC, Inc.*,
  423 F. Supp. 2d 173 (S.D.N.Y. 2006).......................................................19

*Dougherty v. Town of North Hempstead Board of Zoning Appeals*,
  282 F.3d 83 (2d Cir. 2002).........................................................................13

*Dowe v. Leeds Brown Law, P.C.*,
  419 F. Supp. 3d 748 (S.D.N.Y. 2019)..........................................................8

*Dubai Islamic Bank v. Citibank. N.A.*,
  126 F. Supp. 2d 659 (S.D.N.Y. 2000)........................................................33

*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*,
  365 U.S. 127 (1961).......................................................................... *passim*

*Eaton v. Newport Board of Education*,
  975 F.2d 292 (6th Cir. 1992) .....................................................................15

*EDF Renewable Development, Inc. v. Tritec Real Estate Co., Inc.*,
  147 F. Supp. 3d 63 (E.D.N.Y. 2015) ...................................................15, 20

*Effie Film, LLC v. Pomerance*,
  909 F. Supp. 2d 273 (S.D.N.Y. 2012)........................................................10

*Eiseman v. State*,
  511 N.E.2d 1128 (N.Y. 1987).....................................................................31

*Fisher v. JPMorgan Chase Bank, N.A.*,
  740 F. App'x 745 (2d Cir. 2018) ..................................................................4

*Gabelli v. SEC*,
  568 U.S. 442 (2013)..................................................................................5, 6

*Gain v. Eastern Reinforcing Service, Inc.*,
  603 N.Y.S.2d 189 (N.Y. App. Div. 1993) .................................................32

*Gaines-Tabb v. ICI Explosives, USA, Inc.*,
  160 F.3d 613 (10th Cir. 1998) ............................................................29

*German v. Federal Home Loan Mortgage Corp.*,
  896 F. Supp. 1385 (S.D.N.Y. 1995).......................................................31

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974)...........................................................................18

*Gorman Towers, Inc. v. Bogoslavsky*,
  626 F.2d 607 (8th Cir. 1980) ...............................................................15

*Hamilton v. Beretta U.S.A. Corp.*,
  750 N.E.2d 1055 (N.Y. 2001)...............................................................34

*Hardin v. Straub*,
  490 U.S. 536 (1989)...........................................................................7

*Herr v. Pequea Township*,
  274 F.3d 109 (3d Cir. 2001).................................................................15

*Higazy v. Templeton*,
  505 F.3d 161 (2d Cir. 2007).................................................................23

*Howell v. New York Post Co.*,
  612 N.E.2d 699 (N.Y. 1993).................................................................35

*Ingrassia v. Lividikos*,
  864 N.Y.S.2d 449 (N.Y. App. Div. 2008) ...............................................22

*Kemper v. Deutsche Bank AG*,
  911 F.3d 383 (7th Cir. 2018) .................................................24, 25, 26, 27

*Klein v. Metropolitan Child Services, Inc.*,
  954 N.Y.S.2d 559 (N.Y. App. Div. 2012) ...............................................22

*In re Korean Air Lines Disaster of Sept. 1, 1983*,
  1985 WL 9447 (D.D.C.) ............................................................25, 28, 29

*Kottke v. Northwest Kidney Centers*,
  146 F.3d 1056 (9th Cir. 1998) ..............................................................21

*Koziol v. Wright*,
  809 N.Y.S.2d 350 (N.Y. App. Div. 2006) ...............................................22

*Kronos, Inc. v. AVX Corp.*,
  612 N.E.2d 289 (N.Y. 1993).................................................................4

*Kush v. City of Buffalo*,
    449 N.E.2d 725 (N.Y. 1983) ...........................................................................23

*LaDuke v. Lyons*,
    673 N.Y.S.2d 240 (N.Y. App. Div. 1998) .......................................................35

*Lexmark International, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) .......................................................................................22

*Long v. Sowande*,
    810 N.Y.S.2d 195 (N.Y. App. Div. 2006) .........................................................4

*The Lusitania*,
    251 F. 715 (S.D.N.Y. 1918) ...............................................................25, 26, 30

*Mack v. Altmans Stage Lighting Co., Inc.*,
    98 A.D.2d 468 (N.Y. App. Div. 1984) ......................................................22, 24

*Manistee Town Center v. City of Glendale*,
    227 F.3d 1090 (9th Cir. 2000) .......................................................................15

*Manuel v. City of Joliet*,
    137 S. Ct. 911 (2017) .......................................................................................6

*Medellin v. Texas*,
    552 U.S. 491 (2008) .......................................................................................32

*Miracle Mile Associates v. City of Rochester*,
    617 F.2d 18 (2d Cir. 1980) .............................................................................14

*Mora v. New York*,
    524 F.3d 183 (2d Cir. 2008) ...........................................................................32

*Mosdos Chofetz Claim, Inc. v. Village of Wesley Hills*,
    701 F. Supp. 2d 568 (S.D.N.Y. 2010) .............................................................15

*National Fireproofing Co. v. Mason Builders Association*,
    169 F. 259 (2d Cir. 1909) ...............................................................................31

*Nationwide Mutual Insurance Co. v. Mortensen*,
    606 F.3d 22 (2d Cir. 2010) .............................................................................14

*New West, L.P. v. City of Joliet*,
    491 F.3d 717 (7th Cir. 2007) ..........................................................................15

*Overall v. Estate of Klotz*,
    52 F.3d 398 (2d Cir. 1995) .............................................................................12

*Owens v. BNP Paribas, S.A.*,
  897 F.3d 266 (D.C. Cir. 2018) ...................................................................24, 26, 27

*Pahlad v. Brustman*,
  33 A.D.3d 518 (N.Y. App. Div. 2006) ...............................................................7

*Pearl v. City of Long Beach*,
  296 F.3d 76 (2d Cir. 2002).................................................................................7

*Port Authority of New York & New Jersey v. Arcadian Corp.*,
  189 F.3d 305 (3d Cir. 1999)............................................................................26

*Potts v. Howard University Hospital*,
  598 F. Supp. 2d 36 ..........................................................................................33

*Primetime 24 Joint Venture v. National Broadcasting Company, Inc.*,
  219 F.3d 92 (2d Cir. 2000)...............................................................................13

*Pulver v. Dougherty*,
  871 N.Y.S.2d 495 (N.Y. App. Div. 2009) ..........................................................7

*Redd v. Leftenant*,
  737 F. App'x 603 (2d Cir. 2018) ........................................................................5

*Rich v. Fox News Network, LLC*,
  939 F.3d 112 (2d Cir. 2019)............................................................................35

*Rite Aid Corp. v. Grass*,
  48 A.D.3d 363 (N.Y. App. Div. 2008) ...............................................................8

*Rothstein v. UBS AG*,
  708 F.3d 82 (2d Cir. 2013)...................................................................22, 24, 26

*Rotkiske v. Klemm*,
  140 S. Ct. 355 (2019)........................................................................................5

*Schmidt v. Merchants Despatch Transportation Co.*,
  200 N.E. 824 (N.Y. 1936)................................................................................32

*Sheehy v. Big Flats Cmty. Day, Inc.*,
  541 N.E.2d 18 (N.Y. 1989)..............................................................................33

*Shoultz v. Monfort of Colorado, Inc.*,
  754 F.2d 318 (10th Cir. 1985) .........................................................................14

*Simcuski v. Saeli*,
  377 N.E.2d 71 (N.Y. 1978)................................................................................7

*Singh v. NYCTL 2009-A Tr.*,
    683 F. App'x 76 (2d Cir. 2017) ...............................................................14, 15

*Smith v. Campbell*,
    782 F.3d 93 (2d Cir. 2015)...........................................................................5

*Sosa v. DIRECTV, Inc.*,
    437 F.3d 923 (9th Cir. 2006) .....................................................................18

*Spak v. Phillips*,
    857 F.3d 458 (2d Cir. 2017)..........................................................................5

*Staehr v. Hartford Financial Services Group, Inc.*,
    547 F.3d 406 (2d Cir. 2008)........................................................................10

*Stern v. U.S. Gypsum, Inc.*,
    547 F.2d 1329 (7th Cir. 1977) ........................................................14, 18, 20

*Strunk v. New York Province of Society of Jesus*,
    No. 09-cv-1249, 2010 WL 816121 (D.D.C. Mar. 8, 2010) ....................................33

*Suburban Restoration Co., Inc. v. ACMAT Corp.*,
    700 F.2d 98 (2d Cir. 1983)..........................................................................13

*In re Terrorist Attacks on September 11, 2001*,
    714 F.3d 118 (2d Cir. 2013)........................................................................27

*Townes v. City of New York*,
    176 F.3d 138 (2d Cir. 1999)........................................................................22

*TRW Inc. v. Andrews*,
    534 U.S. 19 (2001) ...................................................................................5

*Tuosto v. Philip Morris USA, Inc.*,
    No. 05-cv-9384, 2007 WL 2398507 (S.D.N.Y.) ...................................................15

*Turturro v. City of New York*,
    68 N.E.3d 693 (N.Y. 2016)........................................................23, 24, 26, 28

*Twersky v. Yeshiva University*,
    579 F. App'x 7 (2d Cir. 2014) ......................................................................7

*Twersky v. Yeshiva University*,
    993 F. Supp. 2d 429 (S.D.N.Y. 2014)............................................................7, 8

*United Mine Workers of America v. Pennington*,
    381 U.S. 657 (1965)...................................................................... *passim*

*United States v. DeMott*,
No. 05-cr-0073, 2005 WL 2314134 (N.D.N.Y. Sept. 22, 2005) ...........................................30

*Vernes v. Phillips*,
194 N.E. 762 (N.Y. 1935)....................................................................................................22

*Video International Production, Inc. v. Warner-Amex Cable Communications, Inc.*,
858 F.2d 1075 (5th Cir. 1988) ............................................................................................15

*Wallace v. Kato*,
549 U.S. 384 (2007)..........................................................................................................5, 6

*Warren v. Fischl*,
33 F. Supp. 2d 171 (E.D.N.Y. 1999) ..................................................................................30

*Weican Meng v. Xinhuanet Co., Ltd.*,
No. 16-CV-6127, 2017 WL 3175609 (S.D.N.Y. July 25, 2017)..........................................33

*Weiss v. Willow Tree Civic Ass'n*,
467 F. Supp. 803 (S.D.N.Y. 1979).......................................................................................15

*White v. Lee*,
227 F.3d 1214 (9th Cir. 2000) ............................................................................................14

*Whitney Holdings, Ltd. v. Givotovsky*,
988 F. Supp. 732 (S.D.N.Y. 1997)......................................................................................11

*Zumpano v. Quinn*,
849 N.E.2d (N.Y. 2006).........................................................................................................7

## STATUTES

18 U.S.C. § 372........................................................................................................30, 33

42 U.S.C. § 1985(1) ........................................................................................... *passim*

22 U.S.C. § 611 *et seq.*..........................................................................................19

## RULES

C.P.L.R. § 214................................................................................................................4

C.P.L.R. § 215................................................................................................................4

Federal Rule of Civil Procedure 12(b)(6) .....................................................................3

## TREATISES

1 C. Corman, Limitation of Actions § 7.4.1 (1991).......................................................5

54 C.J.S. Limitations of Actions § 221 ................................................................5

Restatement (Second) of Torts § 45A.................................................................6

Restatement (Second) of Torts § 288.................................................................32

## CONSTITUTIONAL PROVISIONS

First Amendment ..........................................................................................13, 19

U.S. Const., amend. I .......................................................................................12

## OTHER AUTHORITIES

Report of the Special Counsel, S. Doc. No. 102-125 (1992).........................11

Joint Report of the Task Force to Investigate Certain Alegations Concerning the
    Holding of American Hostages by Iran, H.R. No. 102-1 (1993)......................11, 12

Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227 ......................25, 32

## INTRODUCTION

This case arises out of the Iran hostage crisis—one of the major US foreign policy crises of the twentieth century.  Iranian militants stormed the American embassy in Iran, and the Iranian government refused to release 52 diplomats taken hostage for 444 days.  Plaintiffs are former hostages and their family members.  They suffered immensely during their period of captivity and deserve gratitude for their courageous service to our country.

In this case, however, Plaintiffs are not suing the Iranian revolutionaries that attacked the embassy or the Iranian government that sanctioned their captivity.  Instead, Plaintiffs blame Defendants—American banking and financial services companies—for the crisis and seek to hold them liable for the injuries incurred.  But Plaintiffs' outlandish allegations of a plot between some of America's most respected businessmen and statesmen to harm American interests and risk the lives of American diplomats are wholly implausible.  Their federal and state claims all suffer from the same three defects, each of which compels dismissal of the complaint in its entirety.

*First*, Plaintiffs' claims are untimely.  The events at issue occurred nearly forty years ago. Plaintiffs say they only recently learned of Chase Bank's purported involvement, but the timing of that alleged discovery does not affect the claims' accrual under settled law.  Plaintiffs allege no basis for tolling the long-expired statute of limitations.  Nor could they, given that the alleged facts they rely upon have been the subject of numerous books and articles for nearly forty years.

*Second*, all of Plaintiffs' claims are predicated on Defendants' alleged efforts to influence US government policy and lobby the Carter administration to protect their financial interests. Those efforts represent Defendants' exercise of their constitutional right to petition the government for redress and are squarely protected under the First Amendment.  The *Noerr-Pennington* doctrine thus immunizes Defendants from liability on the basis of their alleged conduct.

*Third*, Plaintiffs fail to plausibly allege that Defendants proximately caused their injuries.

1

Defendants' alleged actions are far removed from the crisis, so Plaintiffs must rely on a long and attenuated chain of causation to connect those actions to the harm.  But Iran's acts of terrorism—in flagrant violation of international law—definitively sever Plaintiffs' asserted causal nexus.

In addition, each of Plaintiffs' federal and state claims also suffers from individual pleading defects and fails on the merits.  All of their claims must be dismissed.

## BACKGROUND

On November 4, 1979, Iranian militants attacked the US Embassy in Tehran and placed American diplomats under forced confinement.  Am. Compl. (AC) ¶ 55.  The United States refused to accede to Iran's demands, and as a result 52 hostages were held captive for 444 days, until January 1981.  *Id.*  During their captivity, the hostages were abused and mistreated.  *Id.* ¶¶ 59-68.  Plaintiffs are three former hostages and two of their immediate family members and seek to represent a class composed of all American hostages and immediate family members.  *Id.* ¶ 91.

Plaintiffs allege that Chase Manhattan Corporation and Chase Manhattan Bank (collectively, "Chase") contributed to the hostage crisis in two ways.  *First*, they allege that David Rockefeller, Chase's then-Chairman and CEO, and former Secretary of State Henry Kissinger, then-Chairman of Chase's Board of Advisors, entered into an agreement (known as "Project Eagle") with the Shah of Iran to secure safe haven for the Shah in the United States in order to protect Chase's financial interests.  *Id.* ¶¶ 39-43.  Plaintiffs allege Chase pressured the US government to admit the Shah, including by telling the State Department that he would die without emergency medical treatment in New York, even though Chase knew the Shah's presence in the United States could endanger the lives of Americans in Iran.  *Id.* ¶¶ 45-46, 48-50.  Plaintiffs allege that this lobbying persuaded President Carter to permit the Shah to enter the United States, thereby prompting Iranian revolutionaries to attack the US embassy.  *Id.* ¶¶ 51-53.  *Second*, Plaintiffs allege

that the Project Eagle participants acted to sabotage the Carter administration's efforts to negotiate the release of the hostages, out of fear that a deal might result in the repatriation of Iranian funds held by Chase.  *Id.* ¶¶ 72-76.  Specifically, Plaintiffs allege that Chase "gathered and spread knowingly false rumors about possible payoffs to win the release."  *Id.* ¶ 76.

Plaintiffs assert nine claims against Defendants as successors to Chase.  *Id.* ¶¶ 17-22.  Their claim under the Civil Rights Act of 1871, 42 U.S.C. § 1985(1), alleges that Defendants conspired to injure them while they were serving as US diplomatic agents.  *Id.* ¶¶ 107-111.  The common law claims allege negligence, different forms of negligence per se, gross negligence, false imprisonment, intentional infliction of emotional distress, and negligent infliction of emotional distress.  *Id.* ¶¶ 112-173.  Plaintiffs seek compensatory and punitive damages.  *Id.* at 37.

**ARGUMENT**

Under Rule 12(b)(6), a complaint must be dismissed unless it pleads "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  None of Plaintiffs' claims survive that standard.

## I.   PLAINTIFFS' CLAIMS ARE UNTIMELY

All of Plaintiffs' claims accrued nearly four decades ago, rendering them untimely on their face.  Plaintiffs try to plead around the statute of limitations by claiming that (1) they did not discover Defendants' involvement in their injury until the publication of a *New York Times* article in December 2019; and (2) they are entitled to equitable estoppel based on Defendants' alleged acts of deception.  Both theories fail.  The date of injury—not discovery—governs accrual of their claims.  And Plaintiffs cannot plausibly allege that Defendants directly misled them—or that Plaintiffs diligently investigated the allegations at the heart of their complaint, all of which have been widely publicized for decades.  Because the complaint fails to plausibly allege any facts that could render Plaintiffs' action timely, the Court should dismiss the case in its entirety.

**A.      The State Claims Accrued Upon Injury In 1981, Not Discovery In 2019**

New York law governs the limitations period and accrual rules applicable to Plaintiffs'
state common law claims.  The negligence claims (Counts II-VI and IX) are subject to a three-year
limitations period, while the intentional torts (Counts VII and VIII) carry a one-year period.  N.Y.
C.P.L.R. §§ 214(5), 215(3).  For both sets of claims, accrual occurs when the "injury is sustained,"
not based on the alleged "wrongful act of defendant or discovery of the injury by plaintiff."
*Kronos, Inc. v. AVX Corp.*, 612 N.E.2d 289, 292 (N.Y. 1993); *see also Fisher v. JPMorgan Chase
Bank, N.A.*, 740 F. App'x 745, 746 (2d Cir. 2018) (summary order) (same).

The application of these rules here is clear:  Plaintiffs' injuries were inflicted no later than
their release in 1981, but they waited nearly forty years—until 2019—to bring their common law
claims.  By then, all of the relevant limitations periods had long expired.

Plaintiffs assert that their claims accrued only when they discovered Defendants' purported
"inflict[ion of] injuries upon them and the details of how and why [they] did so."  AC ¶ 106.  But
under New York law, the time of injury, not discovery, governs accrual.  *Kronos*, 612 N.E.2d at
292.  The only injuries alleged are those sustained during the hostages' captivity, *e.g.*, AC ¶¶ 95(d),
96, and so the state law claims accrued, at the latest, at the time of their release, *see Blanco v. Am.
Tel. & Telegraph Co.*, 689 N.E.2d 506, 510 (N.Y. 1997) (actions under C.P.L.R. § 214 accrue
"when all . . . facts necessary to the cause of action have occurred"); *Coleman v. Worster*, 35
N.Y.S.3d 354, 356 (N.Y. App. Div. 2016) (false imprisonment claim accrues on release); *Long v.
Sowande*, 810 N.Y.S.2d 195, 198 (N.Y. App. Div. 2006) (intentional infliction of emotional
distress claim accrues on date that plaintiff first suffers emotional distress).

**B.      The Federal Claim Accrued Upon Injury In 1981, Not Discovery In 2019**

The same result holds under the federal accrual standard:  Plaintiffs' claims accrued at the
time the injury occurred, irrespective of the time of discovery.  Plaintiffs' lone federal claim, for

violation of 42 U.S.C. § 1985(1) (Count I), draws its three-year limitations period from New York law. *See, e.g.*, *Cornwell v. Robinson*, 23 F.3d 694, 703 (2d Cir. 1994). The date on which that period begins to run, however, is determined by federal law, and courts must "apply 'general . . . common-law tort principles' to determine the accrual date of a [federal] claim." *Spak v. Phillips*, 857 F.3d 458, 462 (2d Cir. 2017) (quoting *Wallace v. Kato*, 549 U.S. 384, 388 (2007)).

As the Supreme Court has made clear, it is "the standard rule that [accrual occurs] when the plaintiff has 'a complete and present cause of action,'" *Wallace*, 549 U.S. at 388 (citation omitted), which is "when the wrongful act or omission results in damages," *id.* at 391 (quoting 1 C. Corman, Limitation of Actions § 7.4.1, pp. 526-27 (1991)). "That [injury-accrual] rule has governed since the 1830s," *Gabelli v. SEC*, 568 U.S. 442, 448 (2013), decades before § 1985(1) was enacted in 1871. That rule is fundamentally different from a discovery-accrual rule, under which a claim accrues only when the plaintiff knows or has reason to know of their injury. *See id.* at 447-54 (applying *Wallace*'s injury-accrual rule and explaining that the discovery rule is an "exception" limited to fraud cases); *see also Rotkiske v. Klemm*, 140 S. Ct. 355, 360-61 (2019) (distinguishing between the "standard rule" and accrual based on "the date of discovery"); *TRW Inc. v. Andrews*, 534 U.S. 19, 37 (2001) (Scalia, J., concurring) (noting that under the injury-accrual rule, the fact "that a person entitled to an action has no knowledge of his right to sue, or of the facts out of which his right arises, does not postpone the period of limitation"); 54 C.J.S. Limitations of Actions § 221. The Second Circuit has applied *Wallace*'s injury-accrual rule to dismiss civil rights claims when the plaintiff had a complete cause of action yet failed to sue within the limitations period. *See Smith v. Campbell*, 782 F.3d 93, 100-02 (2d Cir. 2015).[1]

---

[1] The Second Circuit has sometimes cited pre-*Wallace* accrual standards indicating that §§ 1983 and 1985 claims accrue when the plaintiff discovers his injury. *See, e.g.*, *Redd v. Leftenant*, 737 F. App'x 603, 604 (2d Cir. 2018) (summary order); *Allen v. Antal*, 665 F. App'x 9, 12 (2d Cir. 2016) (summary order). *But see Smith*, 782 F.3d at 100. But *Gabelli* makes clear that such a discovery rule is fundamentally incompatible with *Wallace*'s injury-accrual rule,

To determine when the alleged "wrongful act . . . results in damages" for purposes of the injury-accrual rule, courts may "adopt wholesale the rules that would apply in a suit involving the most analogous tort." *Manuel v. City of Joliet*, 137 S. Ct. 911, 920 (2017).  Although § 1985 does not have a direct common-law tort equivalent, the allegation here—that Defendants conspired to "prolong" the hostages' unlawful captivity by others, AC ¶ 108—is most analogous to a claim of false imprisonment.  *See* Restatement (Second) of Torts § 45A.  And *Wallace* makes clear that in false imprisonment cases, the statute of limitations begins to run when the "false imprisonment . . . end[s]," irrespective of later discovery of additional facts.  549 U.S. at 389, 391.  Under *Wallace*, therefore, Plaintiffs' claims accrued upon their release on January 21, 1981; the limitations period expired on January 21, 1984; and this case was untimely filed in March 2020.

Plaintiffs nonetheless assert that their claims accrued when they read a December 2019 *New York Times* article discussing Defendants' purported involvement in their imprisonment. AC ¶ 106.  That is mistaken.  As noted, their § 1985 claim accrued once the alleged unlawful act resulted in damages—no later than January 1981, when the hostages were released—*not* when that cause of action was purportedly first discovered.  *See supra* at 5-6.  Under the injury-accrual approach, Plaintiffs' cause of action accrued almost forty years ago.

## C.    The Narrow Exception For Equitable Estoppel Does Not Apply

To the extent that Plaintiffs seek to equitably estop Defendants' meritorious limitations defense based on claimed misrepresentations about their role in contributing to Plaintiffs' injuries, *see, e.g.*, AC ¶¶ 81-84, those arguments also fail as a matter of law.

State law governs the tolling of claims arising under state common law, and generally governs claims under § 1985 unless it would "defeat the goals" of that statute.  *Abbas v. Dixon*,

---

which turns on when the injury occurs and *not* on when it is discovered.  *See Gabelli*, 568 U.S. at 447-54.

480 F.3d 636, 642 (2d Cir. 2007) (quoting *Pearl v. City of Long Beach*, 296 F.3d 76, 80 (2d Cir. 2002)) (as to § 1983).[2]   Under New York's doctrine of equitable estoppel (sometimes called fraudulent concealment), a defendant may be estopped from asserting a timeliness defense where the plaintiff was "prevented from filing an action within the applicable statute of limitations due to his . . . reasonable reliance on [the defendant's] deception, fraud or misrepresentations." *Pulver v. Dougherty*, 871 N.Y.S.2d 495, 496 (N.Y. App. Div. 2009).  The plaintiff must "articulate . . . acts by defendants that prevented him from timely commencing suit," *Abbas*, 480 F.3d at 642 (quotation marks and alterations omitted), and defendants' failure to "make a public confession[] or [] alert" individuals who might have a claim against them does not suffice absent a fiduciary relationship, *Zumpano v. Quinn*, 849 N.E.2d 926, 930 (N.Y. 2006).   Likewise, "broad misstatements to the community at large" do not merit estoppel.  *Twersky v. Yeshiva Univ.* ("*Twersky I*"), 993 F. Supp. 2d 429, 442 (S.D.N.Y. 2014).  Rather, the alleged misstatements must be "directed at plaintiffs" and "sufficiently specific so as to admit plaintiffs reasonable reliance in failing to investigate or to file suit." *Twersky v. Yeshiva Univ.*, 579 F. App'x 7, 11 (2d Cir. 2014) (summary order) (citing *Zumpano*, 849 N.E.2d at 930).

Moreover, even where the misrepresentations are otherwise sufficient, a plaintiff seeking to estop a timeliness defense "must demonstrate . . . due diligence . . . in ascertaining the facts, and in commencing the action . . . ." *Pahlad v. Brustman*, 33 A.D.3d 518, 519-20 (N.Y. App. Div. 2006) (citations omitted).  He must "establish that the action was brought within a reasonable time after the facts giving rise to the estoppel have ceased to be operational," *Simcuski v. Saeli*, 377 N.E.2d 713, 717 (N.Y. 1978), and equitable estoppel "will not toll a limitations statute where

---

[2] "[T]he central goal of the Reconstruction-Era civil rights statutes . . . is to ensure that individuals whose federal constitutional or statutory rights are abridged may recover damages or secure injunctive relief," *Hardin v. Straub*, 490 U.S. 536, 539 (1989) (quotation marks omitted).  Defendants are unaware of any decision in this circuit holding that New York's tolling rules defeat that purpose.  *See Allaway v. McGinnis*, 362 F. Supp. 2d 390, 395 (W.D.N.Y. 2005).

plaintiffs possessed timely knowledge sufficient to have placed them under a duty to make inquiry and ascertain all the relevant facts," *Rite Aid Corp. v. Grass*, 48 A.D.3d 363, 364-65 (N.Y. App. Div. 2008).  Such knowledge may be imputed where the facts supporting a plaintiffs' claims "were publicly reported and thus discoverable by a reasonable investigation."  *Dowe v. Leeds Brown Law, P.C.*, 419 F. Supp. 3d 748, 764 (S.D.N.Y. 2019).

Plaintiffs fail to allege any misstatement that comes close to satisfying these standards.  As described below, *none* of the purported misstatements were allegedly made or directed to Plaintiffs, and they are substantively indistinguishable from "broad misstatements to the community at large" that provide no basis for relief.  *Twersky I*, 993 F. Supp. 2d at 442; *see also Doe v. Kolko*, No. 06-CV-2215, 2008 WL 4146199, at *4 (E.D.N.Y. Sept. 5, 2008) (noting that equitable estoppel applies when defendants' misconduct is directed "toward the potential plaintiff, not [the] community at large").  Moreover, the majority of the alleged misstatements are entirely unspecific, and there can be no plausible contention that Plaintiffs were "prevented [] from timely commencing suit" by those general denials of wrongdoing.  *Abbas*, 480 F.3d at 642.  Finally, two of the alleged misstatements, though presented as "affirmative acts of misrepresentation," are in actuality nothing more than a "failure to disclose the wrongs [Defendants] committed" that are not actionable.  *Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012).  The specific application of these rules to each of Plaintiffs' claimed misrepresentations is set forth below:

| Para. | Allegation | Response |
|-------|-----------|----------|
| 81(a) | Rockefeller "claimed that aside from a side comment at an April 1979 meeting involving President Carter, he 'did nothing more publicly or privately to influence the administration's thinking,'" and wrote in his biography that "'despite the insistence of journalists and revisionist historians, there was never a "Rockefeller-Kissinger" behind-the- | The cited statements were directed to the general public and not to Plaintiffs, as the complaint itself concedes.  *Id.* (alleging that those claimed misstatements were made "to the public"). |

8

| | | |
|---|---|---|
| | scenes campaign that placed relentless pressure on the Carter administration to have the Shah admitted to the United States regardless of the consequences.'" | |
| 81(b) | Rockefeller "met with former hostage Michael Kennedy" and stated that "he barely knew" the Shah. | Mr. Kennedy is not a plaintiff in this case, and the statement that Rockefeller "barely knew" the Shah does not offer any specific contention on which Plaintiffs could reasonably rely. |
| 81(c) | Rockefeller "misrepresented to the public [Defendants'] actual financial interest in the Shah's dynasty" by stating that the Shah's holdings in Chase "may have been small accounts of convenience, but they had no real significance." | The statement was, by Plaintiff's own admission, directed to the public, rather than any individual plaintiff, and it does not contain any specific statement with regard to the allegedly tortious actions. |
| 81(d) | Defendants "[r]efused to register as foreign agents of the Shah despite being required to do so by federal law." | The claimed act is both public-facing, rather than specific to Plaintiffs, and a non-actionable omission. |
| 81(e) | Joseph Reed "deceived Congressional and FBI personnel who investigated in 1992-93 the long-rumored conspiracy to thwart President Carter's hostage negotiations" by (1) "refus[ing] to speak to or even acknowledge investigator contact;" (2) "l[ying] to the FBI by stating that he did not know what October Surprise referred to;" and (3) "further l[ying] to [the FBI] when he denied meeting with Reagan Campaign Chairman William Casey in 1980." | The alleged misstatements were not made to Plaintiffs, and at most reached them as members of the public. |
| 81(g) | Reed donated his secret records of Project Eagle to Yale University but only on the stipulation that the records remain sealed until Rockefeller's death. | The claimed act is both public-facing, rather than specific to Plaintiffs, and a non-actionable omission. |

Moreover, even if Plaintiffs' alleged misrepresentations were sufficient, they cannot show the requisite diligence in pursuing their claims. All of the substantive allegations that Plaintiffs claim were unknown until the 2019 *New York Times* article in fact circulated widely in press stories dating back to the time of the hostage crisis itself. *See, e.g.*, Ex. 2, Terence Smith, *Why Carter Admitted the Shah*, N.Y. Times Magazine (May 17, 1981) (claiming the Shah was admitted after

"months" of efforts by Rockefeller and Kissinger and that the Carter administration was swayed by "misinformation" regarding medical necessity); Ex. 3, Richard Cohen, *Rockefeller Keys Open Doors for Sick Shah*, Wash. Post (Nov. 20, 1979) (stating that Rockefeller's doctor "pronounced the [S]hah too sick to be treated anywhere but Manhattan"); Ex. 4, Dan Morgan, *Chase Manhattan's Ties to the Shah: Rockefeller and His Bank Have Been Active in Iran for Years*, Wash. Post (Nov. 16, 1979) (emphasizing "Chase's commercial ties to the [S]hah and his country").[3]

Plaintiffs' allegations have also been the subject of multiple books.  For example, one historian devoted a full chapter of a 2007 book to Rockefeller and Chase's alleged links to the hostage crisis.  Ex. 5, Peter Dale Scott*, The Road to 9/11: Wealth, Empire, and the Future of America*, 80-92 (Univ. of Calif. Press 2007).  That chapter—titled "Carter's Surrender to the Rockefellers on Iran"—cites public sources to describe in detail every major allegation in the complaint, including that (1) Rockefeller and Kissinger "organized a 'special project' . . . to admit the Shah," who they code-named "the Eagle"; (2) it succeeded when Rockefeller's personal assistant and physician persuaded the Carter administration that the Shah required medical treatment in New York; and (3) the same group actively undermined the "October Surprise" hostage negotiations.[4]  *Id.* at 82-84, 91.

These myriad public accounts put Plaintiffs on notice of their potential claims, and yet Plaintiffs failed to pursue their claims diligently.  Plaintiffs do not argue that their factual allegations were not discoverable earlier through reasonable diligence; nor do they contend that

---

[3] The Court "may take judicial notice of facts that various newspapers, magazines, and books were published solely as an indication of information in the public realm at the time."  *Effie Film, LLC v. Pomerance*, 909 F. Supp. 2d 273, 299 (S.D.N.Y. 2012) (quotation marks and citation omitted); *see also Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425-26 (2d Cir. 2008) (same).

[4] Other public sources offer similarly detailed accounts of the allegations at issue.  *See, e.g.*, Ex. 6, Kai Bird, *The Chairman: John J. McCloy & The Making of the American Establishment*, 641-54 (Simon & Schuster 1992); Ex. 7, Robert Parry, *Secrecy and Privilege:  Rise of the Bush Dynasty from Watergate to Iraq*, 137-38 (The Media Consortium 2004) (describing Joseph Reed's alleged misstatements to congressional investigators).

they investigated the earlier accounts.  *See Whitney Hldgs., Ltd. v. Givotovsky*, 988 F. Supp. 732, 747-48 (S.D.N.Y. 1997) ("[Plaintiff] has neither affirmatively pleaded diligence in bringing the action nor even asserted that it could not have discovered the facts underlying the claim . . . .") And although Plaintiffs dismiss accounts undermining Defendants' alleged misstatements as "speculation," AC ¶ 84, they fail to explain how those accounts were meaningfully different from the 2019 *New York Times* article that finally triggered their inquiry.  "Without any allegations of diligent action on Plaintiff's behalf, Plaintiff cannot rely on equitable estoppel."  *Abercrombie v. Andrew Coll.*, 438 F. Supp. 2d 243, 267 (S.D.N.Y. 2006).

In a last ditch effort to paper over the deficiencies in their equitable claim, Plaintiffs point to two congressional investigations of the "October Surprise" allegations.  AC ¶¶ 81(f), 83. Plaintiffs argue that Defendants misled Congress into issuing an incomplete account of Defendants' actions, which in turn dissuaded Plaintiffs from investigating any potential claims. *Id.* ¶ 83.  But that drastically misstates the scope of those reports and their application here in at least two ways.  *First*, both of the cited investigations expressly focused on allegations of the Reagan Campaign's involvement in derailing President Carter's negotiations with Iran during the fall of 1980, so there was accordingly no reason for them to document Chase's role in facilitating the Shah's entry into the United States, which is the principal subject of the complaint.[5]  Plaintiffs do not contend that Defendants were in any way affiliated with the Reagan Campaign or its alleged efforts—and so any reliance on those reports to understand the extent of Defendants' alleged actions is plainly unreasonable.  *Second*, one of the cited reports *actually describes* many of the allegations now raised by Plaintiffs, including claims that "Kissinger and Rockefeller lobbied the

---

[5] *See* Ex. 8, Rep. of the Special Counsel, S. Doc. No. 102-125, at 1-2 (1992) (describing allegations of interference by Reagan Campaign officials and stating that "the purpose of this [] investigation was to determine . . . whether there is credible evidence to support any of these allegations"); Ex. 9, H.R. Rept. No. 102–1, at 2-3 (1993) (describing the legislative mandate as including enumerated allegations against the 1980 Reagan Campaign and affiliated individuals).

Carter administration to allow the Shah to come to the United States*,*" H.R. Rept. No. 102–1, at

31; that "Rockefeller banks" were determined to retain Iranian assets held therein, *id.* at 80; and

that "Kissinger and [] Rockefeller were behind the continued breakdown in the negotiations . . . to

effect a hostage release," *id.* at 81.  Those claims closely mirror the present complaint and only

added to Plaintiffs' inquiry notice and duty to investigate.

In sum, Plaintiffs cite a wholly insufficient set of generalized public denials to assert that

they were prevented from discovering a set of allegations that were widely reported for decades

before they brought this action, but do not claim to have investigated those allegations at any point

in the intervening four decades.  No claim in equity can lie on those facts.  *See Overall v. Estate

of Klotz*, 52 F.3d 398, 404 (2d Cir. 1995) ("[A] person who seeks equity must do equity . . . .").

## II.  PLAINTIFFS' CLAIMS ARE BARRED BY THE *NOERR-PENNINGTON* DOCTRINE

Even if Plaintiffs' claims are timely, they run headlong into the First Amendment.  The

*Noerr-Pennington* doctrine grants immunity from liability to parties engaged in conduct protected

by the First Amendment right to petition.  Because all of Plaintiffs' claims are predicated on

Defendants' alleged efforts to lobby or otherwise influence the federal government—conduct

squarely protected by the right to petition—the complaint must be dismissed.

### A.  *Noerr-Pennington* Protects The First Amendment Right To Petition

The First Amendment guarantees "the right of the people . . . to petition the Government

for a redress of grievances."  U.S. Const., amend. I.  That right is "integral to the democratic

process," as it "allows citizens to express their ideas, hopes, and concerns to their government and

their elected representatives."  *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 388 (2011);

*see BE & K Const. Co. v. N.L.R.B.*, 536 U.S. 516, 524-25 (2002) (calling right to petition integral

to the "very idea" of "republican" government (quotation marks omitted)).  Indeed, it is "in some

sense the source of other fundamental rights, for petitions have provided a vital means for citizens to request recognition of new rights and to assert existing rights against the sovereign." *Borough of Duryea*, 564 U.S. at 397; *see also Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 91 (2d Cir. 2002).

The *Noerr-Pennington* doctrine protects that right by immunizing petitioning activity from liability.  The doctrine arose in the antitrust context, after the Supreme Court held that "activities attempting to influence legislative, executive, administrative or judicial action to eliminate competition are wholly immune from federal antitrust liability."  *Suburban Restoration Co., Inc. v. ACMAT Corp.*, 700 F.2d 98, 99 (2d Cir. 1983); *see Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc*., 365 U.S. 127, 138 (1961) (holding that the Sherman Act does not apply to "activities compris[ing] mere solicitation of governmental action with respect to the passage and enforcement of laws"); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965) (extending immunity to efforts to lobby Secretary of Labor); *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508 (1972) (institution of administrative or adjudicative proceedings).

The Supreme Court has "made explicit its reliance on First Amendment principles" in crafting and implementing the *Noerr-Pennington* doctrine.  *Primetime 24 Joint Venture v. Nat'l Broad. Co., Inc.*, 219 F.3d 92, 99 (2d Cir. 2000); *see, e.g.*, *Cal. Motor Transp.*, 404 U.S. at 612. The doctrine provides broad immunity to ensure that the right conferred by the Petition Clause is not eroded through laws that indirectly penalize its exercise.  *See United Mine Workers*, 389 U.S. at 222 (explaining that First Amendment would be "a hollow promise if it left government free to destroy or erode its guarantees by indirect restraints so long as no law is passed that prohibits free speech, press, petition, or assembly as such.").  Accordingly, "*Noerr-Pennington* is a label for a form of First Amendment protection; to say that one does not have *Noerr-Pennington* immunity

is to conclude that one's petitioning activity is unprotected by the First Amendment." *White v. Lee*, 227 F.3d 1214, 1231 (9th Cir. 2000); *see, e.g.*, *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 685-86 (2d Cir. 2009) (citizens' petitions are immune "in light of the First Amendment"); *Miracle Mile Assocs. v. City of Rochester*, 617 F.2d 18, 20 (2d Cir. 1980) (legislative lobbying under *Noerr* is "fully protected by the First Amendment").

Because *Noerr-Pennington* immunity rests on the First Amendment, it applies outside the antitrust context. For example, the Supreme Court relied on *Noerr-Pennington* principles to hold that a retaliatory lawsuit may not be enjoined as an unfair labor practice under the National Labor Relations Act. *See Bill Johnson's Rests., Inc. v. N.L.R.B.*, 461 U.S. 731, 741-743 (1983) (citing *California Motor Transport* and Petition Clause "right of access to the courts"). Other courts have likewise applied *Noerr-Pennington* to immunize petitioning activity against a wide range of claims. *See, e.g.*, *Singh v. NYCTL 2009-A Tr.*, 683 F. App'x 76, 77-78 (2d Cir. 2017) (RICO, the New York General Business Law, and New York common law); *Nationwide Mut. Ins. Co. v. Mortensen*, 606 F.3d 22, 33 (2d Cir. 2010) (Connecticut Unfair Trade Practices Act); *Bath Petrol. Storage, Inc. v. Mkt. Hub Partners, L.P.*, 229 F.3d 1135 (2d Cir. 2000) (unpublished) (RICO and state-law tortious interference and fraud).

Courts routinely apply *Noerr-Pennington* to bar liability under federal civil rights statutes, including § 1985. In *Stern v. U.S. Gypsum, Inc.*, for example, the Seventh Circuit dismissed a § 1985 claim based on "complaints about an auditing IRS agent's professional conduct to his superiors" because the allegations represented a "classic example of the right to petition." 547 F.2d 1329, 1343 (7th Cir. 1977) (noting "chill[ing]" effect suit would have on "the exercise of the right to petition"); *see also Shoultz v. Monfort of Colo., Inc.*, 754 F.2d 318, 321 (10th Cir. 1985) (dismissing § 1985 claim based on "First Amendment right to petition for a redress of grievances"

14

where alleged injury resulted from complaints about plaintiff's official performance to his superiors); *Bradley v. Comput. Scis. Corp.*, 643 F.2d 1029, 1033 (4th Cir. 1981) (same); *Mosdos Chofetz Claim, Inc. v. Vill. of Wesley Hills*, 701 F. Supp. 2d 568, 598 (S.D.N.Y. 2010) (holding that "*Noerr-Pennington* immunity can restrict civil rights claims [under §§ 1982, 1983, and 1985]"); *Weiss v. Willow Tree Civic Ass'n*, 467 F. Supp. 803, 818-19 (S.D.N.Y. 1979) (same).[6]

*Noerr-Pennington* likewise confers immunity against state tort claims. As the Fifth Circuit has explained, "[t]here is simply no reason that a common-law tort doctrine can any more permissibly abridge or chill the constitutional right of petition than can a statutory claim such as antitrust." *Video Int'l Prod.*, 858 F.2d at 1084. Both state and federal courts have therefore applied the doctrine "to bar liability in state common law tort claims, including negligence and products liability claims, for statements made in the course of petitioning the government." *Tuosto v. Philip Morris USA, Inc.*, No. 05-cv-9384, 2007 WL 2398507, at *5 (S.D.N.Y.); *see, e.g.*, *Singh*, 683 F. App'x at 77-78 (common-law fraud); *EDF Renewable Dev., Inc. v. Tritec Real Estate Co., Inc.*, 147 F. Supp. 3d 63, 71 (E.D.N.Y. 2015) (tortious interference with contract); *Alfred Weissman Real Estate, Inc. v. Big V Supermarkets, Inc*., 268 A.D.2d 101, 106-07 (N.Y. Sup. Ct. 2000) (prima facie tort and General Business Law); *Concourse Nursing Home v. Engelstein*, 278 A.D.2d 35, 35 (N.Y. Sup. Ct. 2000) (prima facie tort and tortious interference with contract).

### B.    Plaintiffs' Claims Are Based On Protected Petitioning Activity

All of Plaintiffs' claims are based on Defendants' alleged efforts (i) to secure the Shah's entry to the United States; and (ii) to undermine negotiations with the Iranian government. *See*

---

[6] Every court of appeals to have considered the issue appears to have held that the *Noerr-Pennington* doctrine applies to § 1983 claims. *See, e.g.*, *New West, L.P. v. City of Joliet*, 491 F.3d 717, 722 (7th Cir. 2007); *Herr v. Pequea Twp*., 274 F.3d 109, 119 (3d Cir. 2001); *Manistee Town Ctr. v. City of Glendale*, 227 F.3d 1090, 1093 (9th Cir. 2000); *Eaton v. Newport Bd. of Educ.*, 975 F.2d 292, 298 (6th Cir. 1992); *Video Int'l Prod., Inc. v. Warner-Amex Cable Commc'ns, Inc*., 858 F.2d 1075, 1084 (5th Cir. 1988); *Gorman Towers, Inc. v. Bogoslavsky*, 626 F.2d 607, 615 (8th Cir. 1980); *cf. Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 208 F.3d 885, 890 (10th Cir. 2000).

AC ¶ 3.   But the conduct underlying those claims is petitioning activity protected by the First Amendment.   Accordingly, Defendants are immune from liability under *Noerr-Pennington*.

Plaintiffs' first theory is that Defendants disagreed with "President Carter's foreign policy decisions regarding Iran" and "pressur[ed] . . . the United States government" to change its policy and "admit the Shah."   *Id.* ¶¶  40, 43; *see id.* ¶ 42 ("Chase's Project Eagle team provided financial and logistical support to the Shah, as well as lobbying and public relations as the Shah's propagandists.").   In particular, Plaintiffs allege that Defendants "urge[d the State Department to] admit the Shah for life-saving treatment only available in New York."   *Id.* ¶¶ 49-50.

Lobbying executive branch officials to change federal policy with which one disagrees is plainly protected by the First Amendment right to petition.   *See City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 380-82 (1991) (*Noerr-Pennington* protects "lobbying" that genuinely aims "to influence governmental action"); *Pennington*, 381 U.S. 657 at 670 (*Noerr-Pennington* immunizes any "concerted effort to influence public officials").   Defendants' alleged "campaign of pressure" and overtures to the State Department to persuade the Carter Administration to grant entry to the Shah thus fall within the scope of the *Noerr-Pennington* doctrine.   AC ¶¶ 49-50. Indeed, such communications are "petitions" to the government in the most classic sense.   *See Borough of Duryea*, 564 U.S. at 388 ("A petition conveys the special concerns of its author to the government and . . . requests action by the government to address those concerns.").

And Defendants' alleged financial and logistical support to the Shah is similarly protected conduct.   *Noerr-Pennington* immunity extends to "private action . . . 'incidental' to a valid effort to influence government action."   *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499 (1988) (quoting *Noerr*, 365 U.S. at 143).   By Plaintiffs' own admission, the assistance Defendants allegedly offered to the Shah was incidental to their broader effort to "pressur[e]" the

US government to grant him entry.  AC ¶¶ 42-43.  The Petition Clause therefore protects all of the alleged conduct underlying Defendants' first theory of liability.

Plaintiffs' second theory fares no better.  Plaintiffs contend that, in order to prevent the Carter administration from agreeing to repatriate billions of dollars of Iranian funds, Defendants carried out a "propaganda effort that . . . impeded talks to free the captives" and prolonged the crisis.  *Id.* ¶¶ 73, 76; *see id.* (alleging that Defendants "gathered and spread knowingly false rumors about possible payoffs to win the release").  "After Ronald Reagan won the 1980 presidential election," Plaintiffs further allege, Chase "urged the Reagan transition team to encourage a counter-revolution" and "advocat[ed] for a restoration of the Pahlavi monarchy."  *Id.* ¶ 77.

A "publicity campaign to influence governmental action falls clearly into the category of political activity" protected by the First Amendment.  *Noerr*, 365 U.S. at 140-41.  In fact, the core conduct Plaintiffs allege—a "propaganda effort" to prevent the executive branch from acceding to Iran's demands in negotiations—is closely akin to the conduct the Supreme Court found immune in *Noerr* itself.  *See* AC ¶¶ 73, 76.  There, the railroads and the trucking industry fought for control of the long-distance freight hauling market.  365 U.S. at 128-29.  The Court held that the railroads could not be held liable for mounting a deceptive "publicity campaign" and circulating "propaganda" to sour public perception of truckers and promote laws disadvantageous to the trucking industry.  *Id.* at 129, 136.  Defendants' alleged propaganda campaign to influence the executive branch in its dealings with Iran thus falls squarely within *Noerr*.

Chase's alleged lobbying of the incoming Reagan administration is similarly protected under the Petition Clause.  As noted, *Noerr-Pennington* immunizes any "concerted effort to influence public officials."  *Pennington*, 381 U.S. 657 at 670.  And where, as here, lobbying efforts involve issues of public importance—such as US government policy with respect to the Iranian

revolution, *see* AC ¶ 77—First Amendment concerns are at their apex.  *See Borough of Duryea*, 564 U.S. at 395 ("Petitions to the government assume an added dimension when they seek to advance political, social, or other ideas of interest to the community as a whole.").

All of Plaintiffs' allegations thereby involve classic petitioning activity.  In order to circumvent the clear First Amendment bar on liability, Plaintiffs suggest Defendants' conduct was unprotected for various reasons.  For example, they allege that Defendants' actions involved "deliberate falsehoods and other unethical means" and were motivated by financial self-interest, notwithstanding the risk of injury to others.  AC ¶ 43, *see id.* ¶¶ 38, 45.  None of these allegations, however, takes Defendants' activity outside the scope of *Noerr-Pennington* immunity.

*First*, *Noerr-Pennington* extends to petitioning activity involving deliberate falsehoods and unethical conduct.  Plaintiffs allege that "there was no medical necessity for the Shah to come to the United States" and that Defendants "spread knowingly false rumors" and "propaganda" to defeat the hostage talks.  *Id*. ¶¶ 49, 76.  But the "First Amendment requires . . . protect[ion of] some falsehood in order to protect speech that matters."  *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341 (1974); *see Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 933 (9th Cir. 2006).  In *Noerr* itself, the Court held that the railroads' publicity campaign was protected, even though it involved "deception of the public, manufacture of bogus sources of reference, and distortion of public sources of information"—in short, conduct falling "far short of the ethical standards general[ly] approved in this country."  365 U.S. at 140; *see Cal. Motor Transp.*, 404 U.S. at 513 ("misrepresentations" are "condoned in the political arena"); *Stern*, 547 F.2d at 1345 (affirming that "knowing falsehoods" must be protected under First Amendment to avoid "chill[ing the] right to petition").  Defendants' petitioning is therefore immunized by *Noerr-Pennington* even accepting Plaintiffs' allegation that it was "unethical" and "false."  AC ¶¶ 43, 76; *see Doron Precision Sys.*,

*Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 189 (S.D.N.Y. 2006) ("Defendants are entitled to *Noerr-Pennington* protection even if they pressured government officials [or] lied to the government.").

And Plaintiffs' allegation that Defendants' lobbying was "illegal" because Defendants failed to register as foreign agents under the Foreign Agents Registration Act, 22 U.S.C. § 611 *et seq.* (FARA), gets them no further.  AC ¶¶ 50, 76.  In *Omni Outdoor Advertising*, the Supreme Court made clear that *Noerr-Pennington* immunity extends to "lobbying" that is "improper or even unlawful."  499 U.S. 365, 381 (1991); *see id.* at 378, 383 (rejecting exception to the *Noerr-Pennington* doctrine for cases where "bribery or some other violation of state or federal law has been established"); *Astoria Entm't v. Edwards*, 159 F. Supp. 2d 303, 321 (E.D. La. 2001) (*Omni* "clearly holds that illegal actions do not remove a case from the ambit of . . . *Noerr-Pennington*").  Indeed, a contrary approach would "vitiate *Noerr-Pennington* almost entirely because there is hardly any lobbying effort that is not open to at least a charge of some illegal dealings when important economic interests are at stake."  *Coll v. First Am. Title Ins. Co.*, 642 F.3d 876, 898 (10th Cir. 2011).  Plaintiffs' cannot use FARA to defeat core First Amendment protections.

*Second*, *Noerr-Pennington* shields from liability "a concerted effort to influence public officials *regardless of intent or purpose*."  *Pennington*, 381 U.S. 657 at 670 (emphasis added).  Throughout the complaint, Plaintiffs allege that Defendants' actions were driven by their "financial interests."  AC ¶ 38; *see id.* ¶ 73.  But that does not deprive them of First Amendment protection.  The "Petition Clause undoubtedly does have force and application in the context of a personal grievance addressed to the government."  *Borough of Duryea*, 564 U.S. at 394.  *Noerr* emphatically rejected the idea that defendants could be held liable for seeking to influence governmental action simply because they were "taking a public position on matters in which they [we]re financially interested."  365 U.S. at 139.  To hold as such, the Court instructed, would both "deprive the

government of a valuable source of information and, at the same time, deprive the people of their right to petition in the very instances in which that right may be of the most importance to them." *Id.*; *see Stern*, 547 F.2d at 1343.  Even assuming Defendants sought to shape Iran policy to protect their finances, their actions are fully protected by the right to petition.

Plaintiffs also suggest that Defendants sought to influence the hostage negotiations to further Ronald Reagan's presidential prospects.  *See* AC ¶ 75.  But *Noerr-Pennington* immunity applies to Defendants' petitioning activity "regardless of [their] intent or purpose."  *Pennington*, 381 U.S. at 670.  And insofar as the purpose of Defendants' alleged propaganda campaign was election-related, that effort would merit even greater protection under the First Amendment.  *See Citizens United v. FEC*, 558 U.S. 310, 339 (2010) ("The First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office.").

*Third*, *Noerr-Pennington* immunizes petitioning activity regardless of its consequences. Plaintiffs allege that Defendants lobbied the federal government even though they knew the decision to grant entry to the Shah could "endanger[] American diplomats in Iran."  AC ¶ 45; *see also id.* ¶ 76.  But it is "irrelevant to the applicability of the right to petition that its exercise might have the effect of causing . . . injury to others."  *Stern*, 547 F.2d at 1343.  As *Noerr* itself explained, "[i]t is inevitable" that an effort to influence governmental action might have the "incidental effect" of "inflict[ing] some direct injury" upon another party.  365 U.S. at 143.  And it is "equally inevitable" that those responsible for petitioning "would be aware of, and possibly even pleased by, the prospect of such injury."  *Id*.  Holding that "the knowing infliction of such injury" renders conduct unprotected "would thus be tantamount to outlawing all such campaigns."  *Id*. Defendants' petitioning activity is thus protected by *Noerr-Pennington* even if Defendants were aware of the possibility of injury.  *See EDF Renewable*, 147 F. Supp. 3d at 68 (*Noerr-Pennington*

immunity applies regardless of "injurious . . . effect." (quotation marks omitted)).

Plaintiffs' claims are thus squarely foreclosed by the *Noerr-Pennington* doctrine. The Supreme Court has recognized only a single exception to *Noerr-Pennington* immunity, for "sham" activities. *Noerr*, 365 U.S. at 144; *see Omni Outdoor Advert.*, 499 U.S. at 382 (rejecting "conspiracy" exception to *Noerr-Pennington*). Outside the litigation context, the sham exception is "extraordinarily narrow," *Kottke v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1061-62 (9th Cir. 1998), and applies only to "private action that is not genuinely aimed at procuring favorable government action," *Allied Tube*, 486 U.S. at 500 n.2. That exception does not apply here. Plaintiffs do not allege that Defendants' efforts to lobby the government and influence federal policy were not genuine. Nor could they. Plaintiffs allege Defendants' petitioning was *successful*, as they secured the Shah's entry to the United States and complicated the Carter administration's negotiations. Where a party's lobbying efforts are successful, they "certainly cannot be characterized as a sham." *Allied Tube*, 486 U.S. 492, 502 (1988).

## III.    THE COMPLAINT FAILS TO ALLEGE PROXIMATE CAUSATION

Plaintiffs' claims also fail to plausibly allege that their injuries were proximately caused by Defendants' conduct. Plaintiffs seek to hold Defendants liable for their alleged role in (i) causing and (ii) prolonging the Iranian hostage crisis. But as Plaintiffs themselves acknowledge, Defendants did not inflict any direct harm on the hostages. Rather, their theory is that Defendants' efforts to influence US policy render Defendants responsible for injuries inflicted by the Iranian revolutionaries and government. *See* AC ¶¶ 4-6. Plaintiffs do not and cannot allege proximate causation for two independent reasons: (i) the many steps and intervening actors in the purported causal chain linking Defendants' actions and Plaintiffs' injuries demonstrate that Defendants' actions were not a substantial cause of injury, and (ii) even if Plaintiffs could meet the substantial cause burden, Iran's egregious and illegal actions constitute a superseding cause that defeats

proximate causation.  The complaint therefore fails to state a viable federal or state claim.

### A.     Plaintiffs' Claims All Require Plausibly Alleging Proximate Causation

The purpose of requiring proximate causation is to "bar[] suits for alleged harm that is 'too remote' from the defendant's [allegedly] unlawful conduct." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014).  In that way, proximate causation "serve[s] to place manageable limits upon the liability that flows from . . . [certain] conduct." *Derdiarian v. Felix Contracting Corp.*, 414 N.E.2d 666, 670 (N.Y. 1980).  Here, all of Plaintiffs' claims require that the alleged wrongful conduct proximately cause the stated injuries.[7]

Although proximate causation for a § 1985 claim is a question of federal law, the key principles are the same.  *See Barnes v. Anderson*, 202 F.3d 150, 158 (2d Cir. 1999) (applying "state tort analogs" to determine proximate causation for § 1983 suit).  A plaintiff bears the burden of showing that the defendant's conduct was "a substantial cause of the events which produced the injury." *Derdiarian*, 414 N.E.2d at 670; *see Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013).  In determining whether a plaintiff has met his burden, courts must consider "the aggregate number of factors involved which contribute towards the harm and the effect which each has in producing it." *Mack v. Altmans Stage Lighting Co., Inc.*, 98 A.D.2d 468, 470 (N.Y. App. Div. 1984).

Even with a substantial cause showing, "[w]here the acts of a third person intervene between the defendant's conduct and the plaintiff's injury," the intervening act "breaks the causal nexus" if it is "extraordinary under the circumstances, not foreseeable in the normal course of

---

[7] *Lexmark*, 572 U.S. at 132 (indicating that federal causes of action, including under § 1985, are "presume[d] . . . limited to plaintiffs whose injuries are proximately caused by violations of the statute"); *Arnold v. Int'l Bus. Machs. Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981) ("The causation requirement of [§§] 1983 and 1985" requires "establish[ing] proximate or legal causation."); *Townes v. City of N.Y.*, 176 F.3d 138, 146 (2d Cir. 1999) (same for § 1983); *Ingrassia v. Lividikos*, 864 N.Y.S.2d 449, 452 (N.Y. App. Div. 2008) (negligence); *Koziol v. Wright*, 809 N.Y.S.2d 350, 352 (N.Y. App. Div. 2006) (negligence per se); *Vernes v. Phillips*, 194 N.E. 762, 763 (N.Y. 1935) (false imprisonment); *Klein v. Metro. Child Servs., Inc.*, 954 N.Y.S.2d 559, 562 (N.Y. App. Div. 2012) (intentional infliction of emotional distress); *Brown v. N.Y.C.  Health and Hosps. Corp.*, 648 N.Y.S.2d 880, 885 (N.Y. App. Div. 1996) (negligent infliction of emotional distress).

events, or independent of or far removed from the defendant's conduct." *Derdiarian*, 414 N.E.2d at 670; *see Higazy v. Templeton*, 505 F.3d 161, 175 (2d Cir. 2007) (applying "common law definition of superseding cause" in § 1983 action). "[A]n intervening intentional or criminal act will generally sever the liability of the original tortfeasor." *Turturro v. City of N.Y.*, 68 N.E.3d 693, 705 (N.Y. 2016) (quoting *Kush v. City of Buffalo*, 449 N.E.2d 725, 835 (N.Y. 1983)).

### B.   Defendants' Alleged Acts Did Not Proximately Cause Plaintiffs' Injuries

Plaintiffs do not credibly allege that Defendants' conduct proximately caused their injuries. The complaint sets forth two theories of liability. The first is that Defendants "orchestrate[d] the Shah's entry to the United States," which then prompted Iranian militants, with the support of the Iranian government, to hold dozens of Americans hostage, for 444 days. AC ¶ 3, *see id.* ¶¶ 48-58. The second is that Defendants "sabotage[d the] hostage talks," which extended Plaintiffs' captivity by several months. *Id.* ¶ 6; *see id.* ¶ 70-80. Neither plausibly alleges proximate causation.

Plaintiffs' theories rest on long, attenuated causal chains showing that Defendants' actions were not a substantial cause of the harm. To support their first theory, Plaintiffs allege that: (1) Chase told the State Department the Shah needed "life-saving treatment only available in New York," *id.* ¶ 49; (2) "U.S. officials recommended that President Carter admit the Shah on humanitarian grounds," *id.* ¶ 50; (3) President Carter "agreed," and the Shah was "whisked to a New York hospital," *id.* ¶¶ 51-52; (4) angry Iranian militants "captured the embassy and took the Americans hostage," *id.* ¶ 55; (5) "Iran's fundamentalist Supreme Leader" demanded that "the United States turn the Shah over to Iran" in exchange for releasing the hostages, *id.* ¶ 56; (6) the United States did not accede to Iran's demands, *id.*; and (7) Iran kept the hostages for 444 days, during which period it "blindfolded, tortured, taunted, and threatened [them] with death," *id.* ¶ 57.

Plaintiffs' second causal chain is equally attenuated: (1) Chase "spread knowingly false rumors about possible payoffs to win the release," *id.* ¶ 76; (2) the rumors "impeded" the Carter

23

administration's negotiations with Iran, *id*. ¶ 76; (3) the two governments were unable to reach an agreement until January 20, 1981, *id*. ¶ 78; (4) Iran refused to free the hostages until that agreement was reached, *id*. ¶¶ 77, 116; and (5) the captivity period was thereby prolonged, *id*. ¶¶ 60-61.  A "number of factors"—at least five—each involving different intervening actors are thus required to link Defendants' conduct to Plaintiffs' injuries.  *Mack*, 98 A.D.2d at 470.  These speculative causal chains fail to plausibly allege that Defendants' actions were "a substantial factor in the sequence of responsible causation."  *Rothstein*, 708 F.3d at 91, 97.

Plaintiffs' asserted causal chains make clear that the Iranian government's intervening actions—specifically, its support for an attack against the American embassy and detention of diplomatic personnel, in violation of international law—are superseding causes of their injuries.[8] "When one of the links on a causal chain is a sovereign state, the need for facts specifically connecting a defendant's actions to the ultimate . . . attack is especially acute."  *Kemper v. Deutsche Bank AG*, 911 F.3d 383, 393 (7th Cir. 2018).  In *Kemper*, the plaintiff brought an Anti-Terrorism Act claim alleging that Deutsche Bank "facilitated" an Iranian government terrorist attack that killed her son "by providing services to Iran and state-owned Iranian businesses."  *Id.* The Seventh Circuit found that plaintiff failed to establish proximate cause, explaining that "a sovereign's affirmative choice to engage in a wrongful act will usually supersede a third party's [interactions] . . . with that sovereign."  *Id.*; *see Rothstein*, 708 F.3d at 97 (no proximate cause in a similar suit because "Iran is a government"); *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 276 (D.C. Cir. 2018) (no proximate cause in suit against BNP Paribas for alleged financial assistance to Sudan, which funded al Qaeda's attack on US embassies in Kenya and Tanzania).  This rule

---

[8] The actions of both the Iranian militants and the Iranian government contributed to Plaintiffs' injuries.  Our analysis focuses on the Iranian government, because the government "supported" the militants' attack on the embassy and refused to release the hostages for over a year, thus adopting the militants' actions as its own.  AC ¶ 56.  But the militants' "intentional [and] criminal" conduct also severs the chain of causation.  *Turturro*, 68 N.E.3d at 705.

"makes sense," the court went on, because "[f]inding that a sovereign state's actions supersede other more tangential causes prevents the scope of liability from extending to the many individual persons, businesses, and other sovereigns that interact with that state." *Kemper*, 911 F.3d at 393.

Here, as in *Kemper*, the Iranian government's "affirmative choice to engage in a wrongful act" supersedes "other more tangential causes" of the hostage crisis. 911 F.3d at 393. The Vienna Convention on Diplomatic Relations ("VCDR") declares diplomatic missions and persons "inviolable" and imposes on sovereign states the responsibility to protect missions in their territory. VCDR, Apr. 18, 1961, 23 U.S.T. 3227, arts. 22, 29 (providing that "a diplomatic agent" shall not be "liable to any form of arrest or detention"). Both the United States and Iran ratified the VCDR years before the crisis, *see* U.N. Treaty Collection, VCDR, making those obligations mandatory under international law, *see Boos v. Barry*, 485 U.S. 312, 322 (1988). Iran's refusal to protect the American embassy and decision to hold American diplomats hostage until January 20, 1981, *see* AC ¶¶ 56, 78, was therefore a flagrant breach of international law. Indeed, in the immediate aftermath of the crisis, President Carter denounced Iran's actions as "an act of terrorism totally outside the bounds of international law." Ex. 10, Terence Smith, *Carter, Denouncing Terror, Warns Iran on Hostages' Safety*, N.Y. Times (Nov. 16, 1979).

Courts have long held that this kind of "intentional[]," "illegal" action by a sovereign state definitively breaks any causal chain. *Kemper*, 911 F.3d at 393; *The Lusitania*, 251 F. 715, 736 (S.D.N.Y. 1918); *see also In re Korean Air Lines Disaster of Sept. 1, 1983 ("KAL")*, 1985 WL 9447, at *7 (D.D.C.). In *The Lusitania*, for example, the court dismissed negligence claims against a steamship company whose ship was torpedoed without warning by German submarines, resulting in the deaths of almost 1,200 people. Because international law had long prohibited states from attacking enemy merchant ships without warning, the court held that the "foul" and "illegal act of

25

the Imperial German government" caused the harm. 251 F. at 736. Iran's treatment of the hostages is a similarly "shocking [] breach of international law" that supersedes other causes of harm. *Id.*[9]

Two features of this case make the alleged causal nexus even weaker here than in *Kemper* and the other cases cited finding no proximate cause. *First*, Plaintiffs' asserted causal chains involve intervening actions by not just one sovereign state, but *two*. The actions and decisions of the US government lie at the core of Plaintiffs' allegations. President Carter himself made the decision to grant entry to the Shah, *see* AC ¶ 51, and his administration rejected Iran's demands for release and failed to reach an agreement with the Iranian government until January 1981, *see id*. ¶¶ 77-78. The involvement of an "independent intermediary . . . create[s] a more attenuated chain of causation" between a defendant's actions and the ultimate harm, especially when that "intermediary is a sovereign state." *Owens*, 897 F.3d at 275. Because two of the links in the causal chain are sovereign states—each with their own interests, priorities, and strategies—the purported causal connection between Defendants' conduct and Plaintiffs' injuries breaks down completely.

*Second*, in *Kemper*, plaintiffs at least alleged that defendants interacted directly with the sovereign state responsible for the attack. *See* 911 F.3d at 393 (alleging that Deutsche Bank "facilitated . . . $210 million of transactions" for Iran); *Rothstein*, 708 F.3d at 85, 97 (alleging that UBS provided "U.S. currency to Iran"). Here, however, Defendants' alleged conduct is entirely removed from the harm. The complaint does not allege that Defendants participated in any way in the attack on the Embassy. It does not allege that Defendants provided assistance to the Iranian government or the revolutionaries. It does not allege that Defendants sought to influence the

---

[9] This reflects a direct application of common law principles: If private persons had detained and sanctioned the abuse of American diplomats, their actions would be criminal and would "sever the liability of the original tortfeasor." *Turturro*, 68 N.E.3d at 705; *see Port Auth. of N.Y. & N.J. v. Arcadian Corp.*, 189 F.3d 305, 318-19 (3d Cir. 1999) ("terrorists' intentional acts to create an explosive device and to cause harm to the World Trade Center and its occupants" were a superseding cause of the WTC bombing). Iran's status as a sovereign state renders its resort to international terrorism all the more "extraordinary under the circumstances." *Derdiarian*, 414 N.E.2d at 670.

Iranian government.  And it does not allege that Iran would have released the hostages earlier but for Defendants' actions.  The absence of any "facts specifically connecting [the] defendant's actions to the ultimate . . . attack" dooms Plaintiffs' claims.  *Kemper*, 911 F.3d at 393; *see In re Terrorist Attacks on September 11, 2001*, 714 F.3d 118, 124, 126 (2d Cir. 2013) (dismissing ATA and common-law intentional tort claims because similar types of allegations were "insufficient . . . for establishing proximate causation"); *Owens*, 897 F.3d at 276 (finding no alleged facts "demonstrating a substantial connection between the defendant and terrorism").

Finding proximate causation on these alleged facts would improperly expand "the scope of liability" for entities that interact with the government.  *Kemper*, 911 F.3d at 393.  For example, under Plaintiffs' theory, a veterans group that advocated in favor of the "surge" in Iraq in 2007 could be found liable for the deaths of American citizens in that war.  Or a civil liberties nonprofit that lobbied the State Department to release a report documenting crimes against Uighurs could be held responsible for China's retaliatory detention of American journalists.  These hypotheticals are on all fours with this case and illustrate the extent to which Plaintiffs' claims stretch the concept of legal causation beyond its breaking point.  Defendants' alleged conduct is many steps and intervening actors removed from Plaintiffs' injuries, and the illegal actions of the Iranian government definitively sever any causal link.  The complaint fails for lack of proximate cause.

### C.    Previous Attacks Do Not Render The Crisis Foreseeable

Unable to draw any direct connection between Defendants' actions and Plaintiffs' injuries, Plaintiffs allege that their injuries were foreseeable because of prior incidents of violence against Americans in Iran.  In particular, they note that in February 1979, "Iranian revolutionaries armed with machine-guns attacked the American Embassy in Tehran" and took "dozens of Americans hostage."  AC ¶ 35; *see id.* ¶ 46 (describing two subsequent attacks on the American consul in Tabriz and Isfahan).  Plaintiffs also allege that the State Department warned Chase about potential

fallout from admitting the Shah and that Chase "monitored the political situation in Iran closely." *Id*. ¶¶ 45, 47.  To be sure, an intervening event may not sever the chain of causation if it is "a normal or foreseeable consequence of the situation created by the defendant's negligence." *Turturro*, 68 N.E.3d at 705.  But nothing about the alleged warning signs renders Iran's egregious violation of international law remotely normal or foreseeable.

The decision in *In re Korean Air Lines Disaster of Sept. 1, 1983 ("KAL")*, 1985 WL 9447 (D.D.C.), is instructive.  The *KAL* plaintiffs filed a tort suit against Boeing and Litton after a manufacturing defect caused a civilian flight to deviate from its assigned course into Soviet territory, prompting Soviet military aircraft to fire missiles destroying the plane and killing all the passengers.  The district court held that the Soviet attack was a superseding cause of harm.  It relied on the Convention on International Civil Aviation (ICAO), to which the Soviet Union was a party.  Because the Convention set out detailed procedures for interception and made clear that states should "refrain from deliberate violence against unarmed civilian aircraft," the court found that "Defendant manufacturers had reason to expect that force would be avoided."  *Id*. at *4.

The plaintiffs argued that the Soviet Union's disregard of the ICAO procedures was nonetheless foreseeable based on prior aircraft incidents involving Soviet use of force—and in particular, a similar incident in 1978 in which another KAL jetliner was intercepted by Soviet fighter planes.  The court rejected that argument.  In the 1978 incident, the court explained, "the Soviet intercepting fighter planes did follow the ICAO procedures and signaled the Korean plane to land"; "[o]nly after those attempts failed . . . did the Soviet Union force the plane down."  *Id*. at *5.  Even then, the court observed, the plane was only "forced to land; it was not" shot down, like the 1983 flight.  *Id*.  "*There lies the difference*," the court declared:  "In 1978, the Soviet Union opted to force landing.  Unfortunately, in 1983, the decision was otherwise."  *Id*. (emphasis added).

Defendants, the court concluded, could not "anticipate such deliberate destruction."  *Id*.

The same holds true here.  As in *KAL*, Plaintiffs seek to hold Defendants liable for an act of aggression by a sovereign state, in clear violation of international law.  And as in *KAL*, Plaintiffs claim that the stunning attack was foreseeable based on an earlier, similar incident.  But just as in *KAL*, Plaintiffs fail to recognize the critical difference between the incidents:  The February 1979 embassy attack did not succeed, as the hostages were "released on the orders of the Iranian revolutionary leader Ayatollah Khomeini."  AC ¶ 35.  In November 1979, however, Khomeini backed the embassy takeover and refused to release the hostages until the United States acceded to Iran's demands.  *See id.* ¶ 55-56.  Given that key distinction, Defendants could not anticipate the 444-day hostage crisis that unfolded.  Indeed, if anything, the February 1979 incident made the November 1979 crisis *less* foreseeable.  The earlier incident suggested Khomeini would uphold Iran's obligations under international law—making it all the less predictable that, just a few months later, the Iranian government would turn its back on those very same obligations and sanction a "direct and deliberate . . . attack."  *KAL*, 1985 WL, at *6.  Plaintiffs' conclusory allegation that Defendants "knew or should have known" that the November attack would prove "much more serious" than the February incident is thus wholly implausible.  AC ¶ 56.

Plaintiffs' other alleged warning signs are no more illuminating.  The sporadic episodes of mob violence in Tabriz and Isfahan, *see id.* ¶ 46, bear no resemblance, in scope, duration, or consequence, to Iran's decision to support holding 52 Americans hostage in the Embassy.  *See Gaines-Tabb v. ICI Explosives, USA, Inc*., 160 F.3d 613, 621 (10th Cir. 1998) (holding that it was unforeseeable as a matter of law that ammonium nitrate would be used to create the Oklahoma City bomb despite prior "occasions of successful terrorist actions using ammonium nitrate").  The State Department's intelligence reports and Chase's monitoring of the political situation, *see* AC

¶¶ 45, 47, likewise fail to establish foreseeability.  In *The Lusitania*, the court found that Germany's brazen attack was a superseding cause of harm even though "there had been explicit notice from the German government that enemy merchant ships passing through certain waters would be destroyed."  *KAL*, 1985 WL, at *7; *see* 251 F. at 736 (holding that steamship company was "justified in believing that" Germany would not violate "universally accepted principle[s]" of international law notwithstanding its 1915 war zone proclamation).  Similarly, no paper warning of potential retaliation could render Iran's intentional and illegal actions foreseeable.

At bottom, "[i]t is . . . easy now, in the light of many later events, . . . to look back and say the [Defendants] should have known that [Iranian] government would authorize or permit so shocking a breach of international law and so foul an offense."  *The Lusitania*, 251 F. at 736.  But Iran's actions constituted a grave departure from settled norms and risked a war.  Defendants "cannot be held accountable for [its] unexpected act of aggression."  *KAL*, 1985 WL, at *8.

## IV.   EACH OF THE INDIVIDUAL CLAIMS IS DEFECTIVE

### A.   Defendants Did Not Conspire To Injure Plaintiffs

Plaintiffs' claim under § 1985(1) is also deficient because the agreement described—to "sabotage the Hostage Talks" because of their potential to harm Chase's alleged "efforts to use Iranian foreign assets to pay off Iran's debts," AC ¶¶ 73, 76—was not aimed at injuring Plaintiffs. In relevant part, that statute prohibits conspiracies "to injure [an officer of the United States] . . . while engaged in the lawful discharge" of his duties.  42 U.S.C. § 1985(1); *see* AC ¶ 108.  In order to prevail, Plaintiffs "must plead facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end," *Warren v. Fischl*, 33 F. Supp. 2d 171, 177 (E.D.N.Y. 1999), that is, "to injure" Plaintiffs, *United States v. DeMott*, No. 05-cr-0073, 2005 WL 2314134, at *1 (N.D.N.Y. Sept. 22, 2005) (as to 18 U.S.C. § 372).

Even accepted as true, Plaintiffs' own allegations make clear that the goal of the agreement

was not to inflict injury on the hostages but rather to prevent repatriation of Iranian funds as a term in hostage negotiations.  *See* AC ¶¶ 72-73, 76.  Despite Plaintiffs' characterization of this course of action as an "unlawful agreement," neither that goal nor the means used to pursue it were unlawful.  *Cf. Nat'l Congress for Puerto Rican Rights vs. City of N.Y.*, 75 F. Supp. 2d 154, 168 (S.D.N.Y. 1999) (civil conspiracy under § 1983 requires agreement to "commit an unlawful act, or to commit a lawful act by unlawful means").  That injury resulted from an otherwise lawful agreement and course of action does not transform that arrangement into a conspiracy to cause the injury in the first instance.  *See, e.g.*, *Nat'l Fireproofing Co. v. Mason Builders Ass'n*, 169 F. 259, 265 (2d Cir. 1909) ("An agreement entered into for the primary purpose of promoting the interests of the parties is not rendered illegal by the fact that it may incidentally injure third persons.").

## B.     Plaintiffs Fail To State A Negligence-Based Claim

Plaintiffs' negligence-based claims (Counts II-VI & IX) all fail to assert a cognizable legal duty owed by Defendants.  While the complaint asserts that Defendants owed "common law and statutory duties to Plaintiffs," AC ¶ 150, none of the cited sources of duty in fact create legal obligations owed by Defendants to Plaintiffs.  Because "a duty of reasonable care owed by the tort-feasor to the plaintiff is elemental to any recovery in negligence," *Eiseman v. State*, 511 N.E.2d 1128, 1134 (N.Y. 1987), the failure to establish such a duty is fatal to those claims.

### 1.     None Of Plaintiffs' Cited Sources Of Law Create Tort Duties

Counts II-V all rely on a negligence per se theory, *i.e.,* that the cited laws establish duties owed to Plaintiffs, which Defendants breached in purportedly violating the statutes.  AC ¶¶ 116, 122-48.  Under that doctrine, plaintiffs in negligence actions can rely on certain statutory dictates to establish the existence of a duty of care.  *See, e.g.*, *German v. Fed. Home Loan Mortg. Corp.*, 896 F. Supp. 1385, 1396 (S.D.N.Y. 1995).  But not all statutory duties are properly raised in negligence actions; instead, the question is one of "legislative intent," and those duties are only

privately enforceable where "the underlying policy of the legislation is the protection of a certain class of individuals and [] judicial recognition of a statutory standard [as grounds for liability] will further that policy of protection." *Gain v. E. Reinforcing Serv., Inc.*, 603 N.Y.S.2d 189, 192 (N.Y. App. Div. 1993); *see also Schmidt v. Merchs. Despatch Trans. Co.*, 200 N.E. 824, 829 (N.Y. 1936). No duty exists where the statutory standard exclusively "protect[s] the interests of the state or any subdivision of it as such." Restatement (Second) of Torts § 288.

Plaintiffs raise this theory as to four different sources of law—the VCDR, the Logan Act, FARA, and 18 U.S.C. § 372. AC ¶¶ 116, 123, 133, 141. But none of the cited sources of law give rise to privately enforceable duties. Turning first to the VCDR, it is entirely clear that the treaty does not give rise to private rights or duties. Treaties "generally do not create private rights or provide for a private cause of action in domestic courts." *Medellin v. Texas*, 552 U.S. 491, 506 n.3 (2008) (quotation marks and citation omitted). The VCDR makes this point directly, stating that the "purpose of [VCDR-created] privileges and immunities is not to benefit individuals[.]" VCDR preamble, Apr. 18, 1961, 23 U.S.T. 3227. In *Mora v. New York*, 524 F.3d 183 (2d Cir. 2008), the Second Circuit drew on this presumption and a substantially similar disclaimer of intent to benefit individuals, among other things, in concluding that the Vienna Convention on Consular Rights does not give rise to privately enforceable rights. *See id.* at 197 (explaining that "the rights created by the Convention [] belong to, and should generally be enforced by, the States parties to the Convention and their official representatives"). The same result must apply here.

Nor do FARA or the Logan Act reflect any legislative intent to protect Plaintiffs or any other particular class of individuals. "The purpose of [FARA] is 'to provide [a] centralized reporting system to track activities of agents acting on behalf of foreign countries . . . and no language in [the] statute or its legislative history suggests that Congress intended to establish [a]

cause of action in any entity other than the Federal Government.'" *Weican Meng v. Xinhuanet Co., Ltd.*, No. 16-CV-6127, 2017 WL 3175609, at *3 (S.D.N.Y. July 25, 2017) (citation omitted). The same is true of the Logan Act, which prohibits private citizens from interfering with US foreign policy:  "Only the [] Department of State is aggrieved by a violation of the Logan Act," *Strunk v. N.Y. Province of Soc. of Jesus*, No. 09-cv-1249, 2010 WL 816121, at *2 (D.D.C. Mar. 8, 2010) (citation omitted), and there are no grounds for permitting private actions based on that law, *see Ackers v. Kerry*, No. 18-cv-1296, 2018 U.S. Dist. LEXIS 124013 (D.D.C. July 25, 2018).[10]

Count IV fails for an even more fundamental reason:  18 U.S.C. § 372 is substantially identical to 42 U.S.C. § 1985(1), and the latter act provides a direct source of civil liability.  Under those circumstances, implying a judicial remedy would circumvent the legislature's intent.[11]  *See Sheehy v. Big Flats Cmty. Day, Inc.*, 541 N.E.2d 18, 22 (N.Y. 1989) ("Where the Legislature has not been completely silent but has instead made express provision for [a] civil remedy . . . the courts should ordinarily not attempt to fashion a different remedy . . . on the basis of a different statute, at least where, as here, the two statutes address the same wrong.").

### 2.       "Rescuing" The Shah Did Not Give Rise To A Duty To Plaintiffs

Count II also asserts that "Chase owed Plaintiffs . . . a duty of care when it affirmatively undertook the rescue of the Shah . . . and knew or reasonably should have known that this rescue would create and exacerbate a dangerous situation."  AC ¶ 117.  But there is no legal authority for the proposition that affirmatively agreeing to assist a client creates a duty of care to other individuals who may be harmed by those who dislike one's client.  Moreover, there is no general

---

[10] While the cited cases address private causes of action under the statutes, "[t]he issue of whether a plaintiff can assert a cause of action based on negligence per se is closely related to the question of whether a private cause of action exists under a statute."  *Dubai Islamic Bank v. Citibank, N.A.*, 126 F. Supp. 2d 659, 668 (S.D.N.Y. 2000) (quotation marks and citation omitted).

[11] Moreover, like the other cited statutes, 18 U.S.C. § 372 "provide[s] no basis for a private, civil cause of action." *Potts v. Howard Univ. Hosp.*, 598 F. Supp. 2d 36, 39 n.3 (D.D.C. 2009).

duty to "control the conduct of third-persons so as to prevent them from harming others," absent a special relationship between the defendant and either the plaintiff or the direct tortfeasors. *Hamilton v. Beretta U.S.A. Corp.*, 750 N.E.2d 1055, 1161 (N.Y. 2001) (citation omitted).

### 3. Plaintiffs Allege No Additional Source Of Duties Owed By Defendants

The final two negligence-based counts—for gross negligence (Count VI) and negligent infliction of emotional distress (Count IX)—do not separately allege any source of a duty owed by Defendants, but instead rely on "common law and statutory duties" as "pled in prior paragraphs." AC ¶ 150; *see also id.* ¶ 168. As discussed, however, each purported source of a duty fails. The failure to establish such duty is fatal to those claims, and they must be dismissed.

### C. Defendants Did Not Imprison The Hostages

Plaintiffs' false imprisonment claim (Count VII) asserts that Defendants are liable because they purportedly undertook "acts that were intended to sabotage the Iran Hostage Talks" and that were "substantial factors" in the hostages' continued imprisonment. AC ¶ 157. But to hold a party who does not physically cause confinement liable for false imprisonment, the plaintiff must show that the defendant "personally participate[d] in or proximately cause[d the] false imprisonment." *Conklin v. Doe*, No. 01-cv-987, 2002 WL 227067, at *3 (S.D.N.Y. Feb. 13, 2002) (quotation marks omitted). This standard is high: "[T]he defendant must have affirmatively induced the [captor] to act, such as taking an active part in the [detention] and procuring it to be made or showing active, officious and undue zeal to the point where the [captor] is not acting of his own volition." *Curley*, 153 F.3d at 13-14 (quotation marks omitted). None of the allegations comes close to meeting this standard. Plaintiffs' entire contention is that Defendants' public lobbying undercut efforts to free the hostages. *See* AC ¶¶ 76-79. Even if true, impeding hostage negotiations is very different from "affirmatively induc[ing]" the captors to act. *Curley*, 154 F.3d at 14.

34

## D.        Defendants' Lobbying Was Not Extreme And Outrageous

Plaintiffs' claim for intentional infliction of emotional distress ("IIED") (Count VIII) does not allege conduct nearly approaching the requisite level of outrageousness.  New York's standard for assessing whether conduct supports an IIED claim is both "difficult to satisfy" and "susceptible to determination as a matter of law."  *Rich v. Fox News Network, LLC*, 939 F.3d 112, 122 (2d Cir. 2019) (quotation marks and citations omitted).  The underlying behavior must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Howell v. N.Y. Post Co.*, 612 N.E.2d 699, 702 (N.Y. 1993) (quotation marks and citation omitted).  Noting this stringent standard, the Court of Appeals has emphasized that, of the IIED claims it has reviewed, "*every one* has failed because the alleged conduct was not sufficiently outrageous."  *Chanko v. Am. Broad. Cos., Inc.*, 49 N.E.3d 1171, 1179 (N.Y. 2016) (quotation marks and citation omitted).

Measured against this high threshold, the public lobbying efforts cited here are clearly insufficient to sustain Plaintiffs' IIED claim.  Defendants' alleged actions—urging the government to allow the Shah to enter the country for medical treatment and seeking to prevent negotiation terms contrary to their financial interests—were simply efforts to affect government policy.  Those activities are plainly not "utterly intolerable in a civilized community."  *Howell*, 612 N.E.2d at 702.  The further claim that Defendants made untrue assertions does not make their lobbying "extreme and outrageous."  *See, e.g.*, *Baraliu v. Vinya Capital, L.P.*, No. 07-cv-4626, 2009 WL 959578, at *12 (S.D.N.Y. Mar. 31, 2009) ("[F]alse statements or misrepresentations—even if intentionally made—do not rise to the level of the extreme and outrageous conduct." (citing, *inter alia*, *LaDuke v. Lyons*, 673 N.Y.S.2d 240, 244 (N.Y. App. Div. 1998)).

## CONCLUSION

For these reasons, the Court should grant Defendants' motion to dismiss.

Dated: July 27, 2020
Boston, Massachusetts

Respectfully submitted,

**LATHAM & WATKINS LLP**

s/  William J. Trach
William J. Trach (admitted *pro hac vice*)
Michael F. Houlihan
200 Clarendon Street
Boston, MA 02116
Telephone: (617) 948-6000
Facsimile: (617) 948-6001
Email: william.trach@lw.com
Email: michael.houihan@lw.com

Roman Martinez (admitted *pro hac vice*)
Reema B. Shah (admitted *pro hac vice*)
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004-1304
Telephone: (202) 637-2200
Email: roman.martinez@lw.com
Email: reema.shah@lw.com

James E. Brandt
885 Third Ave.
New York, NY 10022-4834
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email: james.brandt@lw.com

*Attorneys for Defendants JPMorgan Chase & Co.*
*and JPMorgan Chase Bank, N.A.*