UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
                                                            :
DAVID M. ROEDER, SUSANNE A. ROEDER,                         :
RODNEY SICKMANN, DON COOKE, and MARK                        :
SCHAEFER, individually and on behalf of a class of          :
similarly situated individuals,                             :
                                                            :        20-cv-2400 (LJL)
                                  Plaintiffs,               :
                                                            :        OPINION AND ORDER
             -v-                                            :
                                                            :
J.P. MORGAN CHASE & CO., et al.,                           :
                                                            :
                                  Defendants.               :
                                                            :
-------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__2/26/2021__

LEWIS J. LIMAN, United States District Judge:

Defendants J.P. Morgan Chase & Co., and JP Morgan Chase Bank, N.A. (collectively, "Chase" or "Defendants"), move, pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss the amended class action complaint against them.

For the following reasons, the motion to dismiss is granted.

## BACKGROUND

On November 4, 1979, a group of armed Iranian militants scaled the wall of the American Embassy compound in Tehran, Iran, capturing the Embassy and taking 63 American citizens as hostages. Dkt. No. 1 ("Complaint" or "AC") ¶ 55. Shortly thereafter, U.S. Charge d'affaires Bruce Laingen and two other Americans were seized at the Iranian Foreign ministry. *Id.* For the next 444 days, 52 of the 66 Americans continued to be held as hostages.[1] *Id.* The hostage takers, who were supported by the provisional government of Iran, demanded that the United States turn over the Shah of Iran ("Shah") as the price for the release of the hostages. *Id.*

---

[1] Of the original 66 hostages, 14 were released over the next year. AC ¶ 55.

¶ 56.  The Shah was then in the United States for medical treatment.[2]  *Id.* ¶¶ 52, 54.  The Americans remained hostage until January 20, 1981.  They were released on the date of Ronald Reagan's inauguration as President.  *Id.* ¶¶ 78, 113.  Throughout their long captivity, the hostages were blindfolded, tortured, taunted, and threatened with death.  *Id.* ¶ 57.  The impact on family members was also horrific.  *See, e.g.*, *id.* ¶¶ 62, 69.

This lawsuit seeks to recover from Chase for damages incurred as a result of the seizure of the hostages and their delayed release.  Plaintiffs include three former hostages: David M. Roeder, who was Assistant Air Force Attache when he was taken hostage; Rodney Sickmann, an enlisted Marine serving at the American Embassy in Tehran when he was taken hostage; and Don Cooke, a Consular Officer at the American Embassy in Tehran when he was taken hostage.  They also include David M. Roeder's spouse, Susanne Roeder, and Mark Schaefer, son of hostage Colonel Thomas E. Schaefer, the American Defense and Air Attache at the American Embassy in Tehran when he was taken hostage.  *Id.* ¶¶ 12-16.  Plaintiffs bring this action on behalf of themselves and as representatives of a class of all Americans taken hostage from the American Embassy in Tehran or from the Iranian Foreign Ministry in 1979, including the hostages' estates and successors, the hostages' immediate family members at the time, and the estates and successors of those immediate family members.  *Id.* ¶ 91.

The persons alleged to have engaged in the conduct forming the basis of the Complaint include David Rockefeller, who served as President of Chase Manhattan Bank (a predecessor of J.P. Morgan Chase & Co.) from 1960 to 1968 and Chairman and CEO of Chase Manhattan Corporation from 1969 to 1981 and Joseph Verner Reed, who served as Vice President of Chase Manhattan Corporation and Assistant to Rockefeller from 1963 to 1981.  *Id.* ¶¶ 17-18, 113.

---

[2] The Shah ultimately died of cancer on July 27, 1980.  AC ¶ 74.

Other persons also allegedly involved included Henry Kissinger, who had previously served as National Security Advisor and Secretary of State of the United States and, as pertinent here, was Chairman of Chase's Board of Advisers in 1979; John J. McCloy, former Chairman of Chase Manhattan Bank and lawyer to the Shah and Chase Manhattan Corporation; Robert F. Armao, a public relations agent for the Shah; and Benjamin H. Kean, Joseph Reed's personal physician. *Id.* ¶ 41.

Plaintiffs allege that Chase "fomented the seizure of American hostages in Iran and then sabotaged the talks to free them." *Id.* ¶ 1. The events underlying the allegations begin in January of 1979. *See, e.g.*, *id.* ¶¶ 31, 32. That month, Islamic fundamentalists in Iran launched an uprising against the secular monarchy of Mohammad Reza Pahlavi, who was the Shah of Iran and head of the Pahlavi dynasty and who had ruled Iran since 1941. *Id.* ¶ 31. Faced with an uprising, the Shah left Iran that same month, travelling to Egypt, Morocco, the Bahamas, and Mexico, before arriving in the United States. *Id.* ¶ 32. The United States initially invited the Shah to the United States in early 1979. *Id.* ¶¶ 33-34. On February 14, 1979, however, Iranian revolutionaries armed with machine-guns attacked the American Embassy in Tehran, taking hostages before they were later released on the orders of the Iranian revolutionary leader, Ayatollah Khomeini. *Id.* ¶ 35. The United States thereafter refused to admit the Shah when he requested entry in March 1979. *Id.* ¶ 36. A declassified cable sent from the State Department by Undersecretary of State for Political Affairs David Newsom reported: "In March and again on April 20 we informed the Shah we had hoped that it would have been possible for him to come to the U.S. However, because of the unsettled security conditions in Iran and our concern for the safety of Americans living in Iran, we reluctantly concluded it was in neither the Shah's interest nor ours for him to come here." *Id.*

Carter Administration officials requested that Rockefeller convey to the Shah the message that it was not in his interest or in the interest of the United States that the Shah enter the United States but Rockefeller refused to do so. *Id.* ¶ 37. In or around March 1979, Chase, through Rockefeller and other directors, officers, and agents, entered into an agreement with the Shah to launch "Project Eagle," which Plaintiffs allege was "a covert campaign to employ illegal and unethical means to protect the Shah, secure safe haven for him in the United States, and keep the Pahlavi monarchy on the throne." *Id.* ¶ 39.

On or around September 28, 1979, Reed informed Undersecretary Newsom that the Shah was critically ill in Mexico. *Id.* ¶ 48. Secretary of State Cyrus Vance cabled the American Embassy in Tehran to share the news that Rockefeller had sent his personal physician to examine the Shah and that if the Shah's condition were serious, there might be a request that he be admitted to the United States for medical purposes. *Id.* On or around October 18, 1979, Kean— who had been sent to Mexico to take charge of the Shah's medical care—informed the State Department that the Shah did not have long to live without emergency treatment. *Id.* ¶ 49. Reed contacted the State Department to urge that the United States admit the Shah for life-saving treatment that he claimed (falsely, it is alleged) was only available in New York. *Id.* Plaintiffs allege that "[i]n reality, there was no medical necessity for the Shah to come to the United States." *Id.* Based on those recommendations, United States officials recommended that President Carter admit the Shah on humanitarian grounds. Plaintiffs allege that President Carter expressed agreement with the recommendation, notwithstanding that it was against American interests to do so, in part because he feared that his Administration would be criticized by Henry Kissinger if the Shah died in Mexico and in part because he credited the reports that New York had the only medical facility capable of possibly saving the Shah's life. *Id.* ¶¶ 50-51. The Shah

arrived in New York on the night of October 22, 1979 and was taken to New York Hospital.  *Id.*

¶ 52.

Plaintiffs claim that Chase had a profit motive in campaigning to have the Shah admitted

to the United States.  *Id.* ¶¶ 11, 72.  They allege:

> Chase had financial interests in preserving the Iranian monarchy. It processed
> billions in dollar-denominated oil revenue for the National Iranian Oil Company. It
> handled the Shah's family fortune in the Pahlavi Foundation. In 1975, it helped
> form the International Bank of Iran, in which it owned a 35% share. By 1979, Chase
> had syndicated more than $1.7 billion in loans for Iranian public projects (the
> equivalent of about $5.8 billion in 2020). Protecting those business interests meant
> protecting the Shah.

*Id.* ¶ 38; *see also id.* ¶ 40.  Project Eagle was an agreement with the Shah and its "immediate

goal was to advance the interests of the Phalavi [sic] monarchy by defeating President Carter's

foreign policy decisions regarding Iran," such as his earlier decision to deny admission to the

Shah.  *Id.* ¶ 40.  It "provided financial and logistical support to the Shah, as well as lobbying and

public relations as the Shah's propagandists."  *Id.* ¶ 42.[3]  Plaintiffs further allege that Chase

"advanced the Phalavi [sic] monarchy's interests by pressuring through threats, deliberate

falsehoods, and other unethical means the United States government to admit the Shah despite

being warned that his presence in the United States likely would trigger another and likely more

disastrous takeover of the American Embassy in Tehran."  *Id.* ¶ 43.  In taking these actions to

protect its business interests, Plaintiffs claim that Chase acted as an unregistered foreign agent of

the Iranian monarchy under the Foreign Agent Registration Act ("FARA").  *Id.* ¶ 7.

After the hostages were seized in November 1979, Plaintiffs allege that Chase had a "new

goal" of sabotaging the hostage talks because of its "direct financial interest in the outcome of

---

[3] The Complaint alleges that the Project Eagle team "orchestrated the Shah's travel, flying him
on private jets," "arranged visas for his entourage and searched out private schools and mansions
for his family," and "brought him to villas in the Bahamas and Mexico and arranged for
bodyguards."  AC ¶ 42.

the Hostage Talks." *Id.* ¶¶ 72, 76; *see also id.* at 18.  On November 14, 1979, President Carter signed Executive Order 12170 freezing all Iranian assets in the United States, including in United States banks, and authorizing banks to use Iranian deposits to satisfy debts owed by Iran to those banks.  *Id.* ¶ 70.  According to the Complaint, "Iran owed Chase more than $300 million" and "Chase sought to collect on those debts from Iranian assets deposited outside of Iran."  *Id.* ¶ 72.  "As part of that effort, [Chase] transferred the dollar balances of the Iranian Central Bank's deposits in London to New York, sparking litigation with Iran's central bank." *Id.*  The hostage talks threatened to undermine Chase's efforts to use those Iranian foreign assets to pay off Iran's debts, however, because Iran was demanding the repatriation of funds deposited in foreign banks under the Shah's regime, including funds deposited with Chase.  *Id.* ¶ 73.  As the 1980 presidential election approached, Plaintiffs allege that Chase grew concerned that President Carter would achieve an "October surprise," whereby the hostages would be released before that year's presidential election, benefitting the incumbent's presidential campaign.  *Id.* ¶ 75.  Thus, in order to sabotage the hostage talks and delay the release of the American hostages, "[t]he Chase team and its collaborators gathered and spread knowingly false rumors about possible payoffs to win the release."  *Id.* ¶ 76.  After Ronald Reagan won the 1980 presidential election, Plaintiffs allege "Chase continued to act as an unregistered foreign agent by advocating for a restoration of the Pahlavi monarchy," and "[a]s late as December 1980, Rockefeller urged the Reagan transition team to encourage a counter-revolution by stopping 'rug merchant type bargaining' for the hostages and taking military action."  *Id.* ¶ 77.  As noted above, the hostages were ultimately released on inauguration day, January 20, 1981.  *Id.* ¶ 78.

Plaintiffs allege that Chase knew that its actions on behalf of the Shah would likely trigger an attack on the American Embassy in Tehran.  *Id.* ¶ 1.  For example, after the attack on

the American Embassy on February 14, 1979, militants in Tabriz set the United States consulate ablaze and strung a rope around the neck of the American consul, threatening to hang him. *Id.* ¶ 46. In Isfahan, the American consul was attacked while trying to save a United States citizen from a mob. *Id.* Rockefeller received a call on March 14, 1979 from Undersecretary Newsom that the government "had intelligence reports from Iran which suggested that, if the Shah were admitted to the United States, the American embassy would be taken and it would be a threat to American lives." *Id.* ¶ 45. Plaintiffs allege Chase actively monitored the political situation in Iran closely and knew that the risk to Americans had increased steadily and substantially since February 14, 1979; it reduced its staff in the country to one secretary. *Id.* ¶ 47.

Plaintiffs allege that it was a direct and proximate result of Chase's actions to have the Shah admitted to the United States that the hostages were captured. They also allege that, as a direct and proximate result of Chase's sabotage of the hostage talks, the hostages were subjected to further prolonger captivity and torture, and that "Chase purposefully and maliciously forced the hostages to languish even longer in their captors' hands." *Id.* ¶ 80.

Plaintiffs bring one federal law claim, for conspiracy to impede or injure an officer of the United States in violation of 42 U.S.C. § 1985(1), and the following eight state law claims: negligence; negligence per se in connection with the Logan Act, 18 U.S.C. § 953; negligence per se in connection with 18 U.S.C. § 372; negligence per se in connection with FARA, 22 U.S.C. §§ 611-621; gross negligence; false imprisonment; intentional infliction of emotional distress; and negligent infliction of emotional distress.

## PROCEDURAL HISTORY

The initial complaint was filed in this action on March 18, 2020. Dkt. No. 1. An initial pretrial conference was held on April 28, 2020, and on May 1, 2020, the Court entered an order providing for the service of initial disclosures, interrogatories, and requests for production, but

ordered that the parties need not submit responses to the requests for production until thirty days

after the Court's decision on the anticipated motion to dismiss.  Dkt. No. 23.  Fact discovery and

expert discovery were stayed except for the service of third party subpoenas.[4]  After Defendants

moved to dismiss on June 5, 2020, Dkt. No. 36, Plaintiffs filed an amended complaint on June

26, 2020, Dkt. No. 39.  A renewed motion to dismiss was filed on July 27, 2020, the opposition

brief on September 8, 2020, Dkt. No. 48, and Defendants' reply on September 22, 2020, Dkt.

No. 49.  Oral argument was held on February 12, 2021.  Dkt. No. 50.

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must

include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on

its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550

U.S. 554, 570 (2007)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Id.*  "Determining whether a complaint states a plausible claim for relief will . . . be a

context-specific task that requires the reviewing court to draw on its judicial experience and

common sense."  *Id.* at 679.  Put another way, the plausibility requirement "calls for enough fact

to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]."

*Twombly*, 550 U.S. at 556; *accord Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46

(2011).  However, although the Court must accept all the factual allegations of a complaint as

true, it is "not bound to accept as true a legal conclusion couched as a factual allegation."  *Iqbal*,

556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  The ultimate issue "is not whether a

---

[4] The Court permitted the parties to serve third party subpoenas to allow them to collect archival
material that Plaintiffs expressed would take a long time to collect.

plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 235-36 (1974)); *see also DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 113 (2d Cir. 2010) ("In ruling on a motion pursuant to Fed. R. Civ. P. 12(b)(6), the duty of a court is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.") (internal quotation marks and citation omitted).

## DISCUSSION

Defendants move to dismiss all claims on grounds of statute of limitations. The issue presented is of importance. Application of the statute of limitations prevents a court from resolving a weighty matter on the merits, can deprive a deserving plaintiff of a remedy and of his day in court, and "often makes it impossible to enforce what were otherwise perfectly valid claims." *United States v. Kubrick*, 444 U.S. 111, 125 (1979). From the perspective of the plaintiff, it is in detriment to the interests of substantial justice. On the other hand, a judicial case is not a history exercise. Where the legal rights of parties are involved, application of a statute of limitations "promote[s] justice by preventing surprises through [plaintiffs'] revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." *R.R. Telegraphers v. Ry. Express Agency, Inc.*, 321 U.S. 342, 348-49 (1944); *see also Kubrick*, 444 U.S. at 117 (statutes of limitations "represent a pervasive legislative judgment that it is unjust to fail to put the adversary on notice to defend within a specified period of time and that 'the right to be free of stale claims in time comes to prevail over the right to prosecute them'") (quoting *R.R. Telegraphers*, 321 U.S. at 349); *Morse v. Univ. of Vt.*, 973 F.2d 122, 123 (2d Cir. 1992) ("[W]ith the passage of time the wrong alleged becomes stale, witnesses die, memories fade so the litigation must be timely commenced or a statute of limitations may bar its continuing."). It also serves the general interest in repose and is thus "vital to the welfare

of society." *Gabelli v. S.E.C.*, 568 U.S. 442, 449 (2013).  At some point, "even wrongdoers are entitled to assume that their sins may be forgotten." *Id.*

"Although the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint." *Ellul v. Congregation of Christian Brothers.*, 774 F.3d 791, 798 n.12 (2d Cir. 2014) (citation omitted); *see also Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 162 (2d Cir. 1989) ("Where the dates in a complaint show that an action is barred by a statute of limitations, a defendant may raise the affirmative defense in a pre-answer motion to dismiss.").  If it appears from a complaint that the claims are prima facie time-barred, the burden is on the plaintiff to "plausibly alleg[e] that they fall within an exception to the applicable statute of limitations." *Twersky v. Yeshiva Univ.*, 993 F. Supp. 2d 429, 436 (S.D.N.Y. 2014), *aff'd*, 579 F. App'x 7 (2d Cir. 2014) (citing cases).  The Court approaches the allegations and arguments with those principles in mind.

### A.    Accrual

As an initial matter, all of Plaintiffs' state law claims are prima facie time-barred. Plaintiffs do not dispute that the state claims accrued upon injury in 1981 and not discovery in 2019 and thus that, absent an exception to the applicable statute of limitations, their claims are time-barred.  *See* Dkt. No. 48 at 22.  Under New York law, the time of injury, not discovery, governs accrual.[5]  *Kronos, Inc. v. AVX Corp.*, 612 N.E.2d 289, 292 (1993).  The alleged injuries here all were sustained while the plaintiffs were held hostage and so, the state law claims accrued, at the latest, at the time of their last injury, i.e., upon their release, forty years ago.  *See Blanco v. Am. Tel. & Tel. Co.*, 689 N.E.2d 506, 510 (1997) (actions for damages for personal

---

[5] The parties agree that New York law applies.  *See* AC ¶ 85; Dkt. No. 43.

injuries accrue "when all of the facts necessary to the cause of action have occurred"); *see also Fisher v. JPMorgan Chase Bank, N.A.*, 740 F. App'x 745, 746 (2d Cir. 2018) (negligence claims accrue when "an injury is sustained" and "[i]t is irrelevant when a person discovers either her injury or the tortfeasor's wrongful conduct"); *Coleman v. Worster*, 35 N.Y.S.3d 354, 356 (2d Dep't 2016) (false imprisonment); *Long v. Sowande*, 810 N.Y.S.2d 195, 198 (1st Dep't 2006) (intentional infliction of emotional distress).  Plaintiffs do not disagree that the statute of limitations as it pertains to each state law claim has since elapsed.

There is no settled law as to when Plaintiffs' claim for conspiracy to impede or injure an officer of the United States in violation of 42 U.S.C. § 1985(1)—Plaintiffs' single federal claim—accrues.

Defendants argue that the Section 1985(1) claim at issue sounds in the common law tort of false imprisonment, which begins to accrue "when the alleged false imprisonment ends." *Watson v. United States*, 865 F.3d 123, 131 (2d Cir. 2017) (quoting *Wallace v. Kato*, 549 U.S. 384, 389 (2007)); *see Panetta v. Cassel*, 2020 WL 2521533, at *5 (S.D.N.Y. May 18, 2020) (stating that for certain claims under Sections 1983 and 1985(3), such as "malicious prosecution, fabricated evidence, and conspiracy to fabricate evidence, the applicable limitations period accrues at the time of the events that caused the injury").  "False imprisonment ends" and accrual begins "once the victim becomes held pursuant to such [legal] process—when, for example, he is bound over by a magistrate or arraigned on charges," and thus, the "timeliness of [Plaintiff's false imprisonment] claim therefore depends on when he began to be held pursuant to legal process." *Watson*, 865 U.S. at 131 (quoting *Wallace*, 549 U.S. at 389).  Defendants rely, in part, on *Wallace v. Kato*, in which the Supreme Court stated that "[a]spects of § 1983 which are not governed by reference to state law are governed by federal rules conforming in general to

common-law tort principles," and that "[u]nder those principles, it is 'the standard rule that [accrual occurs] when the plaintiff has 'a complete and present cause of action,' that is, when 'the plaintiff can file suit and obtain relief.'"  *Wallace*, 549 U.S. at 388 (quoting *Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 201 (1997)).  In *Wallace*, the Supreme Court held, in the Section 1983 context, that the plaintiff had a "complete and present cause of action" for his false arrest claim at the time of his arrest.  *Id.*[6]

In their Complaint, Plaintiffs rely on the "discovery rule."  They allege that their claims "accrued on December 29, 2019 when the *New York Times* first revealed that the records of Project Eagle had been kept under seal at Yale University in March 2017, and revealed publicly the contents of those records" because that is when they discovered "the critical facts revealing that Chase inflicted injuries upon them and the details of how and why it did so."  AC ¶ 106.[7] Reed had donated his secret records of Project Eagle to Yale University on the stipulation that the records remain sealed until Rockefeller's death; Yale University held the records under seal until Rockefeller died on March 20, 2017.  *Id.* ¶¶ 81(g), 84.

At oral argument and in their briefing, however, Plaintiffs have abandoned this argument. It thus cannot provide a basis for relief for that reason alone.  Moreover, the issue is academic. Under the federal injury discovery rule, accrual begins "when the plaintiff knows or has reason

---

[6] Defendants also point to *Manuel v. City of Joliet*, which similarly advises, in the Section 1983 context, that "[i]n defining the contours and prerequisites of a § 1983 claim, including its rule of accrual, courts are to look first to the common law of torts" and "[s]ometimes, that review of common law will lead a court to adopt wholesale the rules that would apply in a suit involving the most analogous tort."  *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 920 (2017) (remanding for Seventh Circuit to determine whether Section 1983 claim should be analogized to common law tort of malicious *prosecution or false arrest for purposes of accrual).*

[7] *David D. Kirkpatrick, How a Chase Bank Chairman Helped the Deposed Shah of Iran Enter the U.S.*, N.Y. Times, Dec. 29, 2019, https://www.nytimes.com/2019/12/29/world/middleeast/shah-iran-chase-papers.html.  AC ¶ 8 n.1.

to know of the injury which is the basis of his action." *Pearl v. City of Long Beach*, 296 F.3d 76, 80 (2d Cir. 2002) (citations omitted). Thus, the result here would be the same regardless of whether Plaintiffs' claim accrued when the injury ended (when their false imprisonment came to an end) or when they became aware of the injury (when they were held hostage). In either event, the statute of limitations on Plaintiffs' Section 1985(1) claim began to run on January 20, 1981—the date the hostages were released from captivity.

Plaintiffs' allegation to the contrary rests on a misreading of a portion of the Supreme Court decision in *Rotella v. Wood*, 528 U.S. 549 (2000). At one point, the Court quotes from its prior decision in *Kubrick* to state that under the discovery rule, a claim does not accrue until a plaintiff becomes aware of "the critical facts that he has been hurt and who has inflicted the injury." *Rotella*, 528 U.S. at 556 (quoting *Kubrick*, 444 U.S. at 122). Plaintiffs would misread the last part of that language to suggest that under the discovery rule, the statute of limitations does not begin to run against a particular defendant until the plaintiff knows that that defendant has caused her injury.

That reading is mistaken. The broader discussion in *Rotella* makes clear that the "critical fact" for purposes of the discovery rule is "discovery of the injury, not discovery of the other elements of the claim." *Id.* at 555. In *Rotella* itself, the Supreme Court declined to accept plaintiff's proposal of an "injury and pattern discovery rule" and held that accrual of a RICO civil action began at the time of discovery of the injury, not when plaintiff discovered the alleged pattern of racketeering activity. It was "emphatic that the justification for a discovery rule does not extend beyond the injury," and that plaintiff's proposal would depart from the "traditional federal accrual rule of injury discovery." *Id.*

In *Kubrick*, from which the *Rotella* Court drew the language, the plaintiff was allegedly the victim of medical malpractice.  At the time the malpractice was committed on him, however, he had no reason to believe that he had been injured.  The harm had not manifested itself and, even then, when it manifested itself, the plaintiff might not have had reason to know that it was as a result of the medical procedure and not naturally occurring.  The Supreme Court made clear that the statute of limitations could not start running until the plaintiff knew he had been injured. *Kubrick* must be understood from its context.  The language is best understood to mean that until a plaintiff knows the critical facts to show he has been injured (i.e., that the illness or affliction he is suffering from is likely the result of an act committed on him) and knows enough to investigate who harmed him, the statute of limitations begins to run.  At that point, "[h]e is no longer at the mercy of the [putative defendant].  There are others who can tell him if he has been wronged, and he need only ask." *Kubrick*, 444 U.S. at 122.  It does not mean that a plaintiff must know of each doctor in the suite for the clock to begin to run against that doctor. *See Gabelli*, 568 U.S. at 450 (the discovery rule was created and "exist[ed] in part to preserve the claims of victims who do not know they are injured and who reasonably do not inquire as to any injury.  Usually when a private party is injured, he is immediately aware of that injury and put on notice that his time to sue is running.  But when the injury is self-concealing, private parties may be unaware that they have been harmed"); *A.Q.C. ex rel. Castillo v. United States*, 656 F.3d 135, 140 (2d Cir. 2011) (describing the *Kubrick* rule as the "diligence-discovery rule" and holding that it "protects plaintiffs who are either experiencing the latent effects of a previously unknown injury or struggling to uncover the underlying cause of their injuries from having their claims time-barred before they could reasonably be expected to sue" while "at the same time . . .

avoid[ing] unduly extending the limitations period for those who could have timely presented

their claim . . . had they acted diligently in protecting their interests").

The Second Circuit thus has held that the statute of limitations does not start anew each

time a plaintiff learns of the involvement of a new defendant.  In *Horn v. Politopoulos*, 628 F.

App'x 33 (2d Cir. 2015), for example, family members of a victim of multiple fatal gunshot

wounds brought a civil rights lawsuit on his behalf within the applicable three-year statute of

limitations against officers identified in a police report as having fired their guns.  They brought

suit against an additional officer six years later, outside of the statute of limitations, after his

identity was revealed in a ballistics report.  Even though plaintiffs were not aware of the

existence of that additional officer until they later received the ballistics report, the district court

granted summary judgment on statute of limitations grounds and the Second Circuit summarily

affirmed.  The Second Circuit repeated what *Rotella*, *Wallace*, and *Gabelli* have stated: a "claim

accrues under federal law when the plaintiff knows, or has reason to know, of the injury on

which the claim is based."  *Id.* at 34. The family's only recourse was to rely on the doctrine of

equitable estoppel which, the Second Circuit held, was unavailable based on the facts of the case.

*Id.* at 34-35.

Even more recently, in *Levy v. BASF Metals Limited*, 917 F.3d 106 (2d Cir. 2019), the

Second Circuit articulated the identical principle.  There, the plaintiff was aware of her injury but

did not sue all the right injurers.  She brought claims for violations of the Commodities

Exchange Act ("CEA"), RICO, the Sherman Act, and New York law against one set of

defendants but did not receive a complete recovery.  She did not know of, and did not sue, a

second set additional defendants until three years later, when she received a copy of the class

action complaint filed by another lawyer asserting similar claims to her own.  The Second Circuit

rejected the argument that the statute of limitations should accrue when she discovered the existence of additional defendants.  It stated: "The relevant inquiry . . . is not whether Levy had discovered the identity of the defendants or whether she had discovered the manipulation scheme she alleges in her complaint.  Rather, the question is when Levy discovered her CEA injury— that is, a loss that was the result of a CEA violation."  *Id.* at 108; *see also Singleton v. City of New York*, 632 F.2d 185, 192 (2d Cir. 1980) ("[F]ederal law . . . 'establishes as the time of accrual that point in time when the plaintiff knows or has reason to know of the injury which is the basis of his action.") (Section 1983 case) (citation omitted); *see also Andrews v. Fremantlemedia, N.A., Inc.*, 613 F. App'x 67, 68 (2d Cir. 2015) ("Claims under § 1981 and § 1985 accrue 'when the plaintiff knows or has reason to know of the injury which is the basis of his action.'") (quoting *Pearl*, 296 F.3d at 80); *cf. Hargroves v. City of New York*, 694 F. Supp. 2d 198, 216 (E.D.N.Y. 2010), *rev'd on other grounds*, 411 F. App'x 378 (2d Cir. 2011) (noting that "§ 1985 actions have not been expressly limited by the *Wallace* accrual rule" and that "§ 1983 and § 1985 are usually treated together").

Those principles squarely apply here.  Plaintiffs' Section 1985(1) claim was complete and accrued in January 1981 when the hostages were released from imprisonment.  Section 1985(1) makes it unlawful, in part, for "two or more persons in any State or Territory [to] conspire to prevent, by force, intimidation, or threat, any person . . . from discharging any duties [in an office, trust, or place of confidence under the United States] . . . or to injure [any officer of the United States] in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof."  42 U.S.C. § 1985(1).  The injury under the statute is the prevention of the officer from the discharge of his duties, or the injury to the officer in his person or property.  That injury was suffered, and the hostages knew of it, when the

hostages were first imprisoned and then later released.  *See Wallace*, 549 U.S. at 389-90

("Limitations begins to run against an action for false imprisonment . . . once the victim becomes

held pursuant to [legal] process.") (internal citations omitted).  It does not matter that, at the time,

Plaintiffs were not aware that the injury was a consequence of a conspiracy by two or more

persons in the United States or a territory of the United States.  *See Rotella*, 528 U.S. at 555-57;

*Koch v. Christie's Int'l PLC*, 699 F.3d 141, 148 (2d Cir. 2012).  Plaintiffs need not know of their

cause of action for the statute of limitations to run.  *See Rotella*, 528 U.S. at 555 (accrual does

not turn on "discovery of the other elements of the claim").  Nor does it matter that Plaintiffs did

not know that Defendants here were among the alleged co-conspirators.  *See Levy*, 917 F.3d at

108-09.  When the hostages were released from captivity, they knew enough to protect

themselves by seeking advice.  *See A.Q.C. ex rel. Castillo*, 656 F.3d at 141-42 ("An accrual date

that turns on when a plaintiff (or his lawyers) finally decides to take action, rather than when the

plaintiff was sufficiently alerted to the appropriateness of seeking legal advice, would render the

limitations period meaningless."); *S.W. ex rel. Marquis-Abrams v. City of New York*, 46 F. Supp.

3d 176, 190 n.10 (E.D.N.Y. 2014) ("Plaintiffs' claims accrued when they knew or should have

known of the fact of defendants' actions, whether or not plaintiffs understood those actions to be

negligent at that time—accrual does not depend on plaintiff's knowledge that the injury in

question constitutes a legal wrong.").

Because the "statute of limitations governing actions brought under 42 U.S.C. § 1985 is .

. . three years," Plaintiffs' federal claim is prima facie time-barred.  *Lilly v. Town of Lewiston*,

582 F. App'x 55, 56 (2d Cir. 2014); *see also Dowe v. Leeds Brown Law, P.C.*, 419 F. Supp. 3d

748, 762 (S.D.N.Y. 2019) ("Claims brought under 42 U.S.C. § 1985—like those under § 1983—

are generally subject to the limitations period provided by state law for personal injury actions.").

### B.      Equitable Estoppel

Plaintiffs argue that Defendants are equitably estopped from asserting the statute of limitations because Defendants prevented the timely filing of this action through misrepresentations upon which Plaintiffs relied.

Equitable estoppel is an "extraordinary remedy," *Pulver v. Dougherty*, 871 N.Y.S.2d 495, 497 (3d Dep't 2009), that is to be "invoked sparingly and only under exceptional circumstances," *Abercrombie v. Andrew Coll.*, 438 F. Supp. 2d 243, 265 (S.D.N.Y. 2006) (quoting *Matter of Gross v. N.Y.C. Health & Hosps. Corp.*, 505 N.Y.S.2d 678, 679 (2d Dep't 1986)); *see generally Twersky*, 993 F. Supp. 2d at 442.  It estops the defendant/wrongdoer who has taken "affirmative steps to prevent a plaintiff from bringing a claim" within the limitations period from arguing that the plaintiff is at fault and should be precluded from bringing a claim for failure to bring it within that limitations period. *Zumpano v. Quinn*, 849 N.E.2d 926, 929 (2006).  It is available where "defendant's affirmative wrongdoing . . . produced the long delay between the accrual of the cause of action and the institution of the legal proceeding." *Gen. Stencils, Inc. v. Chiappa*, 219 N.E.2d 169, 171 (1966); *see also Putter v. N. Shore Univ. Hosp.*, 858 N.E.2d 1140, 1142 (2006) ("[E]quitable estoppel . . . preclude[s] a defendant from using the statute of limitations as a defense 'where it is the defendant's affirmative wrongdoing which produced the long delay between the accrual of the cause of action and the institution of the legal proceeding.'") (citation omitted).

Plaintiffs must plead three elements to establish equitable estoppel under New York law for their state law claims.  First, equitable estoppel applies when a "defendant 'wrongfully induced the plaintiff to refrain from timely commencing an action by deception, concealment, threats or other misconduct.'" *Overall v. Est. of Klotz*, 52 F.3d 398, 404 (2d Cir. 1995) (quoting *Zoe G. v. Frederick F.G.*, 617 N.Y.S.2d 370, 371 (2d Dep't 1994)); *see Abbas v. Dixon*, 480 F.3d

636, 642 (2d Cir. 2007) (equitable estoppel may be invoked "when the plaintiff was induced by fraud, misrepresentations or deceptions to refrain from filing a timely action") (quoting *Doe v. Holy See (State of Vatican City)*, 793 N.Y.S.2d 565, 568 (3d Dep't 2005)); *see also Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 172 (S.D.N.Y. 2019) (recognizing "'threats or other misconduct' as possible forms of wrongful inducement"). The courts draw "an important distinction between fraudulent concealment of the existence of a cause of action and fraudulent concealment of facts that, if known, would enhance a plaintiff's ability to prevail as to a cause of action of which the plaintiff was previously aware." *Pearl*, 296 F.3d at 84. Concealment of facts that would enhance the plaintiff's ability to prevail is not sufficient to invoke equitable estoppel. *See id.* Moreover, "[a]bsent affirmative conduct on the part of the defendant, 'the plaintiff must demonstrate a fiduciary relationship . . . which gave the defendant an obligation to inform him or her of facts underlying the claim.'" *Twersky*, 993 F. Supp. 2d at 442 (quoting *Zumpano*, 849 N.E.2d at 930). Second, "the plaintiff must demonstrate reasonable reliance on the defendant's misrepresentations" for equitable estoppel to apply. *Zumpano*, 849 N.E.2d at 929; *see also Pahlad v. Brustman*, 33 A.D.3d 518, 519-20 (1st Dep't 2006). Finally, a plaintiff must allege "due diligence in bringing a claim when the conduct relied upon as the basis for equitable estoppel ceases to be operational." *Twersky*, 993 F. Supp. 2d at 443; *see Simcuski v. Saeli*, 377 N.E.2d 713, 717 (1978) ("[D]ue diligence on the part of the plaintiff in bringing his action is an essential element for the applicability of the doctrine of equitable estoppel, to be demonstrated by the plaintiff when he seeks the shelter of the doctrine.").

The principle of equitable tolling under federal law applicable to Plaintiffs' federal claim is similar to the principle of equitable estoppel under New York law applicable to Plaintiffs' state

law claims.[8]  *See, e.g.*, *Diaz v. City Univ. of N.Y.*, 2015 WL 13746673, at *6 (S.D.N.Y. Nov. 16, 2015) (describing equitable estoppel as "strikingly similar to the federal principle"); *Dowe*, 419 F. Supp. 3d at 762 n.7 (same).  To toll the statute of limitations for a federal claim, a plaintiff must establish "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing."  *Menominee Indian Tribe of Wisc. v. United States*, 136 S. Ct. 750, 755 (2016) (quoting *Holland v. Florida*, 560 U.S. 631, 649 (2010)).  To establish the particular type of tolling known as fraudulent concealment, which is relied upon here, a plaintiff must demonstrate that "(1) the defendant wrongfully concealed material facts relating to defendant's wrongdoing; (2) the concealment prevented plaintiff's discovery of the nature of the claim within the limitations period; and (3) plaintiff exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled."  *Corcoran v. N.Y. Power Auth.*, 202 F.3d 530, 543 (2d Cir. 1999).  The rationale behind the doctrine "is to prevent a defendant from 'concealing a fraud, or committing a fraud in a manner that it concealed itself until such time as the party committing the fraud could plead the statute of limitations to protect it.'"  *State of N.Y. v. Hendrickson Brothers*, 840 F.2d 1065, 1083 (2d Cir. 1988) (quoting *Bailey v. Glover*, 88 U.S. 342, 349 (1874)).

### 1.    Alleged Misconduct

None of Plaintiffs' allegations, viewed individually or collectively, establish equitable estoppel of their state law claims and equitable tolling of their federal claim.

---

[8] "For federal claims that borrow state statutes of limitation," such as the Section 1985 claim that borrows the three-year statute of limitations for personal injury actions under New York law, "courts 'borrow not only a state's limitations period but also its 'tolling rules.'"  *Dowe*, 419 F. Supp. 3d at 762 (quoting *Pearl*, 296 F.3d at 80); *see also Abbas*, 480 F.3d at 641 ("Although federal law determines when a section 1983 claim accrues, state tolling rules determine whether the limitations period has been tolled, unless state tolling rules would 'defeat the goals' of section 1983.") (quoting *Pearl v*, 296 F.3d at 80).

Certain of the allegations concern conduct that postdated the end of the statute of limitations.  Plaintiffs allege that in his 2002 memoir, "Rockefeller claimed that aside from a side comment at an April 1979 meeting involving President Carter, he 'did nothing more publicly or privately to influence the administration's thinking'" and stated "there was never a 'Rockefeller-Kissinger' behind-the-scenes campaign that placed 'relentless pressure' on the Carter administration to have the Shah admitted to the United States regardless of the consequences."  AC ¶ 81(a).  Plaintiffs also allege Reed denied the existence of Project Eagle to congressional and FBI personnel in 1992 and 1993, which led congressional reports issued in 1992 and 1993 to "not once mention Chase Manhattan Bank, David Rockefeller, or Joseph Reed" and to "gloss[] over Chase's deep involvement in provoking and prolonging the Iranian hostage crisis."  *Id.* ¶¶ 81(e)(2), (f).  This conduct occurred in 2002 and 1992 respectively.  The statute of limitations ran in 1984.  By definition, this conduct could not have been intended to induce Plaintiffs to refrain from timely commencing an action or even have had that effect.  The claims were already stale by the time of the alleged actions.  *See Koch*, 699 F.3d at 157 ("While [plaintiff] makes specific allegations with respect to [certain events in 2006], the District Court correctly found that those allegations were irrelevant because the statute of limitations had already run by that time."); *see also Katopodis v. Marvin Windows & Doors*, 964 N.Y.S.2d 123, 124 (1st Dep't 2013); *Powers Mercantile Corp. v. Feinberg*, 490 N.Y.S.2d 190, 194 (1st Dep't 1985), *aff'd*, 494 N.E.2d 106 (1986).  The allegations also fail because the conduct alleged did not conceal the elements of Plaintiffs' causes of action, as pleaded here, which involve that the Shah was the client of Chase and that Rockefeller advocated on behalf of the Shah, allegedly leading Iran both to take the hostages captive and to prolong their captivity.  At best, they

involve conduct—such as the extent of the pressure put on the Carter administration—that would have enhanced Plaintiffs' ability to prevail.

Other conduct involves Defendants' alleged failure to confess.  Plaintiffs complain that Reed initially refused to speak to the investigators and that Chase failed to register as a foreign agent under FARA.  AC ¶¶ 81(d), (e)(1).  Plaintiffs also allege that Reed refused to permit Yale University to publish the Project Eagle papers until after Rockefeller's death.  *Id.* ¶ 81(g).  But the statute of limitations does not accord its benefits only to those who confess within its time limits.  Such a reading would render its protections illusory.  "Absent a fiduciary relationship, such passive concealment falls short of the sort of specific and affirmative misrepresentation required to trigger an equitable estoppel defense."  *Twersky*, 993 F. Supp. 2d at 444 (rejecting claim that failure to report known abuse to authorities and to disclose the abuse publicly is sufficient to invoke equitable estoppel); *see also Zumpano*, 849 N.E.2d at 929 ("It is not enough [for equitable estoppel purposes] that plaintiffs alleged defendants were aware of the abuse and remained silent about it."); *Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 566 (S.D.N.Y. 2013) (a party cannot rely on silence "[i]n the absence of a duty to speak").  Reed's failure to speak to investigators and his failure to permit the publication of the Project Eagle papers earlier thus do not constitute affirmative acts that frustrated Plaintiffs' ability to timely commence their action.  Plaintiffs had no right to rely on a confession or the ability to get the papers in the first place.  Ordinarily, a plaintiff only gets the right to obtain private papers and to question the defendant *after* commencing timely litigation.  The fact that Plaintiffs here received the Project Eagle papers but only after the limitations period expired thus cannot have the effect of extending that limitations period.

Similarly, Plaintiffs' argument that Chase's failure to register under FARA extends the statute of limitations is of breathtaking implications.  The law regarding who must register as a foreign agent is complicated and, at least at the margins, can admit of arguments on both sides.  But even Plaintiffs admitted at argument that the failure to register does not *ipso facto* constitute an act of fraudulent concealment delaying the clock in every case where the fact of registration and the admission it would embody would enhance a plaintiff's ability to sue and prevail.  *See* Hr'g Tr. at 17:5-21.  Such is the case here.

Finally, Plaintiffs' allegations with respect to other alleged acts of concealment fail because Plaintiffs do not allege either that they were "take[n] . . . to prevent [the] plaintiff from bringing a claim," or that they induced Plaintiffs not to bring a timely suit.  *Zumpano*, 849 at 929.  The case law thus draws a distinction between misrepresentations made to the "community at large," *Doe v. Kolko,* 2008 WL 4146199 at *4 (E.D.N.Y. Sept. 5, 2008), and "specific misrepresentation[s] [or] deceptive conduct sufficient to constitute a basis for equitable estoppel," *Zumpano*, 849 N.E.2d at 930.  The former is insufficient to make out a claim for equitable estoppel "in light of the specificity requirement in the equitable estoppel standard; equitable estoppel is only 'appropriate where the plaintiff is prevented from filing an action within the applicable statute of limitations due to defendants' misconduct toward the potential plaintiff, not a community at large.'"  *Twersky*, 993 F. Supp. 2d at 445 (quoting *Kolko*, 2008 WL 4146199, at *4).

The 1981 statement by Rockefeller to a hostage—who is not a plaintiff in this action—that he "barely knew" the Shah, AC ¶ 81(b), and another 1981 statement by Rockefeller to the New York Times that "[m]isrepresented to the public [Defendants'] actual financial interest in the Shah's dynasty" when Rockfeller said "[t]here may have been small accounts of

convenience, but they had no real significance," *id.* ¶ 81(c), fall into this category.  These alleged misrepresentations are insufficient to invoke equitable estoppel because they did not conceal Plaintiffs' cause of action.  As discussed below, the New York Times article revealed the basic facts upon which Plaintiffs base their claim.  Even if it did not, however, and focusing solely on Rockefeller's statements, Plaintiffs' claim of equitable estoppel would fail because the causes of actions, as pleaded here, do not turn on the magnitude of Chase's financial interests with the Shah or the extent of Rockefeller's personal relationship with him but rather the fact of those interests that were frozen by President Carter in 1979 and that, Plaintiffs claim, Chase sought to collect, and the conduct allegedly taken by Chase in pursuit of those interests.  *See id.* ¶¶ 70-73.

Plaintiffs' allegations also fail, however, because they do not allege that they were directed to Plaintiffs for the purpose of frustrating the bringing of a timely claim.  Plaintiffs do not allege they even heard the statement made by Rockefeller to another hostage.  The fact that these Plaintiffs have included that hostage or his family in the putative class of unnamed potential plaintiffs does not excuse their failure to bring a timely claim.  The equitable estoppel claim is personal.  A lie to Person A cannot support a claim of equitable estoppel by Person B absent some showing that the misrepresentation affected the ability of Person B to bring a timely claim.  *See Warren v. Garvin*, 219 F.3d 111, 113 (2d Cir. 2000) ("Equitable tolling is a doctrine that permits courts to extend a statute of limitations on a case-by-case basis to prevent inequity."); *Knox v. John Varvatos Enters. Inc.*, 282 F. Supp. 3d 644, 658-59 (S.D.N.Y. 2017) ("[E]quitable tolling is [] concerned with . . . the diligence of a plaintiff who is seeking the application of the doctrine" and thus, "as the Second Circuit has formulated the rule, 'when determining whether equitable tolling is applicable, a district court must consider . . . *the person*

*seeking application of the equitable tolling doctrine*'") (quoting *Zerilli-Edelglass v. N.Y.C. Transit Auth.*, 333 F.3d 74, 80-81 (2d Cir. 2003)).

The New York Times statement, on its face, was not addressed to Plaintiffs but to the "community at large." *Kolko,* 2008 WL 4146199 at *4. It may be that a statement to a third party, even a news organization, would be sufficient to invoke equitable estoppel if it is directed to a plaintiff or intended to frustrate his ability to timely sue. It is not the medium through which a message is conveyed but the content of that message and the purpose behind it that are critical for equitable estoppel. But there are no plausible allegations that Defendants used the New York Times article to frustrate the bringing of a timely claim or that the article was directed to Plaintiffs as opposed to the more general public in response to public concerns. The article, which was based on interviews with more than 50 people, including the first interview with President Carter on the Iranian hostage crisis since leaving office, reported on an event of national interest that may have turned a presidential election and, in the words of the article, caused national trauma and led to "the shattering of relations between the United States and Iran [and] the altering of relations between the United States and Iran." Dkt. No. 44-2. The comments by Rockefeller are stated to be responsive to charges from the press; they are not aimed at the hostages. In the article, Rockefeller is quoted as stated: "Contrary to what has been said by a number of people . . . we have never been the (personal) bankers for the Shah or his family or the Pahlevi Foundation. There may have been small accounts of convenience, but they had no real significance." *Id.*[9] In the very next sentence, the article credits Plaintiffs' allegation

---

[9] In reviewing a Rule 12(b)(6) motion, the Court may consider "facts alleged in the complaint and documents attached to it or incorporated in it by reference" and "documents 'integral' to the complaint and relied upon in it, even if not attached or incorporated by reference." *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 568 F. Supp. 2d 349, 352 n.1 (S.D.N.Y. 2008); *see Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) ("We have previously

that Defendants had a financial relationship with the Iranian government when it says:
"Rockefeller does not deny that the financial relationship between Chase Manhattan and the
Shah's Government was clearly significant." *Id.*

Two cases are illustrative. In *Kolko*, plaintiffs were former students of a Jewish day
school who alleged that a rabbi sexually abused them three decades earlier. Plaintiffs argued for
equitable estoppel on the basis that the school "contacted family members of victims and
threatened that their children would be expelled from the Yeshiva and prevented from attending
other yeshivas if they pursued claims," victims were threatened with "retaliation and ostracism
from their Orthodox Jewish Community if they pursued their claims," and the school's
representative "repeatedly stated that a 1985 Rabbinical Court cleared [the rabbi] of allegations
of sexual abuse by other victims" and "repeatedly stated that he was unaware of any allegations
of sexual abuse or any sexually inappropriate conduct of [defendants]." *Kolko*, 2008 WL
4146199, at *4. The court rejected plaintiffs' argument that they need not allege
misrepresentations or deceptive conduct directed specifically at them and that misrepresentations
to the public or community at large were sufficient as betraying a "fundamental
misunderstanding of the equitable estoppel doctrine." *Id.* It stated: "Equitable estoppel is
appropriate where the plaintiff is prevented from filing an action within the applicable statute of

---

held that it is proper to take judicial notice of the fact that press coverage . . . contained certain
information, without regard to the truth of [the] contents," in deciding inquiry notice); *Roth v.
Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) ("If the court takes judicial notice, it does so in order
to determine what statements [they] contained – but again not for the truth of the matters
asserted.").

The New York Times article is quoted and cited in the Amended Complaint and the full article is
provided by Defendants. Terence Smith, *Why Carter Admitted the Shah*, N.Y. Times, May 17,
1981, https://www.nytimes.com/1981/05/17/magazine/why-carter-admitted-the-shah.htm. *See*
AC ¶ 81(c) & n.15; Dkt. No. 44-2.

limitations due to defendants' misconduct toward the potential plaintiff, not a community at large." *Id.* Plaintiffs had not alleged how the conduct they identified stopped them from filing suit or that "defendants . . . directed these tactics at them as plaintiffs' allegations establish that defendants targeted 'victims,' not [the plaintiffs themselves]." *Id.*

In *Twersky*, the court likewise rejected arguments that misrepresentations made by the defendants "to the school community at large about the trustworthiness and moral uprightness of the [alleged child] abusers" was sufficient to invoke equitable estoppel. *Twersky*, 993 F. Supp. 2d at 445. The defendants there "continued to make frequent and regular representations, *in school events attended by students, and in school publications received by students, parents, former students, and alumni*, that [the alleged abuser] was highly regarded by [the school], that [he] remained in good standing, that [he] was a man of strong moral character, that [he] was a trustworthy man, and that [he] was a positive role model for boys and well-suited to lead them in their journey to learning traditional Jewish principles and traditions and how to live based on the sacred tenets of the Torah." *Id.* Notwithstanding that the plaintiffs were former students and thus members of the community to whom the representations were directed, the court held that the allegations failed the "specificity" requirement of *Zumpano*. *Id.*

If the allegations in *Kolko* and *Twersky* were not sufficient to establish equitable estoppel, it follows *a fortiori* that the more general statements here that Rockefeller made to the New York Times regarding the significance of the Shah's personal financial interests with Chase cannot establish equitable estoppel. The statements here were not, like those in *Kolko* and *Twersky*, directed to a specifically targeted audience of which the plaintiffs were members. The statements also did not concern claims that in the minds of the speakers would reasonably give rise to legal liability by members of that particular community. They were made to a newspaper

of worldwide circulation in response to questions of widespread public interest.  Even if the

Plaintiffs here happened to read the articles and even if these statements happened to make

pursuit of this case less fruitful, Plaintiffs have not shown that the statements were sufficiently

directed at them to deprive Defendants of their statute of limitations defense.  *See also Weinstein*

*v. City of New York*, 622 F. App'x 45, 46 (2d Cir. 2015) (refusing to apply tolling where

appellant's "excuse for his delay" was "that the defendants concealed emails that would have

provided factual support for his claims"); *Rene v. Jablonski*, 2009 WL 2524865, at *7 (E.D.N.Y.

Aug. 17, 2009) (no tolling where evidence "did not interfere with plaintiff's awareness of his

causes of action, or otherwise interfere with his ability to file a timely lawsuit to vindicate his

rights").

### 2.      Reasonable Reliance and Due Diligence

Plaintiffs' attempt to secure equitable estoppel also fails for a second reason: even

assuming they saw the alleged misrepresentations and relied on them, they have not

demonstrated how such reliance was reasonable and dissuaded them from learning of their cause

of action or timely bringing suit.  The New York Times article discussed in the previous section,

entitled "Why Carter Admitted the Shah" and published on May 17, 1981, disclosed the basic

facts upon which they base their causes of action.  *See* AC ¶ 81(c) n.15; Dkt. No. 44-2.

In particular, from the article and from their general knowledge, Plaintiffs would have

known the "critical facts that [they] [had] been hurt," i.e., their physical injury at the time they

were held hostage in 1979, and "who has inflicted the injury," i.e., the Chairman of Chase, the

Chairman of Chase's Board of Advisers, and the former Chairman of Chase and current attorney.

*Rotella*, 528 U.S. at 556.  That is because the article described the decision of President Carter to

admit the Shah into the United States as "a calculated political gamble taken in response to

highpressure lobbying within and outside the Administration and with an eye on the upcoming

Presidential campaign [which] led directly to the trauma of the following weeks and months: the seizure of the American hostages in Teheran [sic] . . . the shattering of relations between the United States and Iran, the altering of strategic realities in the oil-rich Persian Gulf." Dkt. No. 44-2. It also described the persons allegedly involved in that decision, including the individuals named in the Complaint: "[a] high-powered, financial and political 'old-boy network'— including David Rockefeller . . . Henry A. Kissinger . . . [and] John J. McCloy—waged a campaign on behalf of the Shah's admission that was far more intensive than has previously been disclosed." *Id.* The article even stated that "the decision Carter made [to admit the Shah into the United States] was the proximate cause of the takeover and all that followed." *Id.* It also described the criticism Rockefeller faced for his involvement, noting that "[t]oday, Rockefeller charges that his motivations have been 'monstrously distorted' by the press, pointing particularly to suggestions that he acted solely out of concern for Chase Manhattan's profits." *Id.* McCloy is also linked to Chase, where he is described as "a former chairman of the Chase Manhattan Bank" and whose law firm represented both "the Pahlevi [sic] family in many legal matters" and "Chase Manhattan Bank." *Id.*

Plaintiffs do not dispute that the material allegations and the persons accused in the news article are the same as those in the Complaint. They argue instead that their failure to investigate and their delay in bringing suit are justified because the 1981 article and the "numerous accounts" were viewed as a Washington conspiracy theory that lacked credibility. *See* AC ¶ 83; Dkt. No. 48 at 3. In essence, they appear to be claiming that as far back as 1981 they were entitled to consider the article to be "Fake News." The claim is ironic from Plaintiffs who now rely on an article from the very same publication upon which to base their claim. In any event,

that claim is put to rest by *Shah v. Meeker*, 435 F.3d 244 (2d Cir. 2006) (and its progeny) and by *Kolko*.

In the former, the Second Circuit held that allegations in a mainstream publication (there, Fortune magazine) were sufficient to put plaintiffs on inquiry notice; the clock could not be stopped on the basis that the information was in a news publication.  *Shah*, 435 F.3d at 249-51; *see also In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 489 & n.38 (S.D.N.Y. 2017) ("[C]lass plaintiffs had every basis, in real time, to smell a rat" where they based the complaint "on voluminous news articles and other public sources, many published well before [statute of limitations ended]" which "supports a finding that plaintiffs were on inquiry notice"); *Woori Bank v. Merrill Lynch*, 923 F. Supp. 2d 491, 497 (S.D.N.Y. 2013), *aff'd*, 542 F. App'x 81 (2d Cir. 2013) (dismissing complaint as time-barred where it relied on "extensive publicly available information" to support its claims); *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 60 F. Supp. 3d 479, 504 (S.D.N.Y. 2014), *aff'd*, 873 F.3d 85 (2d Cir. 2017) ("Courts have held that a duty of inquiry was triggered when . . . when a news article 'specifically describ[ed],' with a high 'degree of specificity,' the misconduct alleged in the plaintiff's complaint") (quoting *Shah*, 435 F.3d at 251); *cf. Kronisch v. United States*, 150 F.3d 112, 122 (2d Cir. 1998) ("[E]ven if plaintiff's awareness of his injury and its cause prior to December 1979 could only be characterized as a mere 'hunch' or 'suspicion,' plaintiff would still have been under a duty to diligently investigate his claim.").[10]

In the latter, the court held that plaintiffs did not reasonably rely on the defendant school's false denials of abuse because "facts included in the amended complaint" demonstrated

---

[10] *Shah* was abrogated by the Supreme Court in *Merck & Co. v. Reynolds*, 559 U.S. 633, 643 (2010) but on other grounds.

that plaintiffs had "been on notice since early 1985 that reports of abuse surfaced which culminated in a legal proceeding against [defendant rabbi] before a Rabbinical Court." *Kolko*, 2008 WL 4146199, at *5; *see also Putter*, 858 N.E.2d at 1141-43 (rejecting claim of reliance on doctor's false denial of claim because "given [the plaintiff's] level of awareness" of his injury and its likely source, he "had sufficient information available to require him to investigate whether there was a basis for a medical malpractice action"; "[the] statement did not alter [the plaintiff's] timely awareness of the facts requiring him to make further inquiry before the statute of limitations expired").

As a final fallback, Plaintiffs also claim that in deciding not to bring suit, they relied on the 1993 House report that concluded that "wholly insufficient or not credible evidence exists to substantiate" Defendants' role in prolonging the hostage crisis, and thus Plaintiffs "had no reason to doubt Congress' conclusions and had no reason to believe that they had a cause of action against Chase." AC ¶ 83. But this report was issued several years past the statute of limitations had run and more than a decade after the article issued in 1981. To meet the standards for the application of both equitable estoppel and equitable tolling, Plaintiffs must allege that specific actions by Defendants somehow kept them from becoming aware of the existence of a cause of action or from timely bringing suit. They have not done so here.

For these reasons, Plaintiffs' argument for tolling the statute of limitations must be rejected.

**CONCLUSION**

The motion to dismiss is GRANTED.  Plaintiffs' remaining arguments are denied as moot.

The Clerk of Court is respectfully directed to close Dkt. No. 42 and to terminate the action.


SO ORDERED.

Dated: February 26, 2021
     New York, New York

                                       LEWIS J. LIMAN
                              United States District Judge